UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 16-23300-CIV-WILLIAMS

BALEARIA CARIBBEAN LTD., CORP.
a/k/a BALEARIA CARIBBEAN LTD.,

        Plaintiff,

vs.

HERNAN CALVO,

        Defendant.

_____/

## ORDER

**THIS MATTER** is before the Court on Defendant Hernan Calvo's motion to

dismiss the Complaint (DE 20), to which Plaintiff Balearia Caribbean Ltd., Corp. ("BCL"

or "Balearia Caribbean") filed a response in opposition (DE 26) and Calvo filed a reply in

support (DE 32).[1]  For the reasons below, Calvo's motion (DE 20) is **DENIED**.

## I.   BACKGROUND

BCL, a corporation that operates a ferry service between Fort Lauderdale,

Florida and Grand Bahama, Bahamas, brings this trade secrets and breach of fiduciary

---

[1] Calvo's motion argues in the alternative for summary judgment as to Count I of the
Complaint.  (DE 20 at 10-12).  BCL filed a separate response in opposition to the
summary judgment aspects of Calvo's motion (DE 27) and Calvo filed a separate reply
in support of these arguments (DE 31).  Calvo acknowledges that Local Rule 7.1(c)(2)
prohibits litigants from filing more than one motion for summary judgment without leave
of Court.  (DE 20 at 9 n.5).  Accordingly, he requests that the Court grant "leave to move
for summary judgment on this one discreet [cause of action] without waiving his right to
move for summary judgment on all issues later in the case" or, if the Court is not
inclined to permit such a later motion, that "the Court not . . . consider his arguments for
summary judgment."  (DE 20 at 9-10 n.5).  BCL "submits the Court should not consider
Calvo's Rule 56 Motion at this early stage, unless it is with prejudice to his ability to file
successive motions."  (DE 27 at 2).  Thus, at this preliminary stage of the litigation, the
Court adopts the option consistent with both Parties' preferences and declines to
consider Calvo's arguments for summary judgment.  Consequently, Calvo may file a
later motion for summary judgment as to any issue in this case.

duty case against its former CEO, Hernan Calvo, alleging "a months-long scheme by Calvo enacted just prior to his planned departure from Balearia Caribbean" to misappropriate BCL's confidential information for improper purposes.  (DE 1 ¶ 8; *see also* DE 1 ¶ 11).

BCL is part of the "Balearia Group" of companies, which also operates ferry services in the Mediterranean Sea and employs about 1,800 people.  (DE 1 ¶¶ 12, 16). The Balearia Group's principal operating holding company, Balearia Eurolineas Maritimas, S.A. ("BEM"), is based in Valencia, Spain.  (DE 1 ¶ 12).  Calvo began working in Europe for the Balearia Group in September 2007.  (DE 1 ¶ 13).  During his early tenure, he worked closely with BEM's President, Adolfo Utor.  (DE 1 ¶ 13).  In January 2013, the Balearia Group transferred Calvo to South Florida to oversee BCL, which has about 100 employees.  (DE 1 ¶¶ 14, 16).  A month later, Calvo became BCL's CEO.  (DE 1 ¶ 14).

Nineteen months into his tenure as CEO, in November 2014, Calvo purchased a personal laptop computer and had BCL's Director of Information Systems configure the device to access BCL's business information.  (DE 1 ¶ 15).  A company within the Balearia Group, Nautas Technologies S.A. ("Nautas"), was responsible for "implement[ing] the procedures and safeguards for protecting the confidentiality and security of trade secrets and proprietary information of . . . Balearia Caribbean."  (DE 1 ¶ 17).  Nautas did this by establishing three tiers of data access for employees within the Balearia Group.  (DE 1 ¶¶ 18-19).  Top-tier executives like Calvo had access to the highest level of company information, including partial access to the "MIS" application containing financial data.  (DE 1 ¶¶ 19-22).  Even though Calvo's access to MIS was

2

"limited to Balearia Caribbean's operations in Florida and the Bahamas," he "was one of seven employees in the entire Balearia Group to have access to" BCL's most sensitive financial information. (DE 1 ¶ 22). Calvo also had a "proprietary company email" through which he received a "monthly Economic Report, which contained more detailed confidential and proprietary information regarding Balearia Caribbean's financial performance data than that contained in the MIS." (DE 1 ¶ 23).

On March 30, 2015, Calvo began negotiating a business deal (the "Ferry Deal") on BCL's behalf to provide a ferry service between Miami, Florida and a casino in Bimini, Bahamas owned by Genting Group ("Genting"). (DE 1 ¶¶ 24-25). Three months into negotiations, Calvo "secretly inserted an electronic command into his Balearia Caribbean email addresses . . . which ensured that all email communications received by Calvo at his Balearia Caribbean email addresses would be surreptitiously forwarded in their entirety to a private Gmail account Calvo had set up." (DE 1 ¶ 26). Three days after inserting this command, Calvo "unilaterally called off negotiations with Genting" but "did not inform anyone at Balearia Caribbean of his instituted 'delay' in negotiations." (DE 1 ¶ 27). Then, on August 14, 2015, Calvo called Utor to say he was resigning his position as BCL's CEO to move into the energy industry and work for a company called Plastic Energy. (DE 1 ¶ 28). Utor convinced Calvo to remain BCL's CEO until October 30, 2015 to train his replacement, Jose Vicente Herrero Gomez ("Herrero"), and asked Calvo to keep Herrero "fully informed of Calvo's day-to-day undertakings as CEO." (DE 1 ¶ 29).

Then, on August 29, 2015, Calvo—unbeknownst to Herrero or to anyone else at BCL, and acting as BCL's exclusive agent—responded to an August 26, 2015 inquiry

3

from Genting to set up a September 8, 2015 meeting to continue discussions about the Ferry Deal. (DE 1 ¶¶ 30-32). Several days after sending this response, but before the September 8 meeting, Calvo started requesting BCL financial information and reports from employees, including BCL's Senior Financial Officer Erik Brignetti and Sales and System Specialist Manager Mario Otero. (DE 1 ¶¶ 35-39).

Calvo resigned as BCL's CEO on October 30, 2015. Before resigning, he advised Utor that he "would not be engaging in any activity after his departure that would be competitive with Balearia Caribbean in the geographic zones where Balearia Caribbean operates" and told colleagues that he was "leaving the ferry business and would be dedicating himself to a new business involving synthetic fuel development from end-of-life plastics." (DE 1 ¶ 40). In light of these representations, Utor authorized BCL to cover Calvo's housing expenses for the three months after his departure. (DE 1 ¶ 40). Because Calvo did not surrender his laptop after resigning, and because he had forwarded work emails to his personal account, he continued to have access to BCL's sensitive financial data, communications with Genting regarding the Ferry Deal, and details about favorable incentives offered by the Bahamian government. (DE 1 ¶ 39).[2]

On January 8, 2016, months after Calvo's resignation, Genting approached BCL to renew negotiations on the Ferry Deal, but "nobody at Balearia Caribbean could locate

---

[2] In light of this alleged access, BCL filed along with its Complaint an *ex parte* request for seizure of the laptop and temporary restraining order. (DE 4). The Court held an *ex parte* hearing on BCL's motion on August 4, 2016 and, afterwards, issued a temporary restraining order but declined to order the laptop's *ex parte* seizure. (DE 10). The Court later dissolved the temporary restraining order (DE 13) based on the Parties' stipulation (DE 12), in which Calvo agreed to deliver his laptop to counsel to allow computer forensics examiner Richard D. Connor, Jr. Esq. to conduct a "forensic imaging of the hard drive." (DE 12 ¶¶ 1-2). The stipulation permitted Connor to return Calvo's laptop to counsel after the imaging and placed restrictions on Calvo's use of BCL information during the pendency of this litigation. (DE 12 ¶¶ 3-4).

Balearia Caribbean's internal file for the Genting Ferry Deal or any information about the history of the negotiations over the Genting Ferry Deal, which had been kept exclusively by Calvo as the sole Balearia Caribbean negotiator for the Genting Ferry Deal." (DE 1 ¶ 42). Accordingly, on March 15, 2016, Utor emailed Calvo asking him for information about the Ferry Deal. (DE 1 ¶ 43). In this same email, Utor expressed concern about rumors he had heard that Calvo independently contacted Genting to consummate a deal between Genting and BCL's competitor, Silvia Ana. (DE 1 ¶ 43). Calvo responded to Utor the next day claiming he had "no idea what was going on with the Genting Ferry Deal" and that he would get back to Utor if he learned anything—although he never followed up. (DE 1 ¶ 44). Utor then sent Calvo several emails reminding Calvo of "his agreement to not act against the interests of Balearia Caribbean," but Calvo did not respond. (DE 1 ¶ 45). Finally, on June 18, 2016, Utor sent Calvo an email that "emphasized that any work product Calvo generated while employed as CEO of Balearia Caribbean is the property of Balearia Caribbean, and warned that any use by Calvo . . . must be disclosed to Balearia Caribbean." (DE 1 ¶ 48).

Three days later, on June 21, 2016, Genting informed BCL that it had executed an agreement with FRS-Fast Reliable Services LLC ("FRS"), a subsidiary of Balearia Group's Mediterranean competitor Förde Reederei Seetouristik GmbH & Co and a new entrant into the Caribbean ferry market, to provide a Miami to Bimini ferry service. (DE 1 ¶ 46). The same day, BCL obtained a photograph of the ferry that FRS planned to use, which had an internet domain name painted on the side registered to a company Calvo owns. (DE 1 ¶ 53). The FRS-Genting also included certain terms that BCL believes are attributable to Calvo's assistance and to the information that Calvo took

from BCL before his departure. (DE 1 ¶¶ 46, 50-51, 52). In light of this evidence, BCL

sent a cease-and-desist letter to Calvo and FRS, to which FRS responded on June 23,

2016 acknowledging that FRS had a business relationship with Calvo and Genting. (DE

1 ¶ 54).

BCL's Complaint brings three causes of action against Calvo for damages: (1)

misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"),

18 U.S.C. § 1836(b); (2) breach of duty of loyalty under Fla. Stat. § 607.0831; and (3)

breach of fiduciary duty under Florida law. Separately, BCL brings a fourth cause of

action seeking a permanent injunction pursuant to the DTSA, 18 U.S.C. § 1836(b)(3)(A).

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts

to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court's

consideration is limited to the allegations in the complaint. *See GSW, Inc. v. Long Cty.*,

999 F.2d 1508, 1510 (11th Cir. 1993). All factual allegations are accepted as true and

all reasonable inferences are drawn in the plaintiff's favor. *See Speaker v. U.S. Dep't.*

*of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379

(11th Cir. 2010); *see also Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1307 (11th

Cir. 1998). Although a plaintiff need not provide "detailed factual allegations," a

plaintiff's complaint must provide "more than labels and conclusions." *Twombly*, 550

U.S. at 555 (internal citations and quotations omitted). "[A] formulaic recitation of the

elements of a cause of action will not do." *Id.* Rule 12(b)(6) does not allow dismissal of

a complaint because the court anticipates "actual proof of those facts is improbable" but

the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 545).

## III.    DISCUSSION

Calvo moves for dismissal of all of BCL's claims, characterizing this case as "sour grapes over Balearia [Caribbean's] failure to lock-up a valuable executive with a non-compete, its failure to even minimally protect its business information, and its angst over the legitimate loss of a possibly lucrative ferry route to a competitor." (DE 20 at 2). In response to the motion, BCL withdraws Count 2 alleging a breach of Calvo's duty of loyalty in violation of Florida statute. (DE 26 at 2 n.2). However, BCL raises meritorious arguments supporting the Complaint's remaining causes of action: Counts 1 and 4 for damages and a permanent injunction pursuant to the DTSA and Count 3 for breach of fiduciary duty pursuant to Florida law. Consequently, and for the reasons explained below, the Court denies Calvo's motion to dismiss these remaining counts.

### A.    Misappropriation of Trade Secrets

Congress passed the DTSA on May 11, 2016, creating a private right of action for an "owner of a trade secret that is misappropriated" where the trade secret is "related to a product or service used in, or intended for use in, interstate or foreign commerce." Pub. L. 114-153, 130 Stat. 376 (codified at 18 U.S.C. § 1836(b)(1)); *see also M.C. Dean, Inc. v. City of Miami Beach, Florida*, 199 F. Supp. 3d 1349, 1353 (S.D. Fla. 2016). The statute defines "trade secret" as "financial, business, scientific, technical, economic, or engineering" information for which:

> (A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3).  Thus, "[i]n a trade secret action, the plaintiff bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir.1998) (interpreting definition of "trade secret" under the Florida Uniform Trade Secrets Act); *see also M.C. Dean, Inc.*, 199 F. Supp. 3d at 1353 (applying precedent analyzing Florida Uniform Trade Secrets Act in DTSA case).

As relevant here, the DTSA defines "misappropriation" as:

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used improper[3] means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

---

[3] Elsewhere, the statute defines the term "improper" as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" but not "reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake

*Id.* § 1839(5)(B).

Pursuant to the DTSA, "court[s] may award . . . damages for actual loss caused by the misappropriation of the trade secret." *See* 18 U.S.C. § 1836(b)(3)(B)(i)(I). Additionally, courts may, "in a civil action brought . . . with respect to the misappropriation of a trade secret, . . . grant an injunction . . . to prevent the actual or threatened misappropriation . . . on such terms as the court deems reasonable," provided that the injunction meets certain statutory conditions. *See* U.S.C. § 1836(b)(3)(A). Accordingly, Counts 1 and 4 of the Complaint allege that Calvo misappropriated BCL's trade secrets in violation of the DTSA and request this Court to award damages and an injunction, respectively.

Calvo advances four arguments for dismissal of the DTSA counts. First, he contends any information he took was not a "trade secret" because BCL had only rudimentary data security practices. *See* 18 U.S.C. § 1839(3)(A). Second, he argues the Complaint does not plausibly allege that the information he took derives independent economic value from not being generally known and readily ascertainable through proper means. *See* 18 U.S.C. § 1839(3)(B). Third, he asserts the Complaint does not allege he disclosed or used BCL's confidential information in the manner the DTSA requires. *See* 18 U.S.C. § 1839(5). Finally, he claims that the Count 1 does not adequately allege causation. *See* 18 U.S.C. § 1836(b)(3)(B)(i)(I). These arguments are

unavailing at the motion to dismiss stage.

Calvo's first argument is that he could not have violated the DTSA because BCL took insufficient measures to protect the information it is now claiming contained "trade secrets." See 18 U.S.C. § 1839(3)(A). In making this argument, Calvo neglects or minimizes several salient allegations. For instance, Balearia Group tasked Nautas with implementing a tiered system governing Calvo's and other employees' access to BCL information and BCL provided Calvo confidential monthly economic reports. Further, after Calvo's departure, Utor advised that work product generated during Calvo's time as CEO was BCL's property and that Calvo needed to disclose any use of BCL's confidential information. Moreover, Calvo advised Utor before his departure that he that would not compete with BCL and was moving to a different industry, supporting a reasonable inference that Calvo understood BCL was making legitimate efforts to keep secret at least some of the information he purportedly took. At this stage of the litigation, the Court considers these allegations in the light most favorable to BCL and draws all reasonable inferences in BCL's favor. See Speaker, 623 F.3d at 1379. Pursuant to this standard, BCL took "reasonable measures" to keep its sensitive information secret. See Treco Int'l S.A. v. Kromka, 706 F. Supp. 2d 1283, 1287 (S.D. Fla. 2010) (observing in Florida Uniform Trade Secrets Act context that "whether a party has taken reasonable steps under the circumstances to preserve its trade secrets is a factual inquiry that cannot be resolved on a motion to dismiss").

In response, Calvo argues it is "not enough simply to restrict access to the facility and require passwords; these are normal business practices in any business. An employer must use additional measures to protect the confidentiality of information he

considers to be a trade secret." *Maxpower Corp. v. Abraham*, 557 F. Supp. 2d 955, 961 (W.D. Wis. 2008) (denying preliminary injunction under Wisconsin trade secrets statute following evidentiary hearing).  Accordingly, he focuses on what the Complaint fails to allege.  He argues that BCL could have had better information security practices, such as written confidentiality agreements and information security policies, prominent labeling of sensitive information, entry and exit interviews, or segregation of work and personal computers.  (DE 20 at 8-9).  But in contending that BCL's failure to adopt such practices warrants dismissal, he cites decisions other courts rendered in distinguishable procedural postures pursuant to different legal standards.  *See, e.g.*, *Alagold Corp. v. Freeman*, 20 F. Supp. 2d 1305, 1316 (M.D. Ala. 1998) (granting summary judgment for defendant on trade secrets claim where plaintiff failed to take reasonable measures to protect general knowledge defendant gained during employment); *Menzies Aviation (USA), Inc. v. Wilcox*, 978 F. Supp. 2d 983, 995 (D. Minn. 2013) (denying preliminary injunction in relation to trade secrets claim where plaintiff knew defendant "used his personal email and personal computer for work"); *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1335 (N.D. Ga. 2007) (granting summary judgment for defendant on trade secrets claim where plaintiff failed to take reasonable measures to protect documents provided during defendants' employment); *Pressure Sci., Inc. v. Kramer*, 413 F. Supp. 618, 627-28 (D. Conn.) (verdict for defendant on trade secrets claim following bench trial where plaintiff took insufficient measures to maintain secrecy of its manufacturing process).

The one case Calvo cites in which another court in this District granted a motion to dismiss a DTSA claim is wholly distinguishable.  There, the plaintiff M.C. Dean was

an electrical design-build and systems integration firm that worked as a subcontractor on a project to renovate the Miami Beach Convention Center. *M.C. Dean, Inc.*, 199 F. Supp. 3d at 1350.  The firm invested "substantial funds in identifying, recruiting and training its employees" and sued under the DTSA when the defendant City of Miami Beach inadvertently disclosed M.C. Dean's unredacted payrolls to the co-defendant International Brotherhood of Electrical Workers, Local 349. *Id.* at 1351.  The district court granted the defendants' motion to dismiss after finding that M.C. Dean did not take reasonable measures to keep its unredacted payroll secret; indeed, M.C. Dean had freely disclosed the document to a third party, the general contractor on the Miami Beach Convention Center renovation, to facilitate the project's compliance with a Miami Beach wage ordinance. *Id.* at 1355.  Further, the disclosed information was subject to public inspection under Florida's public records law. *Id.* at 1356-57.  Here, there is no allegation that BCL voluntarily disclosed its claimed trade secrets to a public entity in a manner justifying dismissal of DTSA claims.

Calvo's second argument is that he could not have violated the DTSA because the information he took did not derive independent economic value from its secrecy and therefore could not have contained "trade secrets." *See* 18 U.S.C. § 1839(3)(B).  He points to the Complaint's allegation that the Bahamian government's marketing reimbursement incentives—which BCL later learned were part of the FRS-Genting deal—were known to individuals who had specialized knowledge of Florida to Bahamas ferry routes.[4]  Calvo contends that he learned this information while at BCL and appeals

_____

[4] The Complaint also alleges that while Calvo was BCL's CEO, his preliminary discussions with Genting "would have included" the Bahamian government's marketing reimbursement incentives.  (DE 1 ¶ 34).  Thus, Calvo asks the Court to find that

to the well-established proposition that such knowledge, derived from employment experience, is not a protectable "trade secret." *See, e.g., WellCare Health Plans, Inc. v. Preitauer*, No. 8:12-CV-713-T-30MAP, 2012 WL 1987877, at \*4 (M.D. Fla. May 23, 2012) (denying employer's motion for preliminary injunction under Florida Uniform Trade Secrets Act where contested conduct involved employee's post-employment use of "knowledge gained independent of" employer); *Fleming Sales Co. v. Bailey*, 611 F. Supp. 507, 514 (N.D. Ill. 1985) (granting defendants summary judgment on Indiana trade secrets claim where contested conduct involved employee's post-employment use of "general skills and knowledge acquired in the course of employment"); *IKON Office Sols., Inc. v. Am. Office Prod., Inc.*, 178 F. Supp. 2d 1154, 1169 (D. Or. 2001) ("A court cannot compel a man who changes employers to wipe clean the slate of his memory."), *aff'd,* 61 F. App'x 378 (9th Cir. 2003).[5]

Separately, Calvo asserts that the economic data BCL alleges he misappropriated, such as profit and loss statements and sales reports, would not afford

---

Genting—not Calvo—could have disclosed the incentives to FRS and that the incentives therefore were not "trade secrets." (DE 20 at 13-14). But under the governing standard for Rule 12(b)(6) motions, the Court cannot extrapolate the Complaint's allegations in this way. Viewing the Complaint in light most favorable to BCL, it is reasonable to infer that the scope and extent of incentives were known exclusively to BCL through its prior experience running a Florida to Bahamas ferry.

[5] Relatedly, Calvo contends that a permanent injunction in this case would grant BCL the windfall of a non-compete agreement it failed to secure during his employment. The DTSA does prohibit courts from granting injunctions that "conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business." 18 U.S.C. § 1836(b)(3)(A)(II). However, Calvo implicitly acknowledges that to dismiss Count 4 on this basis, the Court would need to find that BCL "has not adequately alleged that the information it seeks to protect is a trade secret." (DE 20 at 19). Because the Court declines to make this finding at this stage of the litigation, Calvo's argument that a permanent injunction would amount to an "after-the-fact non-compete" is premature.

a benefit to competitors because they pertain to the Fort Lauderdale to Grand Bahama ferry route, not the Miami to Bimini route in which Genting had interest. *See B2B CFO Partners, LLC v. Kaufman*, No. CV 09-2158-PHX-JAT, 2011 WL 6297930, at *2 (D. Ariz. Dec. 16, 2011). However, the reasoning in that case potentially undermines his argument. In *B2B*, the court denied a motion to seal certain profit and loss statements after determining that they did not contain trade secrets, but acknowledged that "profit and loss statements may constitute trade secrets" if they afford a "demonstrable competitive advantage to actual or potential competitors." *B2B CFO Partners, LLC v. Kaufman*, No. CV 09-2158-PHX-JAT, 2011 WL 6297930, at *2 (D. Ariz. Dec. 16, 2011) (internal quotations omitted).

Thus, Calvo's arguments and authorities are ultimately unpersuasive because the Complaint contains sufficient facts to support a plausible claim that the information Calvo took derived independent economic value from its secrecy and could afford a "competitive advantage" to an identifiable actual competitor: FRS. Calvo allegedly misappropriated a trove of BCL's financial data, including monthly economic performance reports; sales reports; profit-loss statements; communications with a potential business partner; and details about favorable incentives offered by the Bahamian government that BCL was in a unique position to understand. Such data, viewed in the light most favorable to BCL, is valuable to rivals seeking to assess potential costs and revenues before deciding whether and how to offer a competing service to BCL's actual and potential customers. In fact, the Complaint states that Calvo stole and took BCL's data to just such a rival, FRS—a new entrant in the Caribbean and a subsidiary of an established competitor to the Balearia Group—to help

FRS consummate the deal with Genting that Calvo had been negotiating for BCL. In light of these allegations, the Complaint plausibly alleges that the information Calvo took from BCL was a trade secret. *Cf. Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1141 (M.D. Fla. 2007) (denying summary judgment because "[c]ourts are extremely hesitant to grant summary judgment regarding the fact-intensive questions of the existence of a trade secret").

Third, Calvo argues that even assuming the Complaint properly alleges that he possessed BCL's trade secrets, it does not adequately plead that he "used" or "disclosed" those secrets as the DTSA requires. *See* 18 U.S.C. § 1839(5)(B). The Eleventh Circuit has applied a broad standard for what constitutes "use" of a trade secret. *See Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003) (observing, in Georgia trade secrets action, that "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use'"). Here, the Complaint alleges facts and circumstances plausibly supporting such "use" of BCL's trade secrets. Specifically, the Complaint alleges that before his departure, Calvo engaged in a months-long scheme to secure BCL's information without revealing his reasons to colleagues or his replacement, Herrero; misrepresented his intentions to Utor after his departure; and then cooperated with FRS to secure a deal BCL had previously pursued. Additional allegations corroborate Calvo's relationship with FRS: the ferry FRS planned to use for its Miami to Bimini service displayed a Calvo-owned domain name and FRS later acknowledged its relationship with Calvo. These circumstantial facts, taken together and viewed in the light most favorable to BCL, support a plausible claim that Calvo "used" BCL's trade

secrets.

Finally, Calvo also interprets the statutory language as imposing a causation requirement for BCL's DTSA claim for damages. *See* 18 U.S.C. § 1836(b)(3)(B)(i)(I) ("[A] court may award . . . damages for actual loss *caused* by the misappropriation of the trade secret") (emphasis added).  He contends the Complaint does not satisfy this requirement for three reasons.  First, he repeats arguments that the Complaint does not allege how or which of BCL's trade secrets facilitated the FRS-Genting deal.  Second, he claims that the Complaint does not allege that BCL "would have won the Genting Ferry Deal had Calvo not allegedly misappropriated its trade secrets."  (DE 20 at 20). Third, he asserts that aside from BCL's loss of the Genting deal, the only damages alleged in the Complaint are speculative.  BCL responds that the Complaint directly alleges Calvo's conduct led to "significant damages," including the "loss of the Genting Ferry Deal," the "loss of a significant competitive advantage," and "loss of business opportunities and future contracts with potential customers."  (DE 1 ¶ 63).

Calvo is correct that the Complaint does not set forth precise details about how his misappropriation of trade secrets caused BCL's alleged injuries.  However, as discussed above, the totality of the facts in the Complaint support a reasonable inference that Calvo's contested conduct—including his apparent involvement with BCL's competitors Silvia Ana and FRS[6]—caused the injuries BCL alleged it suffered. This is sufficient to carry BCL's Rule 12(b)(6) burden. *See Mintel Learning Tech., Inc. v. Ambow Educ. Holding Ltd.*, No. 5:11-CV-01504-EJD, 2012 WL 762126, at \*3 (N.D. Cal.

[6] It should also be noted that BCL would have no way to know, at this stage, the specifics of Calvo's dealings with FRS and Silvia Ana because those facts are peculiarly within Calvo's possession.

Mar. 8, 2012) ("*Twombly* and *Iqbal* do not strictly require plaintiffs to plead specific facts with regard to each element of every claim. Rather, a complaint need only include concrete details that make the plaintiff's theory of liability plausible and not merely speculative."). Consequently, BCL's DTSA claims survive Calvo's motion to dismiss.

## B.    Breach of Fiduciary Duty

Calvo also moves to dismiss Count 3, which alleges that he breached the fiduciary duty he owed to BCL as its corporate officer by misappropriating BCL's trade secrets and diverting BCL's corporate opportunity to himself.

"To state a claim for breach of fiduciary duty in Florida, the plaintiff must show: (i) the existence of a fiduciary duty; (ii) the defendant breached that duty; and (ii) the defendant's breach proximately caused the plaintiff's damages." *Lindquist v. Linxian*, No. 11-23876-CIV, 2012 WL 3811800, at *4 (S.D. Fla. Sept. 4, 2012) (citing *Gracey v. Eaker,* 837 So. 2d 348, 353 (Fla. 2002)). "Corporate directors and officers owe a fiduciary obligation to the corporation and its shareholders and must act in good faith and in the best interest of the corporation." *Id.* (quoting *Cohen v. Hattaway*, 595 So. 2d 105, 107 (Fla. 5th DCA 1992)). Accordingly, the Complaint sufficiently alleges that during the period Calvo was BCL's CEO—from February 2013 to October 2015—he owed BCL a fiduciary duty.

Calvo narrowly characterizes the fiduciary duty he owed BCL as a "duty of confidence" and offers five reasons why the Court should dismiss Count 3: (1) he took information that BCL did not adequately protect; (2) he took information that was common knowledge to anyone possessing knowledge of Florida to Bahamas ferry routes; (3) he did not use or disclose the information he took; (4) his post-departure

17

promise to Utor not to compete against Balearia was non-binding; and (5) he did not divert BCL's corporate opportunity with respect to the Genting ferry deal because BCL abandoned the opportunity. (DE 20 at 16-18). The first three of these arguments for dismissal are unpersuasive because—as discussed in Section III.A above—the Complaint, viewed in the light most favorable to BCL, plausibly alleges that Calvo misappropriated BCL's trade secrets and used those secrets to help FRS establish a Caribbean ferry service and secure the FRS-Genting deal.

As to Calvo's fourth argument, the Court need not decide whether Calvo's suggestions to Utor that he would not compete with BCL after his departure constituted a binding non-compete agreement because, even ignoring these suggestions, the Complaint plausibly alleges a breach of fiduciary duty. Namely, it alleges that during Calvo's tenure as BCL's CEO, he engaged in a scheme to siphon information from the company and cabined his successor's involvement in negotiations with Genting so that he could usurp the Ferry Deal—which he eventually did, in cooperation with BCL's competitor FRS. These allegations are sufficient to establish that Calvo breached his fiduciary duty to BCL and proximately caused BCL's lost business opportunities.

Finally, regarding the fifth argument, no reasonable construction of the Complaint supports Calvo's contention that BCL abandoned the Genting Ferry Deal after Calvo's departure. To the contrary, the Complaint alleges that when Calvo left, BCL sought to rekindle negotiations with Genting but could not locate Calvo's file—prompting Utor to reach out to Calvo and express concerns about Calvo's rumored attempts to consummate the Genting deal elsewhere. Accordingly, the Complaint states a claim as to Count 3 for breach of fiduciary duty.

IV.     **CONCLUSION**

For the reasons above, it is **ORDERED AND ADJUDGED** that Calvo's motion, construed only as a motion to dismiss (DE 20), is **DENIED**.  Count 2 of the Complaint is **DISMISSED** pursuant to BCL's voluntary withdrawal.

**DONE AND ORDERED** in Chambers in Miami, Florida, this ⟋⟍day of August, 2017.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE