```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                     CASE NUMBER 16-CV-23300-KMW
 3

 4    Balearia Caribbean Ltd., Corp.

 5
            vs.
 6
      Hernan Calvo
 7    ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

 8                   BENCH TRIAL HELD 9-10-2018
             BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
 9               UNITED STATES DISTRICT COURT JUDGE

10    ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

      APPEARANCES:
11
      FOR THE PLAINTIFF:        Brett Alan Barfield, Esq.
12                              Daniel Patrick Hanlon, Esq.
                                701 Brickell Avenue
13                              Miami, FL 33131

14
      FOR THE DEFENDANT:        Robert G. Post, Esq.
15                              804 South Douglas Road
                                Coral Gables, FL 33134
16
      REPORTED BY:             PATRICIA SANDERS, RPR
17                             United States Court Reporter
                               400 North Miami Avenue, Suite 11-3
18                             Miami, FL  33128
                               T: 305.523.5528
19                             patricia_sanders@flsd.uscourts.gov.

20

21

22

23

24

25
```

```
 1                    I N D E X

 2              DIRECT       CROSS       REDIRECT

 3   Adolfo Utor Martinez    4         47          81

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          THE COURT:  Call your first witness, Mr. Barfield.
```

1          MR. BARFIELD:  I have one item to take up regarding

2     the e-mails that we heard argument about this morning.

3          THE COURT:  Okay.

4          MR. BARFIELD:  I could use some guidance.  We just got

5     the e-mail, and it is very, very important.  It is very

6     possible it has information about Mr. Utor's parent company,

7     but we have not had a chance to fully read it.

8          I believe that Mr. Utor might be the best person to

9     discuss it, so I would ask that he have an opportunity to read

10    it.

11         THE COURT:  Well, he could read it over lunch.

12         MR. BARFIELD:  Thank you.  We probably won't be

13    finished before lunch, so that's probably a good idea.

14         THE COURT:  And again, he won't be introducing the

15    document.  So until it's introduced, it's just a thought out

16    there possibly waiting to be expressed.

17         As I said, I could give you that time over lunch.

18         MR. BARFIELD:  Yes, Your Honor.  We probably won't be

19    done with Mr. Utor by lunch, so that will be fine.

20         THE COURT:  All right.  Are we are still on the

21    schedule that the parties believe we will be done by this week?

22         MR. BARFIELD:  Yes.  Hopefully by Thursday, if not

23    Wednesday.

24         THE COURT:  All right.

25         MR. BARFIELD:  The plaintiffs will call Mr. Adolfo

```
 1    Utor.

 2              Your Honor, we would like to invoke the rule at this

 3    time.

 4              THE COURT:  All right.  Anyone who anticipates

 5    testifying should leave the courtroom.

 6              Mr. Barfield, call your first witness.

 7              MR. BARFIELD:  We would call Mr. Utor at this time,

 8    Your Honor.

 9                        WITNESS SWORN

10     BY MR. BARFIELD:

11    Q.  Good morning, Mr. Utor.

12        If you would, please state your name.

13    A.  My name is Adolfo Utor Martinez.

14    Q.  And where do you reside?

15    A.  In Denia Alicante, Spain.

16    Q.  What is your profession?

17    A.  I am a businessman.  I am the president of a shipping

18    company.

19    Q.  Which company?

20    A.  Balearia Eurolineas Maritimas.

21    Q.  What is the nature of Balearia's business?

22    A.  Balearia provides combined transportation service for

23    passengers, merchandise, and rolling equipment.

24    Q.  And how long have you been the president of Balearia?

25    A.  I have been the president of Balearia since its inception.
```

1    I am also the founder of the company and its majority stock

2    holder.

3    Q.   What geographic regions does Balearia operate in?

4    A.   Spain, the Mediterranean, also in North Africa, in the

5    Caribbean, in the Florida, Bahamas area.

6    Q.   What is the relationship between Balearia, of which you are

7    the president, and Balearia Caribbean Ltd., the plaintiff in

8    this case?

9    A.   Balearia Eurolineas Maritimas is the parent company of

10   Balearia Caribbean Ltd.

11   Q.   When was Balearia Caribbean formed as a company?

12   A.   When the opportunity arose in Florida for operating in the

13   Bahama Island.

14   Q.   When did you first meet the defendant Hernan Calvo?

15   A.   In 2006.

16   Q.   What were the circumstances of your meeting him?

17   A.   We were competitors.  At that time, he was the director

18   general of Buquebus Spain.  So we were competitors in lines

19   across the Straits of Gibraltar between Spain and Africa.

20   Q.   And did you meet him while he was -- in the nature of your

21   business relationship between the two companies?

22   A.   He called on me on one occasion and came to see me.

23   Q.   And did Mr. Calvo eventually come to work for you?

24   A.   That was in 2007 when Balearia bought Buquebus Spain and

25   Mr. Calvo came over and began working with me.

1   Q.   What was Mr. Calvo's initial position with you?

2   A.   Mr. Calvo had the responsibility -- his position was

3   director general of business development.

4   Q.   In that role, who did he report to?

5   A.   He would report directly to me.

6   Q.   And where did he live to work in that role?

7   A.   He used to initially live in Southern Spain, in Cadiz, and

8   then he would do his work based in Madrid.

9   Q.   What were his main responsibilities as the director of

10  business development?

11  A.   His responsibility was to look for new business, for new

12  shipping lines in the international market, to start new

13  opportunities, look into the viability of these opportunities,

14  to submit them to me so that a decision could be made.

15  Q.   And how long did he do that job as development manager?

16  A.   For approximately six years; from 2007 to approximately

17  2013.

18  Q.   During those six years, how would you describe your

19  relationship with Mr. Calvo?

20  A.   It was a very close relationship.  We traveled together to

21  many countries; Brazil, Venezuela.  We also traveled to Gozo

22  Island.  During that time, we had a very close relationship, a

23  relationship based on trust.

24       We had just come out of a crisis in Spain.  The years 2007,

25  2008, there was an international crisis.  He had a lot of

1   problems with his own private business.  I considered him to be

2   a very worthy, a very capable man, and I helped him out with

3   many of his private issues.  I helped him a lot, and I helped

4   his family a lot.

5      It was a very close relationship that developed.  It was a

6   relationship based on trust, on confidence, and friendship.

7   Q.  Did you know his family?

8   A.  I know his wife Raquel, and I met their children.

9   Q.  And did you spend time with him and sometimes the family

10   outside of business and work?

11   A.  I generally was with him during our trips outside of

12   business, and I also had the occasion to spend time socially

13   with his family.

14   Q.  After Mr. Calvo finished serving as the director of

15   business development, what was his next position at Balearia?

16   A.  I would say that, during the course of those six years,

17   none of the projects that he proposed made any headway.  It

18   looked as though his position as director of business

19   development was coming to an end.

20      His former employer, Buquebus, offered him a job

21   opportunity in Brazil.  He was concerned about his family,

22   about Brazil, and what Brazil meant.  He had two small

23   children, one on the way.  He was concerned over his family's

24   welfare and security.

25      So I offered him the possibility of coming to Miami as CEO,

1    as a top executive of Balearia Caribbean with a very promising

2    project of expansion in the Caribbean Sea.  And he accepted my

3    proposal.  He preferred his family to grow in the United States

4    rather than in Brazil.

5    Q.   When did he become CEO of Balearia Caribbean?

6    A.   In early 2013.

7    Q.   In that role, who did he report to?

8    A.   He would report directly to me.

9    Q.   Was there any set protocol of how you would communicate;

10   verbally, by e-mail?

11   A.   We followed the same procedure that we did when he was

12   director of business development, but now only on a more

13   intensive basis because there was a lot of activity on this

14   project.

15   Q.   Did he receive a raise to come to Florida to be the CEO of

16   Balearia Caribbean?

17   A.   His financial situation improved substantially.

18   Q.   Do you remember what his total -- do you remember what his

19   total compensation package totaled?

20   A.   We had worked out some figures.  The total compensation

21   that he received, between his direct salary and certain

22   benefits like housing and vehicles, was half a million dollars.

23   Q.   How often did you speak with Mr. Calvo when he was the CEO?

24   A.   Several times a week.  Sometimes several times in the

25   course of the day.

1   Q.   What topics or issues did you typically discuss with him

2   during those conversations?

3   A.   Issues related to operations, to business, to institutions,

4   company strategy, financial decisions, corporate decisions,

5   everything that pertains to the management of a company.

6   Q.   At Balearia Caribbean, did Mr. Calvo use a Balearia

7   computer for work or a personal computer?

8   A.   At the beginning, he used a company computer, and at a

9   certain period in time, he switched over to a personal

10  computer.

11  Q.   And it was his request to go to a personal computer; is

12  that right?

13  A.   Yes.

14  Q.   Did you have to approve that request?

15  A.   Yes.

16  Q.   Was it typical for a Balearia executive to have a personal

17  computer instead of a company computer?

18  A.   Never.  He was the exception.

19  Q.   Why did you approve it?

20  A.   He asked me because our environment is Microsoft and IBM.

21  He preferred an Apple platform.  I authorized him to buy a

22  computer, and I authorized Balearia systems to be uploaded onto

23  his personal computer.

24  Q.   And separate from having access to the Balearia computer

25  system through his personal computer, did you ever authorize

1   him to download company documents directly into his own

2   computer outside the company system?

3   A.   Never.

4   Q.   I want to move to a different topic and ask you some

5   questions about the Bimini ferry market.

6        Is the Bimini route of importance in the Caribbean market?

7   A.   Very important.

8   Q.   Why?

9   A.   It is very important because the triangle that consists of

10  Florida, Bimini, and Bahamas, that is to say Freeport, enables

11  us to cover that route daily with one single trip.  The

12  profitability of that single ship can be multiplied and, as a

13  result of that, we would be more competitive.

14       This was a goal that I shared with Mr. Calvo, and the two

15  of us were fully in agreement.

16  Q.   Did Balearia once have a Bimini Line?

17  A.   Balearia first came to the United States, Florida, in order

18  to run a line between Miami and Bimini in 2011.

19  Q.   What happened to that line?

20  A.   Initially, the operations could not start because the port

21  was not deep enough.  It had to be dredged, and we had to delay

22  the beginning -- the commencement of the operation.

23       We initially brought a ship, the Pinar del Rio, that could

24  not go into Bimini, and then later on, in 2012, we brought

25  another smaller ship, which operated for a few months.

1    Q.   Bimini, Miami or Bimini, Freeport?

2    A.   Miami, Bimini.

3    Q.   And how long did it operate?

4    A.   In 2012, because the change took place in 2013.

5    Q.   What change took place in 2013?  What happened?

6    A.   A Malayan investor approached our partner in Bimini and he

7    was prepared to make large investments in Bimini north, and he

8    was demanding exclusivity for the Maritime traffic between

9    Miami and Bimini and for the entertainment business as well.

10        Balearia Caribbean held those rights under the 2011

11   agreement, and Balearia gave up those rights in favor of

12   Genting, and beginning in 2013, Genting began to conduct

13   operations with its own ship.  So Balearia pulled out of the

14   Miami, Bimini Line of travel.

15   Q.   You mentioned your partner in Bimini.  Who was that?

16   A.   The Capo Group.

17   Q.   Who was Capo?  Was he the principal of the group?

18   A.   Gerardo Capo was the owner, the patriarch of the family who

19   basically owns the whole of Bimini north.

20   Q.   Did a lawsuit eventually arise between you and Mr. Capo and

21   your group about this agreement that you just described?

22   A.   That happened later when Capo failed to honor his

23   commitments.

24   Q.   All I want to know is if a lawsuit arose between Balearia

25   and Capo, and if so, who initiated the lawsuit?

1   A.   Balearia sued the Capo Group in 2013 as a result of the

2   failure to honor the agreement of April the 26th, 2013.

3   Q.   When was that lawsuit filed?

4   A.   In Spain, ten days ago.

5   Q.   What date was it begun in the Court?

6   A.   In February 2014.

7   Q.   Going back to the agreement that Balearia reached with

8   Genting so they could start their SuperFast, did that agreement

9   permit Balearia to resume a Bimini Line in the future or not?

10  A.   That contract of April 2013 had a clause in which Mr. Capo

11  undertook to make its best efforts with Genting to have

12  Balearia be the entity that would provide the service between

13  Miami and Bimini.

14  Q.   After the Bimini Line that Balearia had up until 2013

15  ended, was Balearia interested in starting up the line again?

16  A.   From the very outset, Balearia was interested in servicing

17  Bimini, but the Genting company decided to have its own

18  SuperFast provide service to Bimini.

19       But the profitability of our company depended on being able

20  to work that triangle of Port Everglades, Bimini, and Freeport.

21  Q.   Was the SuperFast, in your professional opinion, a good

22  vessel for the Miami, Bimini Line?

23  A.   Genting was and is a mult-national company specializing in

24  hotels and casinos.  From the very outset, we saw that the

25  model that Genting had chosen was doomed to failure.  We knew

1   that, sooner or later, they were going to discard that model.

2        Our strategy was to bide our time, and this was a strategy

3   that I always shared with Mr. Calvo.

4   Q.  Did you have that discussion with him about the importance

5   of the Bimini Line shortly after he became CEO of Balearia

6   Caribbean?

7   A.  Shortly thereafter and on numerous occasions.  As a matter

8   of fact, we had a very well defined strategy to see to it that

9   that process was accelerated.

10  Q.  And what was that strategy?  What did you specifically say

11  to Mr. Calvo about that strategy?

12  A.  We followed quite closely the number of passengers that

13  they would ferry over every day, its structure, its costs, its

14  operations, and in addition to that, we competed with them

15  quite aggressively in the day-tripper market; that is one-day

16  voyages from Miami.

17       Day-to-day we were following things and seeing how they

18  were losing millions of dollars on these projects.  Basically

19  because it was an unsustainable model.  It was a big mistake.

20  Q.  Focusing now only on the year 2015, how often,

21  approximately, did the topic of Bimini come up in your

22  conversations with Mr. Calvo?

23  A.  Until March of 2015, everything remained practically the

24  same; that is to say we were just on a standby-by.  We were

25  just waiting to see what would happen with this model.

1          In March, we were able to see that Genting was beginning to

2     show signs of weakness.   It was based on rumors and comments

3     from international brokers and also because they seemed to give

4     the impression that they were actively looking to seek -- I'm

5     sorry, looking to sell the SuperFast and replace it with a

6     smaller ship.

7     Q.   And did you have conversations about this with Mr. Calvo,

8     these signs and --

9     A.   Of course, and on an ongoing basis.   I told Mr. Calvo to

10    keep his eyes peeled, to be very attentive because the

11    situation may come to pass at any time.

12    Q.   Tell me, as specifically as you can recall, the actual

13    conversations you had with Mr. Calvo about Genting in 2015.

14    A.   Until March of 2015, the conversations had to do basically

15    with our follow-up of what was going on with Genting, the

16    commercial activity in the day trip segment of the market, and

17    watching any calls, any movement.

18    Q.   And what about after March?   What were the conversations

19    about?

20    A.   In March, the change took place and we began to see that

21    things were happening, that the fruit was beginning to ripen.

22    I would ask Mr. Calvo whether there was any news on the

23    subject, and he said no, everything remains the same.

24    Q.   Did Mr. Calvo ever tell you about meetings that he had with

25    Genting executives during 2015?

1   A.  No.

2   Q.  Did he ever tell you that he had discussed submitting a

3   contract proposal to Genting with Genting in 2015?

4   A.  He didn't say anything.

5   Q.  Did he tell you that he had discussed contract terms like

6   possible seat guarantees with Genting in 2015?

7   A.  Never.

8   Q.  Did he tell you about a dock test that he arranged for the

9   Pinar del Rio in -- at the dock in the Resorts World Bimini

10  dock?

11  A.  Never.

12  Q.  Did he tell you that he had Genting executives come visit

13  him and inspect two of the Balearia ships in Fort Lauderdale in

14  2015?

15  A.  Never.

16  Q.  Did he tell you that his family had gone on a trip to

17  Resorts World Bimini that was paid for largely by Genting in

18  May or April of 2015?

19  A.  I seem to recall that he told me he was going to take a

20  trip with his family for vacation purposes and also with the

21  intention to spy.

22  Q.  Spy on what?

23  A.  Spy on the operations, see how their operations were doing,

24  see how things were going.

25  Q.  Did he tell you that, during that trip, that Genting had

1    arranged for him to go and inspect the dock to see if it was

2    suitable for a Balearia ship?

3    A.   No.

4    Q.   Did you later learn that such meetings and visits and

5    discussions as those I just described had occurred between Mr.

6    Calvo and Genting during 2015?

7    A.   I have learned of that during the course of these

8    proceedings, many months after he left Balearia.

9    Q.   Tell the Court what you learned happened between Mr. Calvo

10   and Genting in 2015 that you were otherwise unaware of.

11   A.   I have been able to learn that, on March 23rd, he met with

12   Mr. Dana Leiboviz, who was the president of Genting.  On the

13   30th, he met with Mr. Leiboviz and Mr. Farrell, who was the new

14   president of Genting.

15        In late April, Mr. Leiboviz, Mr. Farrell, and Mr. Karavias,

16   who was the technical director, visited our ships the Bahia

17   Mama and the Pinar del Rio.  He had scheduled a test run for

18   the Pinar del Rio in Bimini, which he cancelled two days

19   earlier on May the 13th, apparently at Genting's request.

20        On July the 4th, unilaterally, he halted the conversations

21   that he was having with Genting as Balearia's representative

22   and put them off until August.

23        On August 26th, Mr. Farrell sent an e-mail to Hernan to

24   resume the conversations, and on September 9th, he held a

25   secret meeting with the people from --

1        MR. POST:  Objection, beyond the scope of his

2   knowledge.

3        THE COURT:  I think we're getting afield in a lot of

4   respects.  I think he's telling us what he learned; not

5   necessarily that it's true.

6        MR. BARFIELD:  That was the last question on that

7   line, to the extent it matters.

8        THE COURT:  Okay.  What was the answer?

9        THE WITNESS:  I found out about that meeting months

10  later.

11   BY MR. BARFIELD:

12  Q.  You said you learned about some things that happened in May

13  of 2015 between Mr. Calvo and Genting.

14      In May of 2015 when he visited Bimini with his family, had

15  you spent time with Mr. Calvo in May?

16  A.  I made a trip together with him to Puerto Rico the 14th,

17  15th, 16th of May, thereabouts.  We stayed in the same hotel.

18  We would have breakfast, lunch, and dinner together.  It was a

19  meeting with American Cruises, a Puerto Rican company that was

20  looking to buy Balearia.

21  Q.  How long was that trip with Mr. Calvo.

22  A.  Three days, perhaps four days we spent that time together.

23  24 hours a day except at night except.

24  Q.  During that trip, did Mr. Calvo mention Genting?

25  A.  He did not mention Genting.  He did not mention the trial

```
 1   for the Pinar del Rio on the 15th, which had been cancelled a
 2   couple of days earlier.  I am certain that, by that time, Mr.
 3   Calvo already had a plan that was different from Balearia's.
 4            MR. POST:  Objection.
 5            THE COURT:  Sustained.  Any speculation on the part of
 6   Mr. Utor as to Mr. Calvo, we need to steer clear of that.
 7    BY MR. BARFIELD:
 8   Q.  You mentioned a deal with American Cruise Ferries.
 9        Very brief, what was the nature of that deal?
10   A.  Simply put, Balearia Caribbean was going to take over
11   American Cruises.
12   Q.  This is one of the documents we discussed this morning that
13   has to do with the American Cruises.
14            THE COURT:  It's one of the e-mails?
15            MR. BARFIELD:  It is not one of the new e-mails.  It's
16   one of the e-mails we discussed in arguing over the new
17   e-mails.  In other words, they're related.
18            THE COURT:  Which number is it in the contested
19   exhibits?
20            MR. BARFIELD:  P11 and P50.
21            THE COURT:  Okay.  If you would hand them to Mr. Utor,
22   he can lay a predicate.
23            Is this one of the documents?
24            MR. BARFIELD:  Yes.  I thought you said lay a
25   predicate.
```

1          THE COURT:  I was thinking old school like you have a

2    paper document and you hand it to him.

3          MR. BARFIELD:  We do.

4          If I might approach?

5          THE COURT:  Yes.

6    BY MR. BARFIELD:

7    Q.  I'm showing you the second page of what has been marked for

8    identification as Plaintiff's Exhibit P11.

9          Do you recognize this document?

10   A.  Yes.

11   Q.  Can you tell the Court what this document is.

12   A.  These are three different offers we made to American

13   Cruises in order to acquire it.

14         MR. POST:  I would object to this line of questioning

15   on the grounds that it's irrelevant to this case.  This case

16   involves a route between Miami to Bimini.  It has nothing to do

17   with the American Cruise Ferries issue, and it's just an

18   attempt to hurt Mr. Calvo's credibility on a collateral matter.

19         THE COURT:  All right.  I have overruled that

20   objection.  Right now I'm just trying to ascertain what this is

21   in terms of predicate.  Is it an e-mail?  Is it an actual

22   document that was given to American Cruises?  What is it?

23   BY MR. BARFIELD:

24   Q.  Let's go to the first page of the exhibit.

25         Do you recognize that document?

1   A.   Yes.

2   Q.   What is that document?

3   A.   An e-mail sent by Hernan Calvo to an e-mail address of a

4   hotel in Puerto Rico.

5   Q.   Have you stayed in that hotel in Puerto Rico?

6   A.   Mr. Calvo and I were staying at that hotel in Puerto Rico.

7   Q.   Do you have an understanding of why this document would

8   have been attached to that e-mail to the hotel?

9   A.   Because we were in Puerto Rico and we needed those

10   documents printed.

11         MR. BARFIELD:  Your Honor, this is an e-mail that was

12   sent to be printed during the negotiations in Puerto Rico of

13   the deal reflected in the second page of the document.

14         THE COURT:  Okay.  Just so I'm clear, so P11 is an

15   e-mail sent to Mr. Calvo --

16         MR. BARFIELD:  By Mr. Calvo.

17         THE COURT:  Sent by Mr. Calvo to?

18         MR. BARFIELD:  The hotel concierge where they were

19   staying during the negotiations to have it printed.

20   QUESTIONING BY THE COURT:

21   Q.   And if I understand this correctly, Mr. Utor, the document

22   attached to the e-mail are the terms of an agreement that you

23   were suggesting to American Cruises?

24   A.   Correct.

25   Q.   And you had reviewed these terms and approved these terms?

1    A.   Hernan Calvo and I had agreed on these terms.

2    Q.   This was the type of document that you would generate in

3    the course of your business; is that correct?

4    A.   Yes.

5    Q.   As part of your negotiations with American Cruises, you

6    would have retained a copy of this document for future

7    reference; is that correct?

8    A.   Yes.

9    Q.   So I'm clear, you actually gave this document to a

10   representative of American Cruises to discuss its terms?

11   A.   This was our internal use document.

12   Q.   So it wouldn't have been given to American Cruises?

13   A.   There are three options here.  The first one is more

14   beneficial for us, and the third one is more beneficial for

15   American Cruises.

16   Q.   But you didn't give this document to American Cruises?

17   A.   I gave them the contents of these documents in different

18   phases -- over different phases.

19            THE COURT:  All right.  I think it's clear that this

20   was a document generated by Balearia for this business

21   negotiation.  It would have been maintained -- was it

22   maintained by someone at Balearia other than Mr. Calvo?

23            MR. BARFIELD:  This particular copy would have been

24   retained by Balearia, but this particular copy was in Mr.

25   Calvo's hard drive.

```
 1            THE COURT:  I'm going to overrule the objection as to
 2   relevance.  I'm going to allow Plaintiff's Exhibit 11 to be
 3   admitted.
 4            MR. BARFIELD:  Thank you, Your Honor.
 5    BY MR. BARFIELD:
 6   Q.  I'm going to turn your attention to another document that
 7   is also the subject of the same objection.  If you would turn
 8   to P50.
 9   A.  Yes.
10   Q.  Do you recognize any of the -- first of all, do you
11   recognize this document?
12   A.  I recognize it because I have seen it subsequently.
13            THE COURT:  Is this something that was taken off the
14   hard drive?
15            MR. BARFIELD:  Yes.
16            THE COURT:  Is it from originally the Balearia Group?
17            MR. POST:  Your Honor --
18            MR. BARFIELD:  No.
19            MR. POST:  I object on the grounds that, number one,
20   the witness has no knowledge of the document.
21            Number two, the document was never sent to anyone.
22   This is just taken from Mr. Calvo's hard drive as part of the
23   imaging done by the master.  It's not an attachment to any
24   e-mail.
25            Therefore, this witness certainly can't authenticate
```

1    or testify concerning this document.

2           MR. BARFIELD:  I will take this exhibit up with Mr.

3    Calvo.  I'm not going to try to admit it now.

4           Thank you, Your Honor.

5    BY MR. BARFIELD:

6    Q.  Mr. Utor, are you aware of any communications, during May

7    of 2015, that Mr. Calvo was having with the company Buquebus?

8    A.  I have later learned about them.

9    Q.  At the time in May of 2015, did you have any reason to

10   believe that Mr. Calvo was communicating with Buquebus about

11   matters that interested Balearia?

12   A.  In no event.

13   Q.  Did you ever authorize Mr. Calvo to share Balearia business

14   information that was non-public with Buquebus?

15   A.  It was inconceivable that Balearia's information would be

16   shared with another operator.

17   Q.  Why?

18   A.  Because Balearia's interest, under no circumstances, come

19   into conflict with those of a competitor.  In any event,

20   Balearia's business secrets are Balearia's and not anyone

21   else's.

22   Q.  Did you consider Buquebus to be a competitor of Balearia?

23   A.  If it had the intent to obtain information about my

24   business and be able to enter into my business, then it would

25   be a competitor.

1    Q.   In 2015, did you consider Buquebus to be a competitor of

2    Balearia -- let me withdraw that question.

3         What business was Buquebus in, in 2015?

4    A.   They were in Maritime transportation of passengers,

5    vehicles, and merchandise on the river plate.

6    Q.   Were they essentially in the same business as Balearia?

7    A.   Correct.

8    Q.   Under your agreement with Mr. Calvo, his employment as CEO,

9    was he authorized to engage in business on the side for

10   himself?

11   A.   Providing he had my consent and kept me apprised of what he

12   might do.

13   Q.   Would you have ever authorized him to do business with

14   another ferry operator as part of that private business outside

15   of Balearia?

16   A.   That is absurd.

17   Q.   Moving on to the things that you learned after Mr. Calvo

18   was gone from Balearia that he had done with Genting --

19             MR. POST:   I would object to this line of questioning.

20   If they want to present a witness who can actually testify

21   concerning the discussions that took place with Genting, then

22   they are free to do so.

23             This witness has no knowledge concerning what took

24   place with Genting.   Therefore, his testifying about it is pure

25   speculation.

 1            MR. BARFIELD:  I haven't asked the question yet.

 2            THE COURT:  Right.  I think, and I could be wrong, Mr.

 3    Post -- and if I am wrong, then Mr. Barfield will have to get

 4    off this line of questioning.

 5            He's going to ask Mr. Utor about certain

 6    representations or conversations that were made to Genting and

 7    whether he authorized it or knew about it or would have

 8    authorized it or knew about it.

 9            MR. BARFIELD:  Even better than that.

10            THE COURT:  What is it?

11            MR. BARFIELD:  I'm going to ask him about direct

12    events between him and Mr. Calvo.

13            THE COURT:  Okay.  Let's go to that then.

14            Objection overruled.

15     BY MR. BARFIELD:

16    Q.  In July of 2015, did you spend time with Mr. Calvo in

17    person?

18    A.  In early July, 6th or 7th of July, we were in Havana

19    together.  We were together 24 hours a day except for when we

20    went to bed at night.

21    Q.  During that trip, did Mr. Calvo mention Genting?

22    A.  In answer to my question as to whether there was any news

23    about Genting, he answered that there was no news.

24    Q.  Was the Cuba project that you were on that trip for a very

25    important project to Balearia?

```
 1   A.   We had received our OFAC licenses on July 15th and our --
 2            THE COURT:  Let me stop you there.  The question was,
 3   was the trip important?  Was the deal important.
 4            THE WITNESS:  Okay, yes.
 5            THE COURT:  Okay.
 6    BY MR. BARFIELD:
 7   Q.   And why?
 8   A.   As part of our expansion project within the Caribbean, it
 9   was an important line for us.
10   Q.   Had you been aware of active talks, meetings, and
11   negotiations between Mr. Calvo and Genting, would Balearia have
12   been in a position to enter the Bimini Line given the resources
13   it was putting into Cuba?
14            MR. POST:  Leading, Your Honor.
15            THE COURT:  I'm going to allow this.
16            THE WITNESS:  The Bimini Line was something very
17   concrete.  The Cuba Line was something very abstract.  Had
18   anything happened, we would have acted immediately on the
19   Bimini Line.
20    BY MR. BARFIELD:
21   Q.   Why was the Cuba Line abstract, as you called it?
22   A.   All we wanted to do in Cuba was a docking test.  We were
23   aware of the Cuban Government's resistance to this link, even
24   though we had the licenses from the U.S. Government.
25        So, if I had known that Genting wanted to come to an
```

1  agreement with us, we would have focused our efforts on

2  Genting.

3  Q.  In August of 2015, did you spend time in person with Mr.

4  Calvo?

5  A.  I was with him in mid August when he submitted his

6  resignation and then again in late August.

7  Q.  During either of these meetings, did Mr. Calvo mention

8  Genting?

9  A.  If he did, it was in answer to a question from me as to

10 whether there was news about Bimini, and the answer was always

11 no, there is no news.

12     As a matter of fact, he was with me in Denia on August 26th

13 and 27th, and he received an e-mail from Mr. Farrell -- from

14 Genting.

15 Q.  What was the purpose of his meeting with you in Denia,

16 Spain on August 26th and 27th?

17 A.  To prepare the transition with him and with Victor Karavias

18 as director general and with our new CEO of Balearia Caribbean

19 to prepare the transition.  He was exiting and the others were

20 coming in.

21 Q.  And during those meetings with those gentlemen on

22 August 26th and 27th, did Mr. Calvo mention Genting at any

23 time?

24 A.  Not only did he not say anything about the e-mail he had

25 received that same day from Mr. Farrell, but in addition, he

1   said that there was no news.

2   Q.   I want to go back to the first meeting in August that you

3   mentioned when Mr. Calvo came to Spain earlier in August .

4        What date was that, if you remember?

5   A.   August 14th.

6   Q.   What was the purpose of that visit?

7   A.   At his request, we met in Madrid, and I initially believed

8   that it was a procedural meeting just to talk about things.

9   Q.   And was it a procedural meeting?

10  A.   At that meeting, he submitted to me his resignation as CEO

11  in Miami.

12          MR. BARFIELD:   I don't know what time you had in mind

13  to break, but this might be a good stopping place.

14          THE COURT:   Okay.   We will break till 1:15.

15          MR. BARFIELD:   That's fine.

16          THE COURT:   And you can review the e-mails.

17          MR. POST:   1:15 is fine.   I already provided Mr.

18  Barfield with copies of the e-mails in question.

19          THE COURT:   All right.   Then I will see everybody back

20  at 1:15.

21          RECESS TAKEN

22          THE COURT:   Everyone can be seated.

23          You may resume, Mr. Barfield.

24   BY MR. BARFIELD:

25  Q.   Good afternoon, Mr. Utor.

1    A.   Good afternoon.

2    Q.   Before we broke, we had begun talking about a meeting that

3    you had with Mr. Calvo on August 14th when he turned in his

4    resignation.

5         Do you recall that?

6    A.   Perfectly well.

7    Q.   And how did you react when Mr. Calvo announced his

8    resignation on August 14th?

9    A.   I was greatly surprised.  He had never hinted that

10   possibility in the past.

11   Q.   Did Mr. Calvo give you a reason or reasons why he was

12   resigning?

13   A.   He had a keen interest in beginning his own project, a

14   project in which he would be a shareholder.  He had a great

15   opportunity of representing that project in the whole of the

16   American continent.  The name of that project was Plastic

17   Energy.

18   Q.   Did he give you any other reason, things that had happened

19   in the recent past, things that made him unhappy, anything like

20   that?

21   A.   We certainly had a bad year.  We had just brought on a ship

22   that was generating losses, and there was a certain amount of

23   tension there.  So, of course, the situation was a fluid one,

24   but our relationship was a relationship based on trust, as it

25   had always been.

1   Q.  So when he resigned, what was your response to him?

2   A.  I attempted to persuade him to continue.  I told him that

3   our project was a very good one and that his involvement in it

4   was very important.

5   Q.  Did he change his mind?

6   A.  No.

7   Q.  Had he spoken to you before about the company Plastic

8   Energy?

9   A.  Yes.  He had known that company for many years.  It

10  belonged to a friend of his in London, and he held a small

11  interest in it.

12  Q.  Did you have any other discussions in the meeting that you

13  had with him when he resigned?

14  A.  We talked a little bit about everything.  We discussed the

15  situation in Cuba.  We talked about the Genting matter again.

16  I asked him how it was going with Genting.  So we talked a

17  little about everything.

18  Q.  Did you have any reason to be suspicious about the reason

19  Mr. Calvo was leaving?

20  A.  I had absolute trust in him, and I believed what he told

21  me, that he was going to be greatly involved with that project

22  Plastic Energy.

23  Q.  Would you have considered working with him again in the

24  future after his resignation?

25  A.  My answer was in these exact terms; if at any time in the

1  future you have any problems with Plastic Energy, Balearia's

2  doors are open for you to come back.

3  Q.  What kind of notice did he give?

4     How long was he going to work before he was completely

5  finished?

6  A.  He wanted to leave right away, but I asked that he stay on

7  for a while so that we could have an adequate transition in his

8  office.

9  Q.  If he was resigning for a reason other than to leave the

10  ferry industry, would you have invited him to stay for a

11  transition period?

12  A.  Obviously not.  If he had wanted to leave to go on working

13  in the ferry business, I would very likely have taken a

14  different path.

15  Q.  What you would have done differently?

16  A.  If he had told me that he was going to go and work with a

17  competitor of Balearia's, I would have taken steps to ensure

18  that Balearia's information and data and also his situation

19  vis-a-vis Balearia.

20  Q.  When you asked him to stay on for a transition period, what

21  did he respond?

22  A.  Initially, he said no.  But he really couldn't say no, so

23  eventually he did accept.

24  Q.  What do you mean he couldn't say no?

25  A.  Because his relationship -- the relationship he had with me

1   and with the company for eight years sort of obliged him to be

2   flexible.

3   Q.  And did you discuss what you meant by a transition period?

4   A.  Yes.

5   Q.  And what did that entail?

6   A.  Two, three months.

7   Q.  What would happen during that two, three months?

8   A.  During those three months, Mr. Calvo was going to work out

9   a transition with his replacement.  He was going to transfer to

10  him the knowledge about the company's finances, corporate

11  affairs, operations.

12  Q.  When did you announce Mr. Calvo's replacement as CEO?

13  A.  A few days later, a week perhaps.

14  Q.  Did Mr. Calvo agree to share all of that information that

15  you just described as part of the transition with his

16  replacement?

17  A.  Mr. Calvo agreed to continue being the CEO until

18  October 30th, and he agreed to transfer all of that information

19  to the new CEO.

20  Q.  Did you have any discussion, after Mr. Calvo's resignation,

21  about any financial terms related to his resignation?

22  A.  Initially, Mr. Calvo asked me to pay for his home at Key

23  Biscayne for three months following his leaving the company, an

24  approximate amount including expenses of $50,000.  I agreed

25  without reservations.

```
 1        I also offered him a monthly payment for him to continue

 2   cooperating on an individual and personal basis with the

 3   company.  Back at that time, my relationship with him, as I

 4   said, was based on total, full, and absolute trust.

 5   Q.  First, would you have agreed to pay the housing expenses

 6   you just described if you had known that Mr. Calvo was not

 7   leaving the ferry industry?

 8   A.  I would not have paid that, and I would not have offered to

 9   pay him a monthly fee either.

10   Q.  When you describe that monthly fee, do you mean like a

11   consulting relationship?

12   A.  Exactly.

13   Q.  And did Mr. Calvo accept your offer to work on a consulting

14   basis after he left the company?

15   A.  He told me he would think about it and let me know later.

16   Q.  Did he ever let you know?

17   A.  On November the 15th, he sent me a letter in which he

18   waived or rejected that fee.  He, again, said that he was going

19   to be devoting himself full-time to Plastic Energy.

20        I was very much surprised by that response -- which he

21   mailed in, by the way -- but not enough to cause me to suspect

22   or have suspicions as to what he was doing.

23        Again, I firmly believed that he was devoting himself

24   full-time to Plastic Energy and that he was not going to go

25   over to a competitor.
```

1    Q.  When Mr. Calvo, after he resigned -- well, did you ever

2    have any non-compete agreement with Mr. Calvo -- strike that.

3        At any time, did Mr. Calvo sign a non-competition agreement

4    with Balearia?

5    A.  That never came up at any time.

6    Q.  Why?

7    A.  The relationship with Mr. Calvo was based on such trust.

8    He was my confidant.  He was my friend, and I never thought

9    that he would go over to the competition.

10       Moreover, in that meeting on August the 14th, I said to him

11    kiddingly, "You wouldn't be thinking about going over to a

12    competitor, would you?"  And he answered, "How could you think

13    that?"

14    Q.  Moving forward in time, did Balearia eventually learn that

15    the Genting ferry route to Bimini was becoming available?

16    A.  No.

17    Q.  Did Balearia eventually make a proposal to Genting to take

18    over the Bimini Line when the SuperFast stopped that service?

19    A.  Not in 2005 -- I'm sorry, 2015.

20       MR. BARFIELD:  I will come back to those questions in

21    a moment.

22       Your Honor, we just got the copies of the documents

23    that were produced this morning.  I'm going to show part of

24    those documents to the witness and switch gears here.

25       THE COURT:  Is Mr. Utor here for the week or just for

1    today?

2              THE INTERPRETER:  The witness has indicated he is

3    leaving tomorrow.

4              THE COURT:  In the evening?

5              THE WITNESS:  Yes.

6              THE COURT:  If you perhaps wanted to contemplate this

7    over the evening and call him tomorrow.

8              MR. BARFIELD:  Thank you, Your Honor.  I will try to

9    avoid it.

10   BY MR. BARFIELD:

11   Q.  I want to go back to earlier testimony about negotiations

12   you engaged in, in May of 2015, with a company called American

13   Cruise Ferries.

14        Do you recall that testimony?

15   A.  Yes.

16   Q.  In the course of your negotiations with American Cruise

17   Ferries, did American Cruise Ferries provide Balearia with its

18   financial information?

19   A.  Yes, so that we could make a financial offer.

20             MR. POST:  If I could have a continuing objection to

21   this line of questions on the grounds that it is irrelevant to

22   the issues in this case.

23             THE COURT:  You have a continuing and standing

24   objection to the matters with regard to the Puerto Rico and

25   American Cruise negotiations.

1          MR. POST:  Thank you, Your Honor.

2   BY MR. BARFIELD:

3   Q.  In order to receive American Cruise Ferries' financial

4   information, did Balearia have to sign a non-disclosure

5   agreement?

6   A.  Yes, it is customary in these cases.

7   Q.  And who signed that non-disclosure agreement in this

8   particular case?

9   A.  I signed for it as the highest authority in the company.

10  Q.  To your knowledge, did Mr. Calvo have knowledge that you

11  signed that non-disclosure agreement?

12  A.  Fully aware.

13  Q.  I'm going to show you a document and ask you some

14  preliminary questions about it before I ask you any substantive

15  questions.

16          I'm showing you for identification P85.  If you could look

17  through that, I will have some preliminary questions about your

18  familiarity with it.

19          MR. BARFIELD:  This is one of those documents that was

20  provided to the company as part of the negotiations under the

21  NDA.  I would like to make an ore tenus motion, if it's

22  admitted, to do so under seal.

23          THE COURT:  Back up.  This is a document provided by

24  American Cruise to Balearia as part of their negotiations?

25          MR. BARFIELD:  Correct.

 1              THE COURT:  And was subject to the non-disclosure?

 2              MR. BARFIELD:  Correct.

 3              THE COURT:  Okay.  For the time being, because I don't

 4       want delve into whether I need to since this is a bench trial,

 5       for the time being, it will be under seal.

 6              MR. BARFIELD:  Thank you, Your Honor.

 7       BY MR. BARFIELD:

 8       Q.  Have you seen this document before?

 9       A.  Yes.

10       Q.  And how did you come to receive this document?

11       A.  Through Hernan, through my financial director Ricardo

12       Clemente, and the secretary general.

13       Q.  And why did they give it to you?  What was it in relation

14       to?

15       A.  This is related to the valuation that we were going to make

16       for our offer to American Cruises.

17              MR. BARFIELD:  I would like to admit the document

18       marked as Plaintiff's Exhibit 85.

19              MR. POST:  For the same reasons I have articulated, we

20       object.

21              THE COURT:  Let me ask you this, Mr. Utor.  These

22       documents were given to you, and did you maintain these

23       documents, either physically in a desk or on a computer, as

24       part of this potential business deal?

25              THE WITNESS:  These documents were sent to American

1  Cruise Ferries, the secretary general, and to Hernan, not to

2  me.  They were under obligation to have them in custody in the

3  company's files or archives.

4         THE COURT:  Are these part of the documents, Mr.

5  Barfield, you say that you just discovered, or is this a

6  different set of documents?

7         MR. BARFIELD:  This is part of what we received today.

8  It was attached to an e-mail --

9         THE COURT:  My understanding is the gentleman said his

10 financial officer and also some other gentleman in his office

11 had this.

12        MR. BARFIELD:  What I understood him to say was this

13 was sent to them as part of the negotiations, and his finance

14 director gave it to him to review because he was the

15 negotiator.

16        He did not receive the e-mail directly.  His finance

17 director received the e-mail of the documents and gave them to

18 him to review.

19        THE COURT:  What I'm not understanding is how is it

20 then that Balearia did not have this document about a business

21 deal that may not have come to fruition?  That's why I was

22 asking -- I assume they would maintain such documents in case

23 it came to fruition or --

24        MR. BARFIELD:  Your Honor, I will be frank because

25 it's a bench trial.  This document in Balearia's files would

 1   have no relevance whatsoever to this case until we discovered

 2   this morning that Mr. Calvo e-mailed this document, along with

 3   a lot of other information about this deal, to Buquebus while

 4   the negotiations with Balearia were going on.

 5          MR. POST:  That is the point I have been making from

 6   the beginning, and that is it has no relevance to the case

 7   because there is no deal with Buquebus.  There is no deal with

 8   American Cruise Ferries.  It's an attempt to impeach my client

 9   on a completely collateral matter.

10          THE COURT:  I hardly think your client's relationship

11   to Buquebus is collateral to any of this.  I guess I didn't

12   understand why nobody thought to explore this until now.  But I

13   assume it's because you --

14          MR. BARFIELD:  The other reason, Your Honor, is that

15   under the NDA the documents were to be destroyed when the

16   negotiations ended if they were not successful, and they

17   weren't.  I cannot guarantee that they were destroyed, but they

18   probably were.  Those were the terms of the NDA.

19          THE COURT:  I'm going to admit these documents as a

20   business record.  I'm going to overrule the objection as to

21   relevance.

22          I suppose we could ask Mr. Utor if --

23          MR. BARFIELD:  For the record, it's 84, Your Honor.

24          THE COURT:  So it's 84 on the contested exhibits of

25   five e-mails?

1           MR. BARFIELD:  The last uncontested exhibit of

2    plaintiff is 83.

3           THE COURT:  On page 9, Plaintiff's 84 is a composite

4    of five e-mails.

5           MR. BARFIELD:  Let's make this 84 -- let me explain

6    what's happening here.

7           THE COURT:  Why can't we make it 85?

8           MR. BARFIELD:  We can make it 85 and the next one will

9    be 84.  The e-mail that this was attached to, he could not

10   testify to, so we separated it into two.

11          THE COURT:  So we'll call this 84A.

12          MR. BARFIELD:  84 is the e-mail.  It is what we were

13   fighting about this morning.  Let's make it 85.

14          THE COURT:  If you could ask Mr. Utor if he knows if

15   his company destroyed this pursuant to the directive, and then

16   we can look at it.

17    BY MR. BARFIELD:

18   Q.  All right.  Mr. Utor, do you know if, under the terms of

19   the non-disclosure agreement, the documents that you received

20   from American Cruise Ferries were destroyed by Balearia at the

21   end of the negotiations?  Do you know?

22   A.  I would like to think it was, but I am not absolutely

23   certain.

24   Q.  I want to make sure you had the opportunity to explain what

25   those documents contained, and I'm not sure if we got there.

1          If you could tell us what Exhibit 85 -- what the

2     information is more specifically.

3     A.   We are referring to this document?

4     Q.   Yes.

5     A.   This document contains information about the American

6     Cruise Ferries conglomerate and future projections that seek to

7     establish future value for the company.

8          It is a document that American Cruises provides to us so

9     that we can get a better understanding of the company and how

10    they arrived at the valuation that is reflected on the

11    document.   It is sensitive and confidential information about

12    the company.

13    Q.   And what about the structure of the deal you were

14    negotiating required you to know the value of American Cruise

15    Ferries?

16    A.   We needed this information in order for us to submit an

17    offer that American Cruises could entertain and accept.   We

18    need to have full knowledge of the company in order to be able

19    to submit a proposal, an offer.

20    Q.   I will try one different way.

21         Was the offer to buy the company, or merge with the

22    company, or what kind of offer were you considering?

23    A.   It was a mixed operation.   We would fuse together American

24    Cruises and Balearia Caribbean, and we would pay the owners of

25    American Cruises in cash and in shares of stock.   They would

1    hold a minority interest.

2    Q.  I want to now bring you back to the questions before we

3    went to American Cruise Ferries.

4        Thinking about 2016 -- not 2015 -- did Balearia eventually

5    come to learn that the Genting ferry was going to be sold, the

6    SuperFast was going to be taken out of service?

7    A.  We learned for certain on January the 8th.  That was the

8    date in which Genting made the announcement that they were

9    stopping the SuperFast service to Bimini.

10   Q.  How did Balearia respond or react?

11   A.  Instructions were quickly given to Mr. Herrero, who was

12   responsible for Balearia operations in the Caribbean, to

13   contact Genting and to approach them with a solution to try to

14   come to an agreement.

15       At that time, we still had no knowledge that there were

16   contacts between Buquebus, Genting, and Mr. Calvo.  We had no

17   knowledge of this situation.  We thought we were the

18   best-suited operator to provide answers to Genting's needs when

19   it withdrew its ship SuperFast from operation.

20   Q.  Did then Balearia submit a proposal to Genting?

21   A.  Within the time of one month, we submitted four different

22   proposals trying to tailor it to their needs.

23   Q.  Were you involved in discussions about what those proposals

24   contained?

25   A.  Yes, of course.

1   Q.   Did you attend any meetings with Genting?

2   A.   No.

3   Q.   Who attended the meetings?

4   A.   The director general of Balearia Eurolineas Maritimas, the

5   parent company.

6   Q.   Did Balearia submit a successful bid?

7   A.   It submitted an offer in February, and it was unsuccessful.

8   Q.   Were any of Balearia's offers successful?

9   A.   No.

10   Q.   Was there -- at this time, in February 2016, was there any

11   competition in the Caribbean market for a ferry service between

12   Florida and the Bahamas?

13   A.   Balearia was very well positioned.  It was a big company, a

14   great company with many ships.  It had a presence in Florida.

15   It had ships that had met the Coast Guard requirements, and

16   that is a very lengthy process that takes many months.

17            THE COURT:  I think, Mr. Utor, the question is did you

18   have any competition?

19            THE WITNESS:  No.

20            THE COURT:  Okay.

21    BY MR. BARFIELD:

22   Q.   Did Genting tell Balearia why it did not accept its last

23   proposal?  What was wrong with it?

24   A.   Back in that time, I don't think they did.  We later

25   learned that the reason why they did not accept our proposals

1    was that we had arrived late.

2    Q.   Now, if you had known about an opportunity to contract with

3    Genting or to enter negotiations with them in 2015, would you

4    have done anything differently than you did in 2016?

5    A.   Of course I would.

6    Q.   What?

7    A.   I would have sped up contacts with Genting.  I would have

8    contacted them.  I would have arrived on time to provide

9    Genting with the best solution, among other things, because

10   Genting was interested in that, and so were we.

11   Q.   Would Mr. Calvo have had the opportunity to bring a

12   competitor into the Bahamas market in late 2015 if Balearia and

13   you had known about how serious Genting was about replacing the

14   SuperFast?

15        MR. POST:  Objection, speculation.

16        THE COURT:  Sustained.

17    BY MR. BARFIELD:

18   Q.   I will move to a different area briefly.

19        Do you rely on financial projections in your review of

20   potential business deals?

21   A.   Yes.

22   Q.   And what is the importance of those projections?

23   A.   Depending on what these projections say, the decision is

24   made whether or not to pursue a business deal.

25   Q.   I am going to ask you about a few specific kinds of numbers

1  and financial projections and ask you about their relative

2  importance.

3      For example, seasonability percentages, do you know what

4  that is?

5  A.  Yes.

6  Q.  What is the relevance or importance of that number for new

7  business?

8  A.  These figures, in essence, they manage cash flow, and in

9  that regard, they are essential to know what your capital needs

10  are in order to undertake the business and also the wherewithal

11  necessary to work every month or every season.

12  Q.  The next number I will ask you about are commission rates.

13      Are commission rates important to the financial projections

14  for a new business?

15  A.  They are very important inasmuch as they determine the

16  financial costs that are necessary in order to be able to

17  undertake the business.

18  Q.  How about average passenger price?  Of what relative

19  importance is that number?

20  A.  It determines revenue, and for that purpose, you have to

21  know the market very, very well.

22  Q.  The last number I will ask you about is the bin, pallet,

23  car unit, and price numbers.

24      Of what relevance or importance is that number or those

25  numbers?

```
 1   A.   Bin and pallet activity together with the average price
 2   determines the revenue for that business plan, and the
 3   advisability or otherwise of undertaking or not undertaking it.
 4   And for that purpose, it is also very important to know the
 5   market in order to know these figures.
 6            MR. BARFIELD:  If I could have a moment.
 7            THE COURT:  Yes, of course.
 8    BY MR. BARFIELD:
 9   Q.   If you and Balearia had learned in early September 2015
10   that Genting had done a summer experiment to try to make the
11   SuperFast successful and failed -- and therefore Genting was
12   ready to find an alternative to the SuperFast -- in your years
13   of experience with deals of that nature, how long would it
14   normally take to close a deal if you could reach one?
15            MR. POST:  Objection, speculation.
16            MR. BARFIELD:  Your Honor, based on his --
17            THE COURT:  Overruled.
18            THE WITNESS:  If we had the information about Mr.
19   Calvo and Mr. Farrell's meeting on September the 9th, we would
20   have taken advantage of the opportunity.  We would have acted
21   with alacrity.
22            We would have moved individuals, ships, resources, and
23   we would have provided Genting with an answer they could not
24   have said no to.  We had been waiting for that moment for two
25   years.
```

1          THE COURT:  Mr. Utor, the question is how long would

2     it have taken to close the deal?  If you can't give a number,

3     that's fine.

4      BY MR. BARFIELD:

5     Q.  In your experience.

6     A.  Weeks, I believe.

7     Q.  In your answer, you mentioned if you had known about the

8     September meeting that Mr. Calvo had.  What if you or Mr.

9     Herrero or someone acting actively to pursue this deal had been

10    at all the meetings you now know happened in 2015, how long

11    would it take?

12          MR. POST:  Objection, Your Honor.

13          THE COURT:  Sustained.  I think generally, because he

14    is a very experienced CEO, he can give me some indication of

15    how long he thinks a deal could be put together, but I don't

16    think he can say with any assuredness this deal would close in

17    this amount of time.

18          MR. BARFIELD:  I have no further questions.

19          THE COURT:  All right, cross-examination, Mr. Post.

20          MR. POST:  Thank you.

21          CROSS-EXAMINATION:

22     BY MR. POST:

23    Q.  Good afternoon, Mr. Utor.

24    A.  Good afternoon.

25    Q.  Let's go to American Cruise Ferries.

1      There were actually two meetings with American Cruise

2  Ferries, correct, not one?

3  A.   I believe there were several.

4  Q.   And you walked out of one of those meetings, correct?

5  A.   It is possible that there was some sort of an argument and

6  that I walked out on one of them, yes.

7  Q.   Was it possible, or did it actually happen?

8  A.   I seem to recall that it was possible.  I cannot say for

9  certain, but if you are persuaded it was so, then it was so.

10  Q.   Sir, you recall meeting with American Cruise Ferries on

11  more than one occasion, correct?

12  A.   Yes.

13  Q.   And at least one of those meetings was in late February or

14  early March 2015, correct?

15  A.   What was the year again?

16  Q.   2015.

17  A.   It's possible.

18  Q.   At least at one of the meetings you got angry, correct?

19  A.   Moments of tension can occur in any negotiation, and I have

20  no doubt that that happened in this one as well.  But I do not

21  agree with the characterization "got angry".

22  Q.   Well, you walked out of the meeting, correct?

23  A.   It's possible.

24  Q.   And when you went back to Puerto Rico with Mr. Calvo in

25  May, you were going to Puerto Rico for another purpose, weren't

1   you?

2   A.   I do not remember.

3   Q.   There wasn't a conference in Puerto Rico, at that point in

4   time, that you were planning to go to and you just went back to

5   American Cruise Ferries to see if you could patch things up?

6   A.   Whenever I traveled to Puerto Rico, there are several

7   points on my agenda.  It is possible I was going there for a

8   conference, and it was also possible I was there for meetings.

9        THE COURT:  Is it possible meaning you don't remember

10  what happened in May of 2015?  I'm unclear.

11       THE WITNESS:  It's been three years, and I have

12  traveled to Puerto Rico several times for different reasons.

13  If I don't have my agenda in front of me, it is difficult for

14  me to tell which meetings I went to and what meetings I did not

15  go to.  In Puerto Rico, we had many, many relationships.

16   BY MR. POST:

17  Q.   In any event, sir, am I correct that no agreement was ever

18  reached between Balearia and American Cruise Ferries?

19  A.   Yes.

20  Q.   And the reason for that is because there was a generational

21  issue between the father owner of American Cruise Ferries and

22  the son because the father wanted to cash out and get a large

23  payment and keep a significant minority interest, but Balearia

24  was unwilling to meet his demands, correct?

25  A.   That issue was part of the conversations, but normally,

1    whenever a business deal fails to come through, there is often

2    more than one cause for that.

3    Q.   Am I correct that the person who brought the concept of the

4    American Cruise Ferries deal to Balearia was Mr. Calvo because

5    he had a long relationship with the people at American Cruise

6    Ferries?

7    A.   That is not true.

8    Q.   How did you learn about the deal?

9    A.   We learned of the deal -- of the business through different

10   ways.  We knew of a link between Puerto Rico and the Dominican

11   Republic, and we knew that there was a company, an operator in

12   Puerto Rico, and we decided to contact this company.

13        In addition to which, on one occasion, we did travel with

14   this company once from San Juan, Puerto Rico to Santo Domingo.

15   But that Mr. Calvo had a relationship of long standing with

16   this company, that piece of news I hear it today for the first

17   time.

18   Q.   As far as you know, sir, was a deal ever worked out between

19   American Cruise Ferries and Buquebus?

20   A.   I have been able to learn that he was in touch with

21   Buquebus --

22   Q.   That wasn't my question.

23   A.   You asked whether I know -- could you repeat your question.

24   Q.   As far as you know, sir, was a deal ever worked out between

25   American Cruise Ferries and Buquebus?

1   A.   I don't know it for a fact, but I suspect that was the

2   case.

3   Q.   You suspect there is an agreement between American Cruise

4   Ferries and Buquebus?

5   A.   I suspect that there might have been offers between

6   Buquebus and American Cruise Ferries.

7   Q.   That was not my question.

8        My question is very simple.  Sitting here today, as far as

9   you know, was a deal ever worked out between Buquebus and

10  American Cruise Ferries?

11  A.   No, not that I know of.

12  Q.   As far as you know, was a deal ever worked out between

13  American Cruise Ferries and any other third party along the

14  lines that you were discussing with American Cruise Ferries

15  back in 2015?

16  A.   Not that I know of.

17  Q.   Let's move to what is relevant to this case.

18       The ship that Balearia was intending to use if they were

19  getting the Bimini route was the Pinar del Rio, correct?

20  A.   No.

21  Q.   What was the vessel they intended to use?

22  A.   Whatever ship Genting required for its traffic.  Balearia

23  has 35 ships.

24  Q.   You're aware that Balearia has made a claim for damages in

25  this case, correct?

1  A.  Yes, yes.

2  Q.  Have you seen the report prepared by Balearia's expert

3  concerning the damages that Balearia claims to have sustained?

4  A.  Yes.

5  Q.  Am I correct that, in that damage calculation, Balearia's

6  expert calculates the alleged damages based on the ship the

7  Pinar del Rio?

8  A.  Sort of a sample ship of the company was used in order to

9  calculate damages.

10  Q.  Well, sir, you indicated before that Balearia has many

11  ships, correct?

12  A.  Yes.

13  Q.  Sir, the damage calculation submitted by your expert

14  doesn't have alternative calculations for various ships.  It

15  has a single calculation for the ship, the Pinar del Rio; is

16  that correct?

17  A.  There is a reason for that; the Pinar del Rio was in Port

18  Everglades.

19  Q.  I didn't ask the reason.  I wanted to know whether that was

20  the case.

21  A.  Yes.

22  Q.  And the damage calculations submitted by your expert has

23  two components to it, correct?

24  A.  I think so.

25  Q.  One is a projection of lost profits that they would have

1    gained had they obtained this route, correct?

2    A.  I do not have any knowledge of nor have I reviewed that

3    calculation, and I am not qualified to argue with you about its

4    contents.

5    Q.  I'm not going to get into the nitty gritty.  I wanted to

6    find out whether you were aware generally that there were two

7    components to the damage calculation; one for lost profits and

8    one for an idle ship.

9        Are you aware of that?

10   A.  I do not know that detail.

11   Q.  The Pinar del Rio was not owned by Balearia Caribbean, was

12   it?

13   A.  No.

14   Q.  In fact, it was owned by the parent company of which you're

15   the chairman, correct?

16   A.  As I am of Balearia Caribbean.

17   Q.  Right, but the owner of the Pinar del Rio is the parent

18   company, Balearia Eurolineas Maritimas -- and I apologize for

19   my very poor pronunciation.

20       Do you mind if I call it the parent company?

21   A.  No.

22   Q.  So the parent company owned the Pinar del Rio, correct?

23   A.  Yes.

24   Q.  And the Balearia Caribbean operated the Pinar del Rio

25   pursuant to a charter with the parent company, correct?

1    A.   A contract.

2    Q.   It was what's known as a bare boat charter, correct?

3    A.   Correct, yes.

4    Q.   It wasn't a long-term charter such as for a specified

5    number of years.  Instead, it was a charter for short periods

6    of time, renewable frequently, correct?

7    A.   It is -- I'm not sure.  It's possible it was though.

8    Q.   Do you recall when I took your deposition back in March?

9    A.   Yes.

10   Q.   Do you recall that I asked you the question on, page 27,

11   "Was the charter for a specific period of time, for example,

12   six months or one year?"

13       Answer:  "I don't recall the term.  It could have been for

14   short periods of time, renewable frequently given -- or by

15   necessity."

16       Do you recall giving that answer?

17   A.   Yes, it's the same thing I just said, no.

18            MR. BARFIELD:  Objection, Your Honor.

19            THE COURT:  Well --

20            MR. BARFIELD:  I withdraw the objection.

21            THE COURT:  Okay, but I'm confused.

22            So you don't know what the terms of the bare boat

23   charter between the parent company and Balearia Caribbean was?

24            THE WITNESS:  I do not know it in detail.  I'm

25   applying commonsense and logic.  We're talking about a parent

1    company and a 100 percent owned subsidiary.  They have common

2    shared interests.

3            THE COURT:  So the short answer is he does not

4    remember the terms.  Move on.

5            THE WITNESS:  I do not recall the exact terms of the

6    charter.

7     BY MR. POST:

8    Q.  But you do recall that it was for short periods of time,

9    correct?

10   A.  I have said that I believe that possibly they could have

11   been -- they could have been short-term charters.

12   Q.  If the ship, had worked the charter would be renewed,

13   correct?

14   A.  If the ship had continued to operate, it is obvious.  It is

15   reasonable that the charters would have been renewed upon

16   expiration, of course.

17   Q.  If it was decided to move the vessel back to Europe, there

18   would be no financial penalty to Balearia Caribbean, correct?

19   A.  Moving a ship to Europe has a significant cost, and finding

20   work for a ship to do also requires significant work.

21   Q.  And having a ship wait for an opportunity to arise also

22   involves a high cost?

23           THE COURT:  Mr. Post, I assume you're referring to a

24   penalty clause in the charter?

25           MR. POST:  Exactly.

```
 1              THE COURT:  You see, Mr. Utor doesn't know, so we'll
 2    have to find someone who does.
 3     BY MR. POST:
 4    Q.  Is there anyone at Balearia Caribbean who knows the exact
 5    terms of the charter?
 6    A.  Possibly.  For sure, yes.  Of course.
 7    Q.  Who?
 8    A.  I wouldn't be able to tell you that.
 9    Q.  When Mr. Calvo was CEO, would he have been knowledgeable
10    about the terms of the charter agreement between Balearia
11    Caribbean and the parent company?
12    A.  I think so.
13    Q.  So if Mr. Calvo testifies --
14              THE COURT:  No, no, no.
15     BY MR. POST:
16    Q.  You mentioned that this was a bare boat charter before.
17        It's my understanding that there's a bare boat charter and
18    a time charter.  You're familiar with both of those terms?
19    A.  Yes.
20    Q.  And the difference between the two is that a bare boat
21    charter is just for the vessel itself while the time charter
22    includes the cost of the crew, the cost of repair and
23    maintenance, and the cost of insurance, correct?
24    A.  Yes, yes.
25    Q.  Like renting an unfurnished villa as opposed to renting a
```

 1    furnished villa with a staff, correct?

 2    A.  Or a car with a driver or a car without a driver.

 3    Q.  You are aware that at least some of the terms of the

 4    charter -- for example, you're aware that, under the charter,

 5    Balearia Caribbean was supposed to pay $1.5 million a year to

 6    the parent company, correct?

 7    A.  That's a reasonable figure.  It possibly is the figure.

 8    Q.  And Balearia Caribbean was responsible for the maintenance

 9    of the ship, the cost of the crew, and the insurance, correct?

10    A.  Yes.

11    Q.  When did the Pinar del Rio first begin operations in South

12    Florida?

13    A.  It arrived in Florida in 2011, and it is possible that it

14    began operations in late 2011.  I may be wrong though.

15    Q.  In any event, at some point in time, the -- strike that.

16        In 2013, the Pinar del Rio serviced the route to Freeport;

17    did it not?

18    A.  I think so.

19    Q.  Am I correct that, in the year 2014, the Pinar del Rio

20    serviced Freeport?

21    A.  We have had four ships in the area that have been replacing

22    one another.

23    Q.  I understand that.

24    A.  If you say that it was, I believe you.

25    Q.  That's not what we're doing here today.

1    A.   I cannot tell you for sure during which times each ship was

2    operational every year.

3              THE COURT:   We're going to take a break now.

4              Mr. Barfield, if there's anything that might refresh

5    Mr. Utor's recollection that would move this along, it would be

6    appreciated.

7              MR. BARFIELD:   He's not the corporate rep, Your Honor.

8    If he doesn't know, he doesn't know.   But I will see what we

9    can do to move things along.

10             MR. POST:   I will try to move it along.

11             RECESS TAKEN

12    BY MR. POST:

13   Q.   Do you have in front of you, Mr. Utor, the exhibits that

14   Balearia put together in a notebook?

15   A.   Yes.

16   Q.   Could you take a look at Balearia Exhibit 17 for a moment.

17        Do you recognize this document as Balearia Caribbean's

18   profit and loss statement for the year 2014?

19   A.   It says here it is the profit and loss for 2014, yes.

20   Q.   Have you ever seen the document before?

21   A.   I do not remember it.

22   Q.   Do you ordinarily, as the chairman of the Balearia Group,

23   see profit and loss statements for your subsidiaries?

24   A.   Yes, but not in this format.

25   Q.   This is the format that it was produced to us.

1      Can you take a look at the line item "fletes" under the

2  expenses.

3  A.  Yes.

4  Q.  "Fletes" means charter expense, correct?

5  A.  Yes.

6  Q.  Does this refresh your recollection that, in 2014, the

7  charter expense for the Pinar del Rio was $1.5 million and

8  change?

9  A.  I already told you that I thought it was a reasonable

10  figure.

11  Q.  I just wanted to see whether this refreshed your

12  recollection that this was the actual figure, not just a

13  reasonable figure or a possible figure.

14  A.  I assume so.

15  Q.  There were several other items of expenses on this profit

16  and loss statement that are consistent with what you indicated

17  before, and that is that Balearia Caribbean would have been

18  responsible for repairs and maintenance.  That's a line item,

19  correct?

20  A.  Insurance, crew, everything points in that direction.

21  Q.  So the record is clear, there are four different line items

22  relating to the charter.  You have the charter fletes number,

23  you've got the repairs and maintenance, you have the insurance,

24  and you have the crew, correct?

25  A.  I have said so, yes.

1   Q.  Let's move on to another subject.

2      Now, on direct, Mr. Barfield asked you some questions about

3   Gerardo Capo.

4      Do you remember that?

5   A.  Quite well.

6   Q.  Not only was Mr. Capo one of the largest land owners in

7   Bimini, but he is also the minority partner in Resorts World

8   Bimini, correct?

9   A.  I do not know that.

10   Q.  You don't know that Mr. Capo is a minority owner in Resorts

11   World Bimini?

12   A.  I don't know that, and I don't know why I should know that.

13   Q.  Didn't you just have a trial in Spain last week against Mr.

14   Capo?

15   A.  Yes.

16   Q.  How long did that trial last?

17   A.  One day.

18   Q.  Back in 2016 and 2015, when Balearia was interested in

19   convincing Genting to allow Balearia Caribbean to do the Bimini

20   service, were you aware then that Mr. Capo was a minority owner

21   in Resorts World Bimini?

22   A.  No.

23   Q.  What is the permanent commission at Balearia?

24   A.  Permanent commission?

25   Q.  Perhaps I got it -- you have a board of directors or the

1   equivalent?

2   A.   Yes.

3   Q.   And what's that called?

4   A.   It's the board of directors.

5   Q.   During the course of the negotiations between Balearia and

6   Genting, the board of directors was kept apprised of the

7   developments by Mr. Vicente Herrero; was it not?

8   A.   Yes, yes.

9   Q.   Isn't it a fact that the board of directors was very

10  concerned about the impact of the lawsuit that you had filed

11  against Mr. Capo on the company's ability to successfully

12  obtain this contract?

13  A.   No -- quite the opposite.

14  Q.   Why was it the opposite?

15  A.   Because we had worked with Capo to try to work it out into

16  an agreement, a global agreement, with Genting.  And Capo

17  himself acknowledged that to me ten days ago.

18  Q.   So, you were not concerned that the pending lawsuit that

19  you had against the minority owner of Resorts World Bimini

20  would impact negatively your bid for this project; is that your

21  testimony?

22        MR. BARFIELD:  Objection, we have not established that

23  he knew that he was the minority owner of Genting.

24        THE COURT:  Overruled.

25        THE WITNESS:  Quite the opposite.

```
 1    BY MR. POST:
 2    Q.  As an experienced business executive, you're aware of what
 3    a non-competition agreement is, correct?
 4    A.  Yes.
 5    Q.  Am I correct that non-competition agreements are also used
 6    in Spain?
 7    A.  Yes.
 8    Q.  And you're aware that a non-competition agreement is an
 9    agreement whereby an employee agrees not to compete with its
10    former employer for a specified period of time and sometimes in
11    a specified region, correct?
12    A.  Yes.
13    Q.  And you're aware that, in the State of Florida, a
14    non-compete agreement must be in writing?
15    A.  Yes.
16    Q.  Did Balearia ever ask Mr. Calvo to execute a non-compete
17    agreement?
18    A.  Possibly it did.  For sure it did.
19    Q.  Did Balearia Caribbean ever ask Mr. Calvo to sign a
20    non-compete agreement?
21    A.  It did ask him.
22    Q.  Did Mr. Calvo ever execute a non-compete agreement?
23    A.  It was never asked for.  It's a problem with the tense of
24    the question.
25    Q.  I'm very confused.
```

1  A.  I never did ask for it.

2  Q.  He never gave one, correct?

3  A.  Correct.

4  Q.  Did Balearia Caribbean ever ask Mr. Calvo to execute an

5  agreement whereby he agreed not to solicit the customers of

6  Balearia Caribbean?

7  A.  He was never asked to sign an agreement.

8  Q.  Did Balearia Caribbean ask him to execute an agreement

9  whereby he would not solicit employees of Balearia Caribbean?

10  A.  I never asked him to sign any agreement.

11  Q.  So your answer would be the same then whether he was asked

12  to execute a written agreement whereby he agreed to maintain

13  certain types of documents as confidential, correct?

14  A.  He was never asked because it was not necessary.

15  Q.  And because Mr. Calvo didn't have an employment agreement,

16  he could be fired at will, correct?

17  A.  No.

18  Q.  Did you have an agreement with Mr. Calvo whereby he could

19  only be fired with cause?

20  A.  Mr. Calvo has a long employment relationship with the

21  Balearia company that goes all the way back to Spain under

22  which you cannot fire an employee at will, and the Spanish

23  regulations may govern that.  The U.S. contract could be

24  construed as a Spanish contract.

25  Q.  Was there a contract between Balearia Caribbean and Mr.

1  Calvo whereby Mr. Calvo could only be fired for cause, yes or

2  no?

3  A.   I do not know.

4  Q.   Some companies, in order to emphasize the importance or

5  sensitivity of certain documents, have a policy of marking on

6  the document itself that it is sensitive or confidential.

7       Have you ever seen any Balearia Caribbean documents that

8  are marked confidential?

9  A.   No.

10  Q.   You are aware, sir -- because you testified to this -- that

11  in November of 2014, Mr. Calvo purchased a Mac laptop and

12  requested technical assistance from Balearia to reconfigure it,

13  correct?

14  A.   Yes.

15  Q.   And you personally authorized Balearia's director of

16  information to reconfigure the laptop so that he could use it

17  for Balearia business, correct?

18  A.   Yes.

19  Q.   And by so authorizing that, you understood and you knew

20  that Mr. Calvo would have on his laptop sensitive and propriety

21  confidential Balearia Caribbean information, correct?

22  A.   He was going to have access through his computer to

23  Balearia's files and archives.

24  Q.   And he would also have access on his laptop to the

25  corporate e-mail, correct?

1   A.  Specifically, Lotus Notes.

2   Q.  That's the corporate e-mail system, correct?

3   A.  Yes.

4   Q.  So if someone at Balearia Caribbean sent him sensitive

5   financial information via e-mail, he would have access to that

6   information on his laptop, correct?

7   A.  Only through a password that would enable him to enter the

8   system from his computer.

9   Q.  But he had such a password, correct?

10   A.  For as long as he was working at Balearia Caribbean, yes,

11   he did.

12   Q.  So the point is that he had on his laptop, at his beck and

13   call, all of Balearia's financial information that had been

14   sent to him by e-mail, correct?

15   A.  As the company's CEO, he had access through a password from

16   his personal computer to all the systems, to all the files, and

17   to the e-mail of the company.

18   Q.  In response to some questions to Mr. Barfield, you

19   indicated that Mr. Calvo put a command onto his e-mail to

20   forward his e-mails to his personal e-mail address, and you

21   thought that was improper in some fashion, correct?

22   A.  That is categorically forbidden by our company.

23   Q.  Well, he already had the e-mails on his computer, so did it

24   ever occur to you that he forwarded the e-mails because he

25   couldn't get access to Lotus Notes when he was traveling?

1  A.  Possibly.  That should have been the reasonable answer, but

2  later I thought otherwise.

3  Q.  But the fact is that that command was put into his computer

4  after he had been traveling to Cuba in June or July of 2015,

5  correct?

6  A.  I don't remember the date.  I do know that it was

7  installed, and I know that it was categorically forbidden by

8  company policy.  It was unnecessary because anywhere in the

9  world you can get e-mails through any electronic or data

10  device.

11  Q.  So if Mr. Calvo had difficulty accessing Lotus Notes while

12  in Cuba, that would not provide an explanation to you as to why

13  he forwarded his e-mails since he already had them on the

14  laptop in the first place?

15  A.  I do not agree with that explanation.

16  Q.  I will move on.

17      You're aware that his last day of employment was

18  October 30th, 2015, correct?

19  A.  That is what was agreed upon, yes.

20  Q.  Did anyone at Balearia, to your knowledge, ask Mr. Calvo to

21  delete all of the confidential information on his laptop before

22  he left the company?

23  A.  Yes, yes.

24  Q.  Do you recall my taking your deposition back in March?

25  A.  Yes.

1    Q.  Do you recall me asking the following question and you

2    giving the following answer?

3        Question, page 123, line 4:  "Did anyone at Balearia, to

4    your knowledge, ask Mr. Calvo to delete all of the confidential

5    information on his laptop before he left the company?"

6        Answer:  "I am not aware of that."

7        Do you recall giving that answer?

8    A.  Back then, I did not have any knowledge.  Today I do.

9    Q.  What knowledge do you have today?

10   A.  I learned of that subsequent to that deposition, and I

11   learned by preparing myself for this testimony here today and

12   also because our new CEO informed me that he had given orders

13   to cut all access to Balearia's system and e-mail from Mr.

14   Calvo's personal computer.

15           THE COURT:  Mr. Utor, you must listen to the question

16   that you are asked, and the question you were asked was did

17   anyone tell Mr. Calvo when he left to delete all confidential

18   information from his laptop?

19           THE WITNESS:  I know for a fact that the order was

20   issued to withdraw all of Mr. Calvo's passwords.

21           THE COURT:  I don't know if we're having a language

22   difficulty.  Again, Mr. Utor, the question is -- it's not a

23   withdrawal of passwords.

24           Was Mr. Calvo told to delete all confidential

25   information on his laptop?

1            THE WITNESS:  Yes.

2            THE COURT:  You can take it from there, Mr. Post.

3    BY MR. POST:

4    Q.  And who told him that?

5    A.  The person in charge of the Balearia systems.

6            THE COURT:  We need a name, Mr. Utor.

7            THE WITNESS:  Antonio Garcia.  He was given the order

8    to delete all access and all contents of Mr. Calvo's computer

9    -- and the contents.

10            MR. POST:  Move to strike the answer as hearsay.

11            THE COURT:  I am still not certain that we have an

12    answer.  It appears that Mr. Utor is telling us someone was

13    told to delete remotely.  I imagine that some people have that

14    capacity.

15            Is that what you're telling us, Mr. Utor, that Mr.

16    Garcia was given the order to delete items from Mr. Calvo's

17    laptop remotely?

18            THE WITNESS:  May I explain myself?

19            THE COURT:  Well, what we need to know is not what you

20    believed, but what happened --

21            (WITNESS BEGINS TO SPEAK IN SPANISH)

22            THE COURT:  Well, wait a minute -- and this seems to

23    be a theme here.  You actually have to wait until I am done

24    speaking.  That is one of the perks of the job.

25            So you told us that Mr. Garcia was told to delete Mr.

1    Calvo's access.  We understand that.  Did Mr. Garcia delete or

2    was he told to delete content off of Mr. Calvo's laptop?

3             THE WITNESS:  I do not know.

4             THE COURT:  All right.

5     BY MR. POST:

6    Q.  Did anyone at Balearia, to your knowledge, ask Mr. Calvo to

7    return copies of any allegedly confidential information in his

8    possession before he left the company?

9    A.  I do not know that.

10   Q.  Are you aware of anyone conducting an exit interview at

11   Balearia of Mr. Calvo upon his departure from the company?

12   A.  I do not know.

13   Q.  Let's move to the August 14th meeting you had with Mr.

14   Calvo in Spain where he told you that he wanted to leave.

15        Mr. Calvo told you he wanted to leave right away, correct?

16   A.  Yes.

17   Q.  The only reason he stayed on is because you specifically

18   requested that he stay on, correct?

19   A.  Yes.

20   Q.  During the course of the meeting, you discussed with him

21   the situation then existing with Genting: Did you not?

22   A.  Yes.

23   Q.  You told Mr. Calvo that this topic, meaning the Genting

24   ferry deal, was mature already and that this was the time for

25   this contract to be procured, correct?

1   A.   No.

2   Q.   You did not tell Mr. Calvo that this was a mature

3   opportunity?

4   A.   Not exactly.

5   Q.   Do you recall me asking you the following question and you

6   giving the following answer?

7        On page 125, question:   "When you had your meeting with Mr.

8   Calvo on August 15th, 2015, you had come to the conclusion that

9   this was a mature opportunity, correct?"

10       Answer:   "Yes."

11       Does that refresh your recollection?

12   A.   I thought then, and I think now, that the question wasn't

13   ripe; that it was beginning to ripen.

14   Q.   Now, October 30th is Mr. Calvo's last day.   Mr. Herrero

15   takes over immediately, correct?

16   A.   Yes.

17   Q.   So I would presume then -- because this was such a ripe

18   opportunity -- that the first thing you told Mr. Herrero was to

19   march himself over to the Genting offices right down the street

20   and talk to them about the Bimini ferry deal, correct?

21   A.   May I explain what I told Mr. Herrero?

22        THE COURT:   Mr. Utor, you can answer the question yes

23   or no.   Your lawyer, Mr. Barfield, is going to have a chance to

24   talk to you again on redirect and ask for any explanations you

25   have of these answers.

1          So let's start with yes or no and see if we can move

2   along from there.

3          THE WITNESS:  No.

4    BY MR. POST:

5   Q.  All right.  Did you tell Mr. Herrero to review the various

6   business plans that had been prepared at Balearia Caribbean for

7   the eventuality that they might have a deal with Genting

8   concerning Bimini?

9   A.  No.

10  Q.  How about on December 1st?  He's been there for a month

11  now.  Did you ask him to go over to Genting and see whether he

12  could -- see whether they could complete this ripe opportunity

13  on December 1st?

14  A.  No, and I do not agree with your characterization.

15  Q.  Did you ask Mr. Herrero, in December, to educate himself

16  about the potential Bimini deal so that he would be prepared in

17  the event that something happened in that regard?

18  A.  Yes.

19  Q.  What did you tell Mr. Herrero to do in December?

20          THE COURT:  I don't think he said it was in December.

21  I think he just -- when did you tell Mr. Herrero, and what did

22  you tell him?

23          THE WITNESS:  I can explain now.

24          THE COURT:  Okay.

25          THE WITNESS:  I discussed with Mr. Herrero the

1    strategies that Mr. Calvo and I had discussed for Genting,

2    which was nothing more than waiting until Genting contacted us

3    considering that the situation was beginning to ripen.

4              THE COURT:  Mr. Utor, the question was when did you

5    tell him?  You have told us what you told him, but maybe you

6    could give us a when.

7              THE WITNESS:  In August, in September, in October, in

8    November, in December, and in January.

9     BY MR. POST:

10   Q.  Are you aware of any contact that Mr. Herrero made with

11   anyone at Genting in October, November, or December?

12   A.  No -- in January, yes.

13   Q.  On January 8th, Genting made a public announcement that

14   they were going to cease operation of the SuperFast, correct?

15   A.  Yes.

16   Q.  Within eight days following that, Balearia had already

17   contacted Genting concerning the possibility that Balearia

18   would be able to secure that deal, correct?

19   A.  We tried it before, but yes, it was eight days.

20   Q.  Sitting here today, you're certainly aware that, in mid

21   June, an agreement was entered into between FRS and Genting to

22   provide ferry service from Miami to Bimini, correct?

23   A.  Yes.

24   Q.  I want to get the timeframe here.

25        Mr. Calvo leaves on October 30th, 2015.

1       No later than January 16th, Balearia Caribbean is in

2   contact with Genting about the route.

3       Five months later, Genting chose FRS to provide the

4   service, correct?

5   A.  Yes.

6   Q.  During that five-month period, from mid January 2016 to mid

7   June 2016, there were ongoing negotiations between Balearia and

8   Genting for this route, correct?

9   A.  No.

10  Q.  Do you recall when I asked you the following question and

11  you gave the following answer at your deposition on page 131?

12      Question:  "During that five-month period" -- excuse me,

13  starting at the bottom of page 130, going to 131.

14      Question:  "Now, during that five-month period from

15  January 16th -- mid January 16th to mid June 2016, there were

16  ongoing negotiations between Balearia and Genting; were there

17  not?"

18      And the answer was:  "There were many comes and goes,

19  true."

20      Do you recall giving me that answer back when your

21  deposition was taken?

22  A.  Yes, until February the 22nd.

23  Q.  And the delegation for Balearia who headed those

24  negotiations was Mr. Herrero and Mr. Terricabras, correct?

25  A.  Yes.

1    Q.  And those two gentlemen would keep you and the Permanent

2    Commission or the Board of Directors regularly informed

3    concerning the status of negotiations, correct?

4    A.  Yes.

5    Q.  During that five-month period, there were a number of

6    face-to-face meetings between representatives of Balearia and

7    Genting, correct?

8    A.  I seem to recall those meetings stopped to take place as of

9    February after we made our last offer.

10   Q.  Well, they resumed though when Buquebus pulled out, right?

11   A.  I'm not sure.  I'm sorry.

12   Q.  Did negotiations recommence after February?

13   A.  I'm not sure.

14   Q.  You're are not sure whether there were face-to-face

15   meetings on multiple occasions in May and June 2016 between

16   Balearia and Genting?

17   A.  I'm sorry, I do not remember that.

18   Q.  You recall that there were a number of face-to-face

19   meetings and there were also regular e-mails and phone

20   communications between representatives of Genting and Balearia

21   during that five-month period; do you not?

22   A.  As I stated earlier, I believe those relations ended in

23   February.

24   Q.  So you're not familiar with the negotiations that took

25   place in May and June; is that what your testimony is?

1   A.   I'm not sure they took place.

2   Q.   Didn't Mr. Terricabras and Mr. Herrero regularly give you

3   updates on those negotiations?

4   A.   Yes, but I do not recall everything that takes place in my

5   company over the years.

6   Q.   Let me ask if you recall me asking these questions and your

7   answers from your deposition beginning at the bottom of page

8   131.

9        Question:   "In addition to the face-to-face meetings,

10  there was regular e-mail contact or phone communications

11  between representatives of Balearia and Genting, correct?"

12       Answer:   "Yes."

13  A.   Yes.

14  Q.   Then I asked you:   "And because of that fact, you were

15  regularly informed of what was going on, you were familiar with

16  the various proposals that were made by Balearia to Genting,

17  correct?"

18       And your answer was:   "Not to all detail of it, but in

19  general manner, yes."

20  A.   Yes, but not of the distinct times at which those

21  communications took place.   That I do not remember.

22  Q.   I will ask that of Mr. Herrero when he's on the stand.

23       But you were aware, generally, sir, of the proposals that

24  were made and the interest of Genting for the potential carrier

25  for this route, correct?

```
 1   A.  I'm sorry, carrier?

 2   Q.  Ferry service provider for this route.

 3   A.  In January.

 4   Q.  You were aware of it all along.  It wasn't that

 5   complicated, right?

 6   A.  Yes, it was very complicated.  It became complicated.

 7   Q.  Didn't Genting simply want someone who could provide

 8   quality service with a top flight vessel so that they could get

 9   tourists from South Florida to Bimini?

10   A.  Yes.

11   Q.  You believed, because Balearia was a first class company

12   with good ships, that you had a very, very good chance of

13   getting that route, correct?

14   A.  Yes, and that's what we expected or hoped for.

15   Q.  Exactly.  Because of that, when you made proposals to

16   Genting, you tried to stress what a great company Balearia was

17   and how good its ships were, correct?

18   A.  Yes, but we came late.

19   Q.  We'll get to that.

20           THE COURT:  When do you think we might get to that,

21   Mr. Post?  I know Mr. Barfield had a very optimistic -- even

22   when I wasn't going to going to rush us -- a three-witness day.

23           How much longer do you think you will be?

24           MR. POST:  I think I will finish with him before 4:30,

25   4:40.  I was hoping that the witness would be a little bit more
```

1  responsive.

2         THE COURT:  Well, let's move along then.

3   BY MR. POST:

4   Q.  By mid April, you had learned that Mr. Calvo was

5   partnering, in some fashion, with Buquebus to try and secure

6   the route, correct?

7   A.  That's when I began to suspect.

8   Q.  Sir, you were absolutely aware of it by April 11th,

9   correct?

10  A.  I believe in April, as of late April, May, I already knew.

11  Q.  You indicated before that you knew there were some

12  negotiations in February, correct?

13  A.  With whom?

14  Q.  There were negotiations between your group and Genting in

15  February, correct?

16  A.  Yes, yes, of course.

17  Q.  At some point in time, even though I'm sure you don't

18  recall the day, negotiations recommenced between Genting and

19  Balearia for that route, correct?

20  A.  I'm sorry, I do not know that.

21  Q.  Did you personally attend any of the negotiations with the

22  people at Genting for this route?

23  A.  No.

24  Q.  You went to Cuba three times in 2015, but you didn't have a

25  single meeting with Genting, did you?

1    A.  Yes.

2    Q.  Now, did you learn that Goetz Becker, the chairman of FRS,

3    had personally come to South Florida to pitch FRS's proposal to

4    Genting?

5    A.  Yes, he is the general manager.

6    Q.  Do you know how many times he came to pitch the deal?

7    A.  No.

8    Q.  If this was such an important deal for Balearia, why didn't

9    you come?

10   A.  My general manager came.

11   Q.  Am I correct that you have never spoken with Edward

12   Farrell, the president of -- the then president of Resorts

13   World Bimini?

14   A.  Yes.

15   Q.  You have never spoken with him, correct?

16   A.  Yes.

17   Q.  You have never spoken to Dana Leiboviz, the prior president

18   of Resorts World Bimini, correct?

19   A.  No.

20   Q.  Have you ever spoken to Victor Karavias?

21   A.  No.

22   Q.  Have you ever spoken to anyone at Genting concerning the

23   negotiations for this route?

24   A.  No.

25   Q.  Who told you that you came late to the negotiations?

1   A.   In Farrell's declaration in these proceedings.   He did not

2   tell me.   He said that in his deposition.

3   Q.   So your conclusion that you came late to the negotiations

4   is based upon what you read in Mr. Farrell's deposition?

5   A.    No, it is based on more things, a chain of events, a chain

6   of facts and information that I have been receiving in the

7   course of these proceedings.

8   Q.   Information from your attorneys?

9   A.   Information from my attorneys, yes, depositions and

10  information that I have been receiving from different sources

11  in these proceedings.

12  Q.   Isn't it a fact that no one at Genting ever said to you

13  that Balearia came too late to the negotiations?

14  A.   That could hardly be possible if I never spoke with anyone

15  at Genting.

16  Q.   That's exactly right.

17       Now, it's your understanding, sir, is it not, that Genting

18  chose FRS over Balearia because of two main reasons; one,

19  because Genting did not want Balearia to have a monopoly in the

20  region, and two, because Mr. Calvo had earned their trust?

21  A.   That is your opinion.

22  Q.   Do you recall being asked the following question at your

23  deposition, beginning at page 139:

24       Question:   "Okay, do you know why Genting chose FRS over

25  Balearia?"

1     And your answer was this:  "First, because of Hernan Calvo.

2     He earned their trust.  And second of all, according to

3     Farrell, because they did not want to have a monopoly."

4     Do you recall giving that answer to the question I asked

5     you during the deposition?

6     A.  Because I answered that doesn't mean I am in agreement with

7     that.  I said according to Farrell.  I had read that in

8     Farrell's deposition.  That is why I am saying "according to

9     Farrell".  I am not saying in my opinion.

10    Q.  I asked whether you were told why FRS chose --

11         THE COURT:  Mr. Post, this applies to you as well.

12    When I start to speak, I would like people to pause for a

13    moment.

14         I think the problem is -- I'm not sure what we're

15    presenting to Mr. Utor anymore.  He didn't speak to anyone at

16    Genting, so he wouldn't know from them who told them what.

17         MR. POST:  I will move on, Your Honor.  I'm almost

18    done.

19         THE COURT:  All right.

20    BY MR. POST:

21    Q.  Would you agree with me, Mr. Utor, that the key to this

22    deal did not lay with FRS or Buquebus, but with Hernan Calvo?

23    A.  No.

24    Q.  Do you recall me asking you the following question at your

25    deposition on page 137:

1      Question:  "FRS doesn't get involved until mid May 2016,

2   four months later, and yet you're claiming that you lost the

3   deal because you were late in the game, correct?"

4      Answer:  "Yes, because the key does not lay with FRS nor

5   in Buquebus.  It's in Hernan Calvo.  He is the one that

6   possesses the information, the knowledge, and he is the one

7   closing and opening the door."

8      Do you remember giving that answer?

9   A.  No, I'm sorry.

10  Q.  Isn't it a fact, sir, that Mr. Calvo had been the image of

11  Balearia Caribbean to everyone here in South Florida?

12  A.  He was the first executive officer.  He was Balearia's

13  face.  He was my trusted man with full powers.

14  Q.  And the reason we are here today is because Balearia

15  Caribbean didn't obtain a non-compete agreement with Mr. Calvo,

16  who was the image, the brand, the face of Balearia Caribbean

17  and the person who you trusted, correct?

18      THE COURT:  I'm going to sustain the objection.  I'm

19  going to give you ample closing argument, Mr. Post.

20      MR. POST:  I have no further questions for Mr. Utor.

21      THE COURT:  Redirect, Mr. Barfield.

22      REDIRECT EXAMINATION

23   BY MR. BARFIELD:

24  Q.  Mr. Utor, you testified a few moments ago to Mr. Post that

25  you did not tell Mr. Herrero to go visit Genting immediately

1   when he took over as CEO to talk about the SuperFast.

2       Do you remember that?

3   A.  Yes.

4   Q.  Why ; did you not tell him that?

5   A.  Because the strategy was different, was another.

6   Q.  What did you tell him?

7   A.  That we had to continue following, transmitting Genting's

8   operations, that we had to continue competing against them in

9   the excursion and day trip portion of the market, and we had to

10  wait for Genting to give the first sign that it had realized

11  that the model it was using was wrong in order to come to an

12  agreement with us; a signal that we did not receive at Balearia

13  until January the 8th or the 9th.

14  Q.  And you also testified that you did not tell Mr. Herrero to

15  educate himself about the Genting deal and the Bimini Line; is

16  that what I understood?

17  A.  Yes.

18  Q.  What did you tell him in that regard about educating

19  himself as the new CEO?

20  A.  To closely follow Genting's moves.  We know that the matter

21  was beginning to ripen and at some point they were going to

22  look to Balearia as the only operator in the area.

23  Q.  This is the same strategy that you had discussed numerous

24  times with Mr. Calvo earlier -- or was there anything different

25  about that?

A.   This was my strategy, and it was my director Mr. Calvo's

strategy.   It was our strategy.

Q.   And would your instruction to Mr. Herrero about the

strategy have been different had you known, in 2015, what you

know now had happened between Balearia and Genting in 2015?

A.   Yes.

Q.   Was education about the Genting situation part of what you

anticipated would be the transition period where Mr. Herrero

and Mr. Calvo worked together?

A.   My understanding was that Mr. Calvo would bring Mr. Herrero

up-to-date on all matters in order to make the decisions that

were best for the company, in a matter as important as the

matter of Genting and Bimini.

Q.   Why; did you not personally come to any meetings with

Genting in 2016?

A.   First of all, because I thought it was an easy thing

because, at that time, I did not think that there was another

competitor.   As you can see, I do not speak English, and I do

not feel comfortable in meetings of that sort.

     And because I have a manager, Mr. Terricabras, who can

perform that role in exactly the same fashion that Mr. Goetz

does for FRS.

     I also wish to remind you that I am the owner of Balearia

while Mr. Goetz is an employee of FRS.

Q.   If you could turn to P81 in your notebook.

84

```
 1              THE COURT:  Is P81 in evidence?
 2              MR. BARFIELD:  Yes.
 3              THE COURT:  All right.
 4    BY MR. BARFIELD:
 5    Q.  If you would look at the first page, have you seen this
 6    document before?
 7    A.  I do not remember it.
 8    Q.  Look at the attachment.
 9    A.  Probably I have.
10    Q.  And are you a recipient according to the e-mail addresses?
11    A.  Yes.
12    Q.  And does this document relate to Balearia Caribbean and its
13    financials?
14    A.  Yes.
15    Q.  Could you read the legend at the bottom -- you don't have
16    to read it, but what is it about?
17    A.  It is confidential -- the information is confidential and
18    may not be used individually.  It's a confidential document.
19              MR. BARFIELD:  Thank you.  I have no further
20    questions, Your Honor.
21              THE COURT:  Thank you, Mr. Utor.  You may step down.
22              WITNESS EXCUSED
23              THE COURT:  Is there anything we could handle within
24    the next 20 or 25 minutes?
25              MR. BARFIELD:  We could start another witness.
```

```
 1              THE COURT:  I understand.

 2              MR. BARFIELD:  I don't think there is any housekeeping

 3    or anything.

 4              THE COURT:  Let me give you what is the tentative

 5    schedule.  I thought we would start again at 9:30 tomorrow.  I

 6    have a calendar call at 11:00.  That will last about

 7    20 minutes.  I have a 4:00 sentencing.

 8              Wednesday is open until -- I'm going to open Wednesday

 9    up for you.

10              Thursday I'm going to open up for you.

11              I have things Friday that I hadn't rescheduled because

12    I thought we might conclude.

13              With those matters coming up, do you both think we

14    will conclude on Thursday or should we take the 20 minutes now?

15              MR. BARFIELD:  I am optimistic that we will still

16    finish on Thursday.  With the shorter day tomorrow, could we

17    perhaps start at 8:30 or 9:00?

18              THE COURT:  We could start at 9:00 tomorrow.

19              MR. BARFIELD:  That would be great.

20              THE COURT:  Is that all right, Mr. Post?

21              MR. POST:  That would be fine.

22              THE COURT:  All right.  I will see everyone back here

23    tomorrow at 9:00.

24

25
```

```
 1                          -   -   -

 2                  C E R T I F I C A T E

 3         I hereby certify that the foregoing is an accurate

 4    transcription of proceedings in the above-entitled matter.

 5

 6                                    /S/PATRICIA SANDERS

 7    _____                 _____

 8    DATE FILED                  PATRICIA SANDERS, RPR

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**$**

**$50,000** [1] - 32:24

**/**

**/S/PATRICIA** [1] - 86:6

**1**

**1.5** [2] - 57:5, 59:7
**100** [1] - 55:1
**11** [1] - 22:2
**11-3** [1] - 1:17
**11:00** [1] - 85:6
**11th** [1] - 77:8
**123** [1] - 67:3
**125** [1] - 70:7
**130** [1] - 73:13
**131** [3] - 73:11, 73:13, 75:8
**137** [1] - 80:25
**139** [1] - 79:23
**13th** [1] - 16:19
**14th** [6] - 17:16, 28:5, 29:3, 29:8, 34:10, 69:13
**15th** [5] - 17:17, 18:1, 26:1, 33:17, 70:8
**16-CV-23300-KMW** [1] - 1:3
**16th** [4] - 17:17, 73:1, 73:15
**17** [1] - 58:16
**1:15** [3] - 28:14, 28:17, 28:20
**1st** [2] - 71:10, 71:13

**2**

**20** [3] - 84:24, 85:7, 85:14
**2005** [1] - 34:19
**2006** [1] - 5:15
**2007** [3] - 5:24, 6:16, 6:24
**2008** [1] - 6:25
**2011** [4] - 10:18, 11:10, 57:13, 57:14
**2012** [2] - 10:24, 11:4
**2013** [10] - 6:17, 8:6, 11:4, 11:5, 11:12, 12:1, 12:2, 12:10, 12:14, 57:16
**2014** [6] - 12:6, 57:19, 58:18, 58:19, 59:6, 64:11
**2015** [38] - 13:20, 13:23, 14:13, 14:14, 14:25, 15:3, 15:6,

15:14, 15:18, 16:6, 16:10, 17:13, 17:14, 23:7, 23:9, 24:1, 24:3, 25:16, 27:3, 34:19, 35:12, 42:4, 44:3, 44:12, 46:9, 47:10, 48:14, 48:16, 49:10, 51:15, 60:18, 66:4, 66:18, 70:8, 72:25, 77:24, 83:4, 83:5
**2016** [10] - 42:4, 43:10, 44:4, 60:18, 73:6, 73:7, 73:15, 74:15, 81:1, 83:15
**22nd** [1] - 73:22
**23rd** [1] - 16:11
**24** [2] - 17:23, 25:19
**25** [1] - 84:24
**26th** [5] - 12:2, 16:23, 27:12, 27:16, 27:22
**27** [1] - 54:10
**27th** [3] - 27:13, 27:16, 27:22

**3**

**305.523.5528** [1] - 1:18
**30th** [5] - 16:13, 32:18, 66:18, 70:14, 72:25
**33128** [1] - 1:18
**33131** [1] - 1:13
**33134** [1] - 1:15
**35** [1] - 51:23

**4**

**4** [2] - 2:3, 67:3
**400** [1] - 1:17
**47** [1] - 2:3
**4:00** [1] - 85:7
**4:30** [1] - 76:24
**4:40** [1] - 76:25
**4th** [1] - 16:20

**6**

**6th** [1] - 25:18

**7**

**701** [1] - 1:12
**7th** [1] - 25:18

**8**

**804** [1] - 1:15
**81** [1] - 2:3
**83** [1] - 40:2

**84** [6] - 39:23, 39:24, 40:3, 40:5, 40:9, 40:12
**84A** [1] - 40:11
**85** [5] - 37:18, 40:7, 40:8, 40:13, 41:1
**8:30** [1] - 85:17
**8th** [3] - 42:7, 72:13, 82:13

**9**

**9** [1] - 40:3
**9-10-2018** [1] - 1:8
**9:00** [3] - 85:17, 85:18, 85:23
**9:30** [1] - 85:5
**9th** [3] - 16:24, 46:19, 82:13

**A**

**ability** [1] - 61:11
**able** [9] - 12:19, 14:1, 16:11, 23:24, 41:18, 45:16, 50:20, 56:8, 72:18
**above-entitled** [1] - 86:4
**absolute** [2] - 30:20, 33:4
**absolutely** [2] - 40:22, 77:8
**abstract** [2] - 26:17, 26:21
**absurd** [1] - 24:16
**accelerated** [1] - 13:9
**accept** [5] - 31:23, 33:13, 41:17, 43:22, 43:25
**accepted** [1] - 8:2
**access** [9] - 9:24, 64:22, 64:24, 65:5, 65:15, 65:25, 67:13, 68:8, 69:1
**accessing** [1] - 66:11
**according** [4] - 80:2, 80:7, 80:8, 84:10
**accurate** [1] - 86:3
**acknowledged** [1] - 61:17
**acquire** [1] - 19:13
**acted** [2] - 26:18, 46:20
**acting** [1] - 47:9
**active** [1] - 26:10
**actively** [2] - 14:4, 47:9
**activity** [3] - 8:13, 14:16, 46:1

**actual** [3] - 14:12, 19:21, 59:12
**addition** [4] - 13:14, 27:25, 50:13, 75:9
**address** [2] - 20:3, 65:20
**addresses** [1] - 84:10
**adequate** [1] - 31:7
**admit** [3] - 23:3, 37:17, 39:19
**admitted** [2] - 22:3, 36:22
**Adolfo** [2] - 2:3, 4:13
**adolfo** [1] - 3:25
**advantage** [1] - 46:20
**advisability** [1] - 46:3
**affairs** [1] - 32:11
**afield** [1] - 17:3
**Africa** [2] - 5:4, 5:19
**afternoon** [4] - 28:25, 29:1, 47:23, 47:24
**agenda** [2] - 49:7, 49:13
**aggressively** [1] - 13:15
**ago** [3] - 12:4, 61:17, 81:24
**agree** [5] - 32:14, 48:21, 66:15, 71:14, 80:21
**agreed** [8] - 21:1, 32:17, 32:18, 32:24, 33:5, 63:5, 63:12, 66:19
**agreement** [39] - 10:15, 11:11, 11:21, 12:2, 12:7, 12:8, 20:22, 24:8, 27:1, 34:2, 34:3, 36:5, 36:7, 36:11, 40:19, 42:14, 49:17, 51:3, 56:10, 61:16, 62:3, 62:8, 62:9, 62:14, 62:17, 62:20, 62:22, 63:5, 63:7, 63:8, 63:10, 63:12, 63:15, 63:18, 72:21, 80:6, 81:15, 82:12
**agreements** [1] - 62:5
**agrees** [1] - 62:9
**alacrity** [1] - 46:21
**Alan** [1] - 1:11
**Alicante** [1] - 4:15
**alleged** [1] - 52:6
**allegedly** [1] - 69:7
**allow** [3] - 22:2, 26:15, 60:19
**almost** [1] - 80:17
**alternative** [4] - 46:12, 52:14

**American** [46] - 17:19, 18:8, 18:11, 18:13, 19:12, 19:17, 19:22, 20:23, 21:5, 21:10, 21:12, 21:15, 21:16, 29:16, 35:12, 35:16, 35:17, 35:25, 36:3, 36:24, 37:16, 37:25, 39:8, 40:20, 41:5, 41:8, 41:14, 41:17, 41:23, 41:25, 42:3, 47:25, 48:1, 48:10, 49:5, 49:18, 49:21, 50:4, 50:5, 50:19, 50:25, 51:3, 51:6, 51:10, 51:13, 51:14
**amount** [3] - 29:22, 32:24, 47:17
**ample** [1] - 81:19
**angry** [1] - 48:18
**angry"** [1] - 48:21
**announce** [1] - 32:12
**announced** [1] - 29:7
**announcement** [2] - 42:8, 72:13
**answer** [29] - 17:8, 25:22, 27:9, 27:10, 30:25, 46:23, 47:7, 54:13, 54:16, 55:3, 63:11, 66:1, 67:2, 67:6, 67:7, 68:10, 68:12, 70:6, 70:10, 70:22, 73:11, 73:18, 73:20, 75:12, 75:18, 80:1, 80:4, 81:4, 81:8
**answered** [3] - 25:23, 34:12, 80:6
**answers** [3] - 42:18, 70:25, 75:7
**anticipated** [1] - 83:8
**anticipates** [1] - 4:4
**Antonio** [1] - 68:7
**apologize** [1] - 53:18
**aPPEARANCES** [1] - 1:10
**Apple** [1] - 9:21
**applies** [1] - 80:11
**applying** [1] - 54:25
**appreciated** [2] - 58:6
**apprised** [2] - 24:11, 61:6
**approach** [2] - 19:4, 42:13
**approached** [1] - 11:6
**approve** [2] - 9:14, 9:19
**approved** [1] - 20:25
**approximate** [1] - 32:24

**April** [8] - 12:2, 12:10, 15:18, 16:15, 77:4, 77:8, 77:10
**archives** [2] - 38:3, 64:23
**area** [4] - 5:5, 44:18, 57:21, 82:22
**argue** [1] - 53:3
**arguing** [1] - 18:16
**argument** [3] - 3:2, 48:5, 81:19
**arise** [2] - 11:20, 55:21
**arose** [2] - 5:12, 11:24
**arranged** [2] - 15:8, 16:1
**arrived** [4] - 41:10, 44:1, 44:8, 57:13
**articulated** [1] - 37:19
**ascertain** [1] - 19:20
**assistance** [1] - 64:12
**assume** [4] - 38:22, 39:13, 55:23, 59:14
**assuredness** [1] - 47:16
**attached** [4] - 20:8, 20:22, 38:8, 40:9
**attachment** [2] - 22:23, 84:8
**attempt** [2] - 19:18, 39:8
**attempted** [1] - 30:2
**attend** [2] - 43:1, 77:21
**attended** [1] - 43:3
**attention** [1] - 22:6
**attentive** [1] - 14:10
**attorneys** [2] - 79:8, 79:9
**August** [17] - 16:22, 16:23, 27:3, 27:5, 27:6, 27:12, 27:16, 27:22, 28:2, 28:3, 28:5, 29:3, 29:8, 34:10, 69:13, 70:8, 72:7
**authenticate** [1] - 22:25
**authority** [1] - 36:9
**authorize** [2] - 9:25, 23:13
**authorized** [7] - 9:21, 9:22, 24:9, 24:13, 25:7, 25:8, 64:15
**authorizing** [1] - 64:19
**available** [1] - 34:15
**Avenue** [2] - 1:12, 1:17
**average** [2] - 45:18, 46:1
**avoid** [1] - 35:9

**aware** [22] - 23:6, 26:10, 26:23, 36:12, 51:24, 53:6, 53:9, 57:3, 57:4, 60:20, 62:2, 62:8, 62:13, 64:10, 66:17, 67:6, 69:10, 72:10, 72:20, 75:23, 76:4, 77:8

# B

**bad** [1] - 29:21
**Bahama** [1] - 5:13
**Bahamas** [4] - 5:5, 10:10, 43:12, 44:12
**Bahia** [1] - 16:16
**Balearia** [149] - 1:4, 4:20, 4:22, 4:24, 4:25, 5:3, 5:6, 5:7, 5:9, 5:10, 5:11, 5:24, 7:15, 8:1, 8:5, 8:16, 9:6, 9:16, 9:22, 9:24, 10:16, 10:17, 11:10, 11:11, 11:13, 11:24, 12:1, 12:7, 12:9, 12:12, 12:14, 12:15, 12:16, 13:5, 15:13, 16:2, 16:8, 17:20, 18:10, 21:20, 21:22, 21:24, 22:16, 23:11, 23:13, 23:22, 24:2, 24:6, 24:15, 24:18, 25:25, 26:11, 27:18, 31:19, 34:4, 34:14, 34:17, 35:17, 36:4, 36:24, 38:20, 39:4, 40:20, 41:24, 42:4, 42:10, 42:12, 42:20, 43:4, 43:6, 43:13, 43:22, 44:12, 46:9, 49:18, 49:23, 50:4, 51:18, 51:22, 51:24, 52:3, 52:10, 53:11, 53:16, 53:18, 53:24, 54:23, 55:18, 56:4, 56:10, 57:5, 57:8, 58:14, 58:16, 58:17, 58:22, 59:17, 60:18, 60:19, 60:23, 61:5, 61:16, 62:19, 63:4, 63:6, 63:8, 63:9, 63:21, 63:25, 64:7, 64:12, 64:17, 64:21, 65:4, 65:10, 66:20, 67:3, 68:5, 69:6, 69:11, 71:6, 72:16, 72:17, 73:1, 73:7, 73:16, 73:23, 74:6, 74:16, 74:20, 75:11, 75:16, 76:11, 76:16, 77:19, 78:8, 79:13,

79:18, 79:19, 79:25, 81:11, 81:14, 81:16, 82:12, 82:22, 83:5, 83:23, 84:12
**Balearia's** [19] - 4:21, 16:21, 18:3, 23:15, 23:18, 23:20, 31:1, 31:17, 31:18, 38:25, 43:8, 52:2, 52:5, 64:15, 64:23, 65:13, 65:21, 72:21, 76:4, 77:8
**bare** [5] - 54:2, 54:22, 56:16, 56:17, 56:20
**BARFIELD** [75] - 3:1, 3:4, 3:12, 3:18, 3:22, 3:25, 4:7, 4:10, 17:6, 17:11, 18:7, 18:15, 18:20, 18:24, 19:3, 19:6, 19:23, 20:11, 20:16, 20:18, 21:23, 22:4, 22:5, 22:15, 22:18, 23:2, 23:5, 25:1, 25:9, 25:11, 25:15, 26:6, 26:20, 28:12, 28:15, 28:24, 34:20, 35:8, 35:10, 36:2, 36:19, 36:25, 37:2, 37:6, 37:7, 37:17, 38:7, 38:12, 38:24, 39:14, 39:23, 40:1, 40:5, 40:8, 40:12, 40:17, 43:21, 44:17, 46:6, 46:8, 46:16, 47:4, 47:18, 54:18, 54:20, 58:7, 61:22, 81:23, 84:2, 84:4, 84:19, 84:25, 85:2, 85:15, 85:19
**barfield** [2] - 4:6, 58:4
**Barfield** [11] - 1:11, 2:25, 25:3, 28:18, 28:23, 38:5, 60:2, 65:18, 70:23, 76:21, 81:21
**based** [11] - 6:8, 6:23, 7:6, 14:2, 29:24, 33:4, 34:7, 46:16, 52:6, 79:4, 79:5
**basis** [4] - 8:13, 14:9, 33:2, 33:14
**became** [2] - 13:5, 76:6
**beck** [1] - 65:12
**Becker** [1] - 78:2
**become** [1] - 8:5
**becoming** [1] - 34:15
**bed** [1] - 25:20
**began** [5] - 5:25, 11:12, 14:20, 57:14, 77:7

**begin** [1] - 57:11
**beginning** [12] - 9:8, 10:22, 11:12, 14:1, 14:21, 29:13, 39:6, 70:13, 72:3, 75:7, 79:23, 82:21
**BEGINS** [1] - 68:21
**begun** [2] - 12:5, 29:2
**belonged** [1] - 30:10
**bench** [2] - 37:4, 38:25
**BENCH** [1] - 1:8
**beneficial** [2] - 21:14
**benefits** [1] - 8:22
**best** [5] - 3:8, 12:11, 42:18, 44:9, 83:12
**best-suited** [1] - 42:18
**better** [2] - 25:9, 41:9
**between** [41] - 5:6, 5:19, 5:21, 8:21, 10:18, 11:8, 11:20, 11:24, 12:12, 16:5, 16:9, 17:13, 19:16, 25:12, 26:11, 42:16, 43:11, 49:18, 49:21, 50:10, 50:18, 50:24, 51:3, 51:5, 51:9, 51:12, 54:23, 56:10, 56:20, 61:5, 63:25, 72:21, 73:7, 73:16, 74:6, 74:15, 74:20, 75:11, 77:14, 77:18, 83:5
**beyond** [1] - 17:1
**bid** [2] - 43:6, 61:20
**bide** [1] - 13:2
**big** [2] - 13:19, 43:13
**Bimini** [52] - 10:5, 10:6, 10:10, 10:16, 10:18, 10:24, 11:1, 11:2, 11:6, 11:7, 11:9, 11:14, 11:15, 11:19, 12:9, 12:13, 12:14, 12:17, 12:18, 12:20, 12:22, 13:5, 13:21, 15:9, 15:17, 16:18, 17:14, 19:16, 26:12, 26:16, 26:19, 27:10, 34:15, 34:18, 42:9, 51:19, 60:7, 60:8, 60:11, 60:19, 60:21, 61:19, 70:20, 71:8, 71:16, 72:22, 76:9, 78:13, 78:18, 82:15, 83:13
**bin** [2] - 45:22, 46:1
**Biscayne** [1] - 32:23
**bit** [2] - 30:14, 76:25
**Board** [1] - 74:2
**board** [4] - 60:25,

61:4, 61:6, 61:9
**boat** [5] - 54:2, 54:22, 56:16, 56:17, 56:20
**bottom** [3] - 73:13, 75:7, 84:15
**bought** [1] - 5:24
**brand** [1] - 81:16
**Brazil** [5] - 6:21, 7:21, 7:22, 8:4
**break** [3] - 28:13, 28:14, 58:3
**breakfast** [1] - 17:18
**Brett** [1] - 1:11
**Brickell** [1] - 1:12
**brief** [1] - 18:9
**briefly** [1] - 44:18
**bring** [3] - 42:2, 44:11, 83:10
**broke** [1] - 29:2
**brokers** [1] - 14:3
**brought** [3] - 9:23, 10:24, 29:21, 50:3
**Buquebus** [23] - 5:18, 5:24, 7:20, 23:7, 23:10, 23:14, 23:22, 24:1, 24:3, 39:3, 39:7, 39:11, 42:16, 50:19, 50:21, 50:25, 51:4, 51:6, 51:9, 74:10, 77:5, 80:22, 81:5
**business** [40] - 4:21, 5:21, 6:3, 6:10, 6:11, 7:1, 7:10, 7:12, 7:15, 7:18, 8:12, 9:3, 11:9, 21:3, 21:20, 23:13, 23:20, 23:24, 24:3, 24:6, 24:9, 24:13, 24:14, 31:13, 37:24, 38:20, 39:20, 44:20, 44:24, 45:7, 45:10, 45:14, 45:17, 46:2, 50:1, 50:9, 62:2, 64:17, 71:6
**businessman** [1] - 4:17
**buy** [3] - 9:21, 17:20, 41:21
**BY** [36] - 1:16, 4:10, 17:11, 18:7, 19:6, 19:23, 20:20, 22:5, 23:5, 25:15, 26:6, 26:20, 28:24, 35:10, 36:2, 37:7, 40:17, 43:21, 44:17, 46:8, 47:4, 47:22, 49:16, 55:7, 56:3, 56:15, 58:12, 62:1, 68:3, 69:5, 71:4, 72:9, 77:3, 80:20, 81:23,

84:4

# C

**Cadiz** [1] - 6:7
**calculate** [1] - 52:9
**calculates** [1] - 52:6
**calculation** [5] - 52:5, 52:13, 52:15, 53:3, 53:7
**calculations** [2] - 52:14, 52:22
**calendar** [1] - 85:6
**Calvo** [102] - 1:6, 5:14, 5:25, 6:2, 6:19, 7:14, 8:23, 9:6, 10:14, 13:3, 13:11, 13:22, 14:7, 14:9, 14:13, 14:22, 14:24, 16:6, 16:9, 17:13, 17:15, 17:21, 17:24, 18:3, 18:6, 20:3, 20:6, 20:16, 20:17, 21:1, 21:22, 23:3, 23:7, 23:10, 23:13, 24:8, 24:17, 25:12, 25:16, 25:21, 26:11, 27:4, 27:7, 27:22, 28:3, 29:3, 29:7, 29:11, 30:19, 32:8, 32:14, 32:17, 32:22, 33:6, 33:13, 34:2, 34:3, 34:7, 36:10, 39:2, 42:16, 44:11, 46:19, 47:8, 48:24, 50:4, 50:15, 56:9, 56:13, 62:16, 62:19, 62:22, 63:4, 63:15, 63:18, 63:20, 64:1, 64:20, 65:19, 66:20, 67:4, 67:17, 67:24, 69:6, 69:11, 69:14, 69:15, 69:23, 70:2, 70:8, 72:1, 72:25, 77:4, 79:20, 80:1, 80:22, 81:5, 81:15, 82:24, 83:9, 83:10
**calvo** [6] - 5:23, 20:15, 34:1, 64:11, 66:11, 81:10
**Calvo's** [14] - 6:1, 19:18, 21:25, 22:22, 32:12, 32:20, 67:14, 67:20, 68:8, 68:16, 69:1, 69:2, 70:14, 83:1
**cancelled** [2] - 16:18, 18:1
**cannot** [4] - 39:17, 48:8, 58:1, 63:22

**capable** [1] - 7:2
**capacity** [1] - 68:14
**capital** [1] - 45:9
**Capo** [16] - 11:16, 11:17, 11:18, 11:20, 11:22, 11:25, 12:1, 12:10, 60:3, 60:6, 60:10, 60:14, 60:20, 61:11, 61:15, 61:16
**car** [3] - 45:23, 57:2
**Caribbean** [46] - 1:4, 5:5, 5:7, 5:10, 5:11, 8:1, 8:2, 8:5, 8:16, 9:6, 10:6, 11:10, 13:6, 18:10, 26:8, 27:18, 41:24, 42:12, 43:11, 53:11, 53:16, 53:24, 54:23, 55:18, 56:4, 56:11, 57:5, 57:8, 59:17, 60:19, 62:19, 63:4, 63:6, 63:8, 63:9, 63:25, 64:7, 64:21, 65:4, 65:10, 71:6, 73:1, 81:11, 81:15, 81:16, 84:12
**Caribbean's** [1] - 58:17
**carrier** [2] - 75:24, 76:1
**case** [13] - 1:3, 5:8, 19:15, 35:22, 36:8, 38:22, 39:1, 39:6, 51:2, 51:17, 51:25, 52:20
**cases** [1] - 36:6
**cash** [3] - 41:25, 45:8, 49:22
**casinos** [1] - 12:24
**categorically** [2] - 65:22, 66:7
**cease** [1] - 72:14
**CEO** [17] - 7:25, 8:5, 8:15, 8:23, 13:5, 24:8, 27:18, 28:10, 32:12, 32:17, 32:19, 47:14, 56:9, 65:15, 67:12, 82:1, 82:19
**certain** [1] - 8:21, 9:9, 18:2, 25:5, 29:22, 40:23, 42:7, 48:9, 63:13, 64:5, 68:11
**certainly** [3] - 22:25, 29:21, 72:20
**certify** [1] - 86:3
**chain** [2] - 79:5
**chairman** [3] - 53:15, 58:22, 78:2
**chance** [3] - 3:7, 70:23, 76:12

**change** [5] - 11:4, 11:5, 14:20, 30:5, 59:8
**characterization** [2] - 48:21, 71:14
**charge** [1] - 68:5
**charter** [22] - 53:25, 54:2, 54:4, 54:5, 54:11, 54:23, 55:6, 55:12, 55:24, 56:5, 56:10, 56:16, 56:17, 56:18, 56:21, 57:4, 59:4, 59:7, 59:22
**charters** [2] - 55:11, 55:15
**children** [2] - 7:8, 7:23, 79:18, 79:24, 80:10
**chose** [4] - 73:3, 79:18, 79:24, 80:10
**chosen** [1] - 12:25
**circumstances** [2] - 5:16, 23:18
**claim** [1] - 51:24
**claiming** [1] - 81:2
**claims** [1] - 52:3
**class** [1] - 76:11
**clause** [2] - 12:10, 55:24
**clear** [5] - 18:6, 20:14, 21:9, 21:19, 59:21
**Clemente** [1] - 37:12
**client** [1] - 39:8
**client's** [1] - 39:10
**close** [6] - 6:20, 6:22, 7:5, 46:14, 47:2, 47:16
**closely** [2] - 13:12, 82:20
**closing** [2] - 81:7, 81:19
**Coast** [1] - 43:15
**collateral** [3] - 19:18, 39:9, 39:11
**combined** [1] - 4:22
**comfortable** [1] - 83:19
**coming** [4] - 7:19, 7:25, 27:20, 85:13
**command** [2] - 65:19, 66:3
**commencement** [1] - 10:22
**comments** [1] - 14:2
**commercial** [1] - 14:16
**Commission** [1] - 74:2
**commission** [4] - 45:12, 45:13, 60:23, 60:24
**commitments** [1] -

11:23
**common** [1] - 55:1
**commonsense** [1] - 54:25
**communicate** [1] - 8:9
**communicating** [1] - 23:10
**communications** [4] - 23:6, 74:20, 75:10, 75:21
**companies** [2] - 5:21, 64:4
**company** [62] - 3:6, 4:18, 4:19, 5:1, 5:9, 5:11, 9:4, 9:5, 9:8, 9:17, 10:1, 10:2, 12:17, 12:19, 12:23, 17:19, 23:7, 30:7, 30:9, 32:1, 32:23, 33:3, 33:14, 35:12, 36:9, 36:20, 40:15, 41:7, 41:9, 41:12, 41:18, 41:21, 41:22, 43:5, 43:13, 43:14, 50:11, 50:12, 50:14, 50:16, 52:8, 53:14, 53:18, 53:20, 53:22, 53:25, 54:23, 55:1, 56:11, 57:6, 63:21, 65:17, 65:22, 66:8, 66:22, 67:5, 69:8, 69:11, 75:5, 76:11, 76:16, 83:12
**company's** [4] - 32:10, 38:3, 61:11, 65:15
**compensation** [2] - 8:19, 8:20
**compete** [7] - 34:2, 62:9, 62:14, 62:16, 62:20, 62:22, 81:15
**competed** [1] - 13:14
**competing** [1] - 82:8
**competition** [7] - 34:3, 34:9, 43:11, 43:18, 62:3, 62:5, 62:8
**competitive** [1] - 10:13
**competitor** [9] - 23:19, 23:22, 23:25, 24:1, 31:17, 33:25, 34:12, 44:12, 83:18
**competitors** [2] - 5:17, 5:18
**complete** [1] - 71:12
**completely** [2] - 31:4, 39:9
**complicated** [3] - 76:5, 76:6
**components** [2] -

52:23, 53:7
**composite** [1] - 40:3
**computer** [20] - 9:7, 9:8, 9:10, 9:11, 9:17, 9:22, 9:23, 9:24, 9:25, 10:2, 37:23, 64:22, 65:8, 65:16, 65:23, 66:3, 67:14, 68:8
**concept** [1] - 50:3
**concerned** [4] - 7:21, 7:23, 61:10, 61:18
**concerning** [8] - 23:1, 24:21, 24:23, 52:3, 71:8, 72:17, 74:3, 78:22
**concierge** [1] - 20:18
**conclude** [2] - 85:12, 85:14
**conclusion** [2] - 70:8, 79:3
**concrete** [1] - 26:17
**conduct** [1] - 11:12
**conducting** [1] - 69:10
**conference** [2] - 49:3, 49:8
**confidant** [1] - 34:8
**confidence** [1] - 7:6
**confidential** [13] - 41:11, 63:13, 64:6, 64:8, 64:21, 66:21, 67:4, 67:17, 67:24, 69:7, 84:17, 84:18
**conflict** [1] - 23:19
**confused** [2] - 54:21, 62:25
**conglomerate** [1] - 41:6
**consent** [1] - 24:11
**consider** [2] - 23:22, 24:1
**considered** [2] - 7:1, 30:23
**considering** [2] - 41:22, 72:3
**consistent** [1] - 59:16
**consists** [1] - 10:9
**construed** [1] - 63:24
**consulting** [2] - 33:11, 33:13
**contact** [5] - 42:13, 50:12, 72:10, 73:2, 75:10
**contacted** [3] - 44:8, 72:2, 72:17
**contacts** [2] - 42:16, 44:7
**contained** [2] - 40:25, 42:24
**contains** [1] - 41:5

**contemplate** [1] - 35:6
**content** [1] - 69:2
**contents** [4] - 21:17, 53:4, 68:8, 68:9
**contested** [2] - 18:18, 39:24
**continent** [1] - 29:16
**continue** [5] - 30:2, 32:17, 33:1, 82:7, 82:8
**continued** [1] - 55:14
**continuing** [2] - 35:20, 35:23
**contract** [10] - 12:10, 15:3, 15:5, 44:2, 54:1, 61:12, 63:23, 63:24, 63:25, 69:25
**conversations** [10] - 9:2, 13:22, 14:7, 14:13, 14:14, 14:18, 16:20, 16:24, 25:6, 49:25
**convincing** [1] - 60:19
**cooperating** [1] - 33:2
**copies** [3] - 28:18, 34:22, 69:7
**copy** [3] - 21:6, 21:23, 21:24
**Coral** [1] - 1:15
**Corp** [1] - 1:4
**corporate** [5] - 9:4, 32:10, 58:7, 64:25, 65:2
**correct** [87] - 20:24, 21:3, 21:7, 24:7, 36:25, 37:2, 48:2, 48:4, 48:11, 48:14, 48:18, 48:22, 49:17, 49:24, 50:3, 51:19, 51:25, 52:5, 52:11, 52:16, 52:23, 53:1, 53:15, 53:22, 53:25, 54:2, 54:3, 54:6, 55:9, 55:13, 55:18, 56:23, 57:1, 57:6, 57:9, 57:19, 59:4, 59:19, 59:24, 60:8, 62:3, 62:5, 62:11, 63:2, 63:3, 63:13, 63:16, 64:13, 64:17, 64:21, 64:25, 65:2, 65:6, 65:9, 65:14, 65:21, 66:5, 66:18, 69:15, 69:18, 69:25, 70:9, 70:15, 70:20, 72:14, 72:18, 72:22, 73:4, 73:8, 73:24, 74:3, 74:7, 75:11, 75:17, 75:25, 76:13, 76:17, 77:6, 77:9,
77:12, 77:15, 77:19, 78:11, 78:15, 78:18, 81:3, 81:17
**correctly** [1] - 20:21
**cost** [6] - 55:19, 55:22, 56:22, 56:23, 57:9
**costs** [2] - 13:13, 45:16
**countries** [1] - 6:21
**couple** [1] - 18:2
**course** [16] - 7:16, 8:25, 14:9, 16:7, 21:3, 29:23, 35:16, 42:25, 44:5, 46:7, 55:16, 56:6, 61:5, 69:20, 77:16, 79:7
**COURT** [97] - 1:1, 1:9, 2:25, 3:3, 3:11, 3:14, 3:20, 3:24, 4:4, 17:3, 17:8, 18:5, 18:14, 18:18, 18:21, 19:1, 19:5, 19:19, 20:14, 20:17, 20:20, 21:19, 22:1, 22:13, 22:16, 25:2, 25:10, 25:13, 26:2, 26:5, 26:15, 28:14, 28:16, 28:19, 28:22, 34:25, 35:4, 35:6, 35:23, 36:23, 37:1, 37:3, 37:21, 38:4, 38:9, 38:19, 39:10, 39:19, 39:24, 40:3, 40:7, 40:11, 40:14, 43:17, 43:20, 44:16, 46:7, 46:17, 47:1, 47:13, 47:19, 49:9, 54:19, 54:21, 55:3, 55:23, 56:1, 56:14, 58:3, 61:24, 67:15, 67:21, 68:2, 68:6, 68:11, 68:19, 68:22, 69:4, 70:22, 71:20, 71:24, 72:4, 76:20, 77:2, 80:11, 80:19, 81:18, 81:21, 84:1, 84:3, 84:21, 84:23, 85:1, 85:4, 85:18, 85:20, 85:22
**Court** [4] - 1:17, 12:5, 16:9, 19:11
**courtroom** [1] - 4:5
**cover** [1] - 10:11
**credibility** [1] - 19:18
**crew** [4] - 56:22, 57:9, 59:20, 59:24
**crisis** [2] - 6:24, 6:25
**cross** [1] - 47:19
**CROSS** [2] - 2:2, 47:21
**cross-examination** [1]

- 47:19
**CROSS-EXAMINATION** [1] - 47:21
**Cruise** [29] - 18:8, 19:17, 35:13, 35:16, 35:17, 35:25, 36:3, 36:24, 38:1, 39:8, 40:20, 41:6, 41:14, 42:3, 47:25, 48:1, 48:10, 49:5, 49:18, 49:21, 50:4, 50:5, 50:19, 50:25, 51:3, 51:6, 51:10, 51:13, 51:14
**Cruises** [16] - 17:19, 18:11, 18:13, 19:13, 19:22, 20:23, 21:5, 21:10, 21:12, 21:15, 21:16, 37:16, 41:8, 41:17, 41:24, 41:25
**Cuba** [9] - 25:24, 26:13, 26:17, 26:21, 26:22, 30:15, 66:4, 66:12, 77:24
**Cuban** [1] - 26:23
**custody** [1] - 38:2
**customary** [1] - 36:6
**customers** [1] - 63:5
**cut** [1] - 67:13

---

## D

**daily** [1] - 10:11
**damage** [4] - 52:5, 52:13, 52:22, 53:7
**damages** [4] - 51:24, 52:3, 52:6, 52:9
**Dana** [2] - 16:12, 78:17
**Daniel** [1] - 1:12
**data** [2] - 31:18, 66:9
**DATE** [1] - 86:8
**date** [5] - 12:5, 28:4, 42:8, 66:6, 83:11
**day-to-day** [1] - 13:17
**day-tripper** [1] - 13:15
**days** [9] - 12:4, 16:18, 17:22, 18:2, 32:13, 61:17, 72:16, 72:19
**deal** [34] - 18:8, 18:9, 20:13, 26:3, 37:24, 38:21, 39:3, 39:7, 41:13, 44:24, 46:14, 47:2, 47:9, 47:15, 47:16, 50:1, 50:4, 50:8, 50:9, 50:18, 50:24, 51:9, 51:12, 69:24, 70:20, 71:7, 71:16, 72:18, 78:6,
78:8, 80:22, 81:3, 82:15
**deals** [2] - 44:20, 46:13
**December** [7] - 71:10, 71:13, 71:15, 71:19, 71:20, 72:8, 72:11
**decided** [3] - 12:17, 50:12, 55:17
**decision** [2] - 6:14, 44:23
**decisions** [3] - 9:4, 83:11
**declaration** [1] - 79:1
**deep** [1] - 10:21
**defendant** [1] - 5:14
**DEFENDANT** [1] - 1:14
**defined** [1] - 13:8
**del** [17] - 10:23, 15:9, 16:17, 16:18, 18:1, 51:19, 52:7, 52:15, 52:17, 53:11, 53:17, 53:22, 53:24, 57:11, 57:16, 57:19, 59:7
**delay** [1] - 10:21
**delegation** [1] - 73:23
**delete** [10] - 66:21, 67:4, 67:17, 67:24, 68:8, 68:13, 68:16, 68:25, 69:1, 69:2
**delve** [1] - 37:4
**demanding** [1] - 11:8
**demands** [1] - 49:24
**Denia** [3] - 4:15, 27:12, 27:15
**departure** [1] - 69:11
**depended** [1] - 12:19
**deposition** [12] - 54:8, 66:24, 67:10, 73:11, 73:21, 75:7, 79:2, 79:4, 79:23, 80:5, 80:8, 80:25
**depositions** [1] - 79:9
**describe** [2] - 6:18, 33:10
**described** [4] - 11:21, 16:5, 32:15, 33:6
**desk** [1] - 37:23
**destroyed** [4] - 39:15, 39:17, 40:15, 40:20
**detail** [3] - 53:10, 54:24, 75:18
**determine** [1] - 45:15
**determines** [2] - 45:20, 46:2
**developed** [1] - 7:5
**development** [6] - 6:3, 6:10, 6:15, 7:15, 7:19, 8:12

**developments** [1] - 61:7
**device** [1] - 66:10
**devoting** [2] - 33:19, 33:23
**difference** [1] - 56:20
**different** [17] - 10:4, 18:3, 19:12, 21:17, 21:18, 31:14, 38:6, 41:20, 42:21, 44:18, 49:12, 50:9, 59:21, 79:10, 82:5, 82:24, 83:4
**differently** [2] - 31:15, 44:4
**difficult** [1] - 49:13
**difficulty** [2] - 66:11, 67:22
**dinner** [1] - 17:18
**DIRECT** [1] - 2:2
**direct** [3] - 8:21, 25:11, 60:2
**direction** [1] - 59:20
**directive** [1] - 40:15
**directly** [4] - 6:5, 8:8, 10:1, 38:16
**director** [14] - 5:17, 6:3, 6:9, 7:14, 7:18, 8:12, 16:16, 27:18, 37:11, 38:14, 38:17, 43:4, 64:15, 83:1
**Directors** [1] - 74:2
**directors** [4] - 60:25, 61:4, 61:6, 61:9
**discard** [1] - 13:1
**disclosure** [5] - 36:4, 36:7, 36:11, 37:1, 40:19
**discovered** [2] - 38:5, 39:1
**discuss** [4] - 3:9, 9:1, 21:10, 32:3
**discussed** [9] - 15:2, 15:5, 18:12, 18:16, 30:14, 69:20, 71:25, 72:1, 82:23
**discussing** [1] - 51:14
**discussion** [2] - 13:4, 32:20
**discussions** [4] - 16:5, 24:21, 30:12, 42:23
**distinct** [1] - 75:20
**DISTRICT** [3] - 1:1, 1:2, 1:9
**DIVISION** [1] - 1:2
**dock** [4] - 15:8, 15:9, 15:10, 16:1
**docking** [1] - 26:22
**document** [39] - 3:15,

19:2, 19:9, 19:11, 19:22, 19:25, 20:2, 20:7, 20:13, 20:21, 21:2, 21:6, 21:9, 21:11, 21:16, 21:20, 22:6, 22:11, 22:20, 22:21, 23:1, 36:13, 36:23, 37:8, 37:10, 37:17, 38:20, 38:25, 39:2, 41:3, 41:5, 41:8, 41:11, 58:17, 58:20, 64:6, 84:6, 84:12, 84:18

**documents** [22] - 10:1, 18:12, 18:23, 20:10, 21:17, 34:22, 34:24, 36:19, 37:22, 37:23, 37:25, 38:4, 38:6, 38:17, 38:22, 39:15, 39:19, 40:19, 40:25, 63:13, 64:5, 64:7

**dollars** [2] - 8:22, 13:18

**Domingo** [1] - 50:14

**Dominican** [1] - 50:10

**done** [9] - 3:19, 3:21, 22:23, 24:18, 31:15, 44:4, 46:10, 68:23, 80:18

**doomed** [1] - 12:25

**door** [1] - 81:7

**doors** [1] - 31:2

**doubt** [1] - 48:20

**Douglas** [1] - 1:15

**down** [2] - 70:19, 84:21

**download** [1] - 10:1

**dredged** [1] - 10:21

**drive** [3] - 21:25, 22:14, 22:22

**driver** [2] - 57:2

**during** [27] - 6:18, 6:22, 7:11, 7:16, 9:2, 14:25, 15:25, 16:6, 16:7, 17:24, 20:12, 20:19, 23:6, 25:21, 27:7, 27:21, 32:7, 32:8, 58:1, 61:5, 69:20, 73:6, 73:12, 73:14, 74:5, 74:21, 80:5

## E

**e-mail** [28] - 3:5, 8:10, 16:23, 19:21, 20:3, 20:8, 20:11, 20:15, 20:22, 22:24, 27:13, 27:24, 38:8, 38:16,

38:17, 40:9, 40:12, 64:25, 65:2, 65:5, 65:14, 65:17, 65:19, 65:20, 67:13, 75:10, 84:10

**e-mailed** [1] - 39:2

**e-mails** [15] - 3:2, 18:14, 18:15, 18:16, 18:17, 28:16, 28:18, 39:25, 40:4, 65:20, 65:23, 65:24, 66:9, 66:13, 74:19

**early** [4] - 8:6, 25:18, 46:9, 48:14

**earned** [2] - 79:20, 80:2

**easy** [1] - 83:16

**educate** [2] - 71:15, 82:15

**educating** [1] - 82:18

**education** [1] - 83:7

**Edward** [1] - 78:11

**efforts** [2] - 12:11, 27:1

**eight** [3] - 32:1, 72:16, 72:19

**either** [3] - 27:7, 33:9, 37:23

**electronic** [1] - 66:9

**emphasize** [1] - 64:4

**employee** [2] - 62:9, 63:22, 83:24

**employees** [1] - 63:9

**employer** [2] - 7:20, 62:10

**employment** [4] - 24:8, 63:15, 63:20, 66:17

**enable** [1] - 65:7

**enables** [1] - 10:10

**end** [2] - 7:19, 40:21

**ended** [3] - 12:15, 39:16, 74:22

**Energy** [6] - 29:17, 30:8, 30:22, 31:1, 33:19, 33:24

**engage** [1] - 24:9

**engaged** [1] - 35:12

**English** [1] - 83:18

**ensure** [1] - 31:17

**entail** [1] - 32:5

**enter** [4] - 23:24, 26:12, 44:3, 65:7

**entered** [1] - 72:21

**entertain** [1] - 41:17

**entertainment** [1] - 11:9

**entitled** [1] - 86:4

**entity** [1] - 12:12

**environment** [1] - 9:20

**equipment** [1] - 4:23

**equivalent** [1] - 61:1

**Esq** [3] - 1:11, 1:12, 1:14

**essence** [1] - 45:8

**essential** [1] - 45:9

**essentially** [1] - 24:6

**establish** [1] - 41:7

**established** [1] - 61:22

**Eurolineas** [4] - 4:20, 5:9, 43:4, 53:18

**Europe** [2] - 55:17, 55:19

**evening** [2] - 35:4, 35:7

**event** [5] - 23:12, 23:19, 49:17, 57:15, 71:17

**events** [2] - 25:12, 79:5

**eventuality** [1] - 71:7

**eventually** [6] - 5:23, 11:20, 31:23, 34:14, 34:17, 42:4

**Everglades** [2] - 12:20, 52:18

**evidence** [1] - 84:1

**exact** [3] - 30:25, 55:5, 56:4

**exactly** [6] - 33:12, 55:25, 70:4, 76:15, 79:16, 83:21

**examination** [1] - 47:19

**EXAMINATION** [2] - 47:21, 81:22

**example** [4] - 45:3, 54:11, 57:4

**except** [3] - 17:23, 25:19

**exception** [1] - 9:18

**exclusivity** [1] - 11:8

**excursion** [1] - 82:9

**excuse** [1] - 73:12

**EXCUSED** [1] - 84:22

**execute** [5] - 62:16, 62:22, 63:4, 63:8, 63:12

**executive** [4] - 8:1, 9:16, 62:2, 81:12

**executives** [1] - 14:25, 15:12

**Exhibit** [5] - 19:8, 22:2, 37:18, 41:1, 41:6

**exhibit** [3] - 19:24, 23:2, 40:1

**exhibits** [3] - 18:19, 39:24, 58:13

**existing** [1] - 69:21

**exit** [1] - 69:10

**exiting** [1] - 27:19

**expansion** [2] - 8:2, 26:8

**expected** [1] - 76:14

**expense** [2] - 59:4, 59:7

**expenses** [4] - 32:24, 33:5, 59:2, 59:15

**experience** [2] - 46:13, 47:5

**experienced** [1] - 47:14, 62:2

**experiment** [1] - 46:10

**expert** [4] - 52:2, 52:6, 52:13, 52:22

**expiration** [1] - 55:16

**explain** [5] - 40:5, 40:24, 68:18, 70:21, 71:23

**explanation** [2] - 66:12, 66:15

**explanations** [1] - 70:24

**explore** [1] - 39:12

**expressed** [1] - 3:16

**extent** [1] - 17:7

**eyes** [1] - 14:10

## F

**face** [10] - 74:6, 74:14, 74:18, 75:9, 81:13, 81:16

**face-to-face** [4] - 74:6, 74:14, 74:18, 75:9

**fact** [10] - 13:8, 27:12, 51:1, 53:14, 61:9, 66:3, 67:19, 75:14, 79:12, 81:10

**facts** [1] - 79:6

**failed** [2] - 11:22, 46:11

**fails** [1] - 50:1

**failure** [2] - 12:2, 12:25

**familiar** [3] - 56:18, 74:24, 75:15

**familiarity** [1] - 36:18

**family** [10] - 7:4, 7:7, 7:9, 7:13, 7:21, 8:3, 11:18, 15:16, 15:20, 17:14

**family's** [1] - 7:23

**far** [4] - 50:18, 50:24, 51:8, 51:12

**Farrell** [6] - 16:13, 16:15, 16:23, 27:13, 27:25, 78:12, 80:3,

80:7

**Farrell"** [1] - 80:9

**farrell's** [1] - 46:19

**Farrell's** [3] - 79:1, 79:4, 80:8

**fashion** [3] - 65:21, 77:5, 83:21

**father** [2] - 49:21, 49:22

**favor** [1] - 11:11

**February** [10] - 12:6, 43:7, 43:10, 48:13, 73:22, 74:9, 74:12, 74:23, 77:12, 77:15

**fee** [3] - 33:9, 33:10, 33:18

**Ferries** [26] - 18:8, 19:17, 35:13, 35:17, 38:1, 39:8, 40:20, 41:6, 41:15, 42:3, 47:25, 48:2, 48:10, 49:5, 49:18, 49:21, 50:4, 50:6, 50:19, 50:25, 51:4, 51:6, 51:10, 51:13, 51:14

**Ferries'** [1] - 36:3

**ferry** [13] - 10:5, 13:13, 24:14, 31:10, 31:13, 33:7, 34:15, 42:5, 43:11, 69:24, 70:20, 72:22, 76:2

**few** [4] - 10:25, 32:13, 44:25, 81:24

**fighting** [1] - 40:13

**figure** [6] - 57:7, 59:10, 59:12, 59:13

**figures** [3] - 8:20, 45:8, 46:5

**filed** [2] - 12:3, 61:10

**FILED** [1] - 86:8

**files** [4] - 38:3, 38:25, 64:23, 65:16

**finance** [2] - 38:13, 38:16

**finances** [1] - 32:10

**financial** [15] - 8:17, 9:4, 32:21, 35:18, 35:19, 36:3, 37:11, 38:10, 44:19, 45:1, 45:13, 45:16, 55:18, 65:5, 65:13

**financials** [1] - 84:13

**fine** [5] - 3:19, 28:15, 28:17, 47:3, 85:21

**finish** [2] - 76:24, 85:16

**finished** [3] - 3:13, 7:14, 31:5

**fire** [1] - 63:22

**fired** [3] - 63:16,

63:19, 64:1
**firmly** [1] - 33:23
**first** [19] - 2:25, 4:6, 5:14, 10:17, 19:24, 21:13, 22:10, 28:2, 33:5, 50:16, 57:11, 66:14, 70:18, 76:11, 80:1, 81:12, 82:10, 83:16, 84:5
**five** [8] - 39:25, 40:4, 73:3, 73:6, 73:12, 73:14, 74:5, 74:21
**five-month** [1] - 73:6, 73:12, 73:14, 74:5, 74:21
**FL** [3] - 1:13, 1:15, 1:18
**fletes** [3] - 59:1, 59:4, 59:22
**flexible** [1] - 32:2
**flight** [1] - 76:8
**Florida** [13] - 5:5, 5:12, 8:15, 10:10, 10:17, 43:12, 43:14, 57:12, 57:13, 62:13, 76:9, 78:3, 81:11
**FLORIDA** [1] - 1:2
**flow** [1] - 45:8
**fluid** [1] - 29:23
**focused** [1] - 27:1
**focusing** [1] - 13:20
**follow** [2] - 14:15, 82:20
**follow-up** [1] - 14:15
**followed** [2] - 8:11, 13:12
**following** [12] - 13:17, 32:23, 67:1, 67:2, 70:5, 70:6, 72:16, 73:10, 73:11, 79:22, 80:24, 82:7
**FOR** [2] - 1:11, 1:14
**forbidden** [2] - 65:22, 66:7
**foregoing** [1] - 86:3
**format** [2] - 58:24, 58:25
**formed** [1] - 5:11
**former** [2] - 7:20, 62:10
**Fort** [1] - 15:13
**forward** [2] - 34:14, 65:20
**forwarded** [2] - 65:24, 66:13
**founder** [1] - 5:1
**four** [5] - 17:22, 42:21, 57:21, 59:21, 81:2
**frank** [1] - 38:24
**free** [1] - 24:22

**Freeport** [5] - 10:10, 11:1, 12:20, 57:16, 57:20
**frequently** [2] - 54:6, 54:14
**Friday** [1] - 85:11
**friend** [2] - 30:10, 34:8
**friendship** [1] - 7:6
**front** [2] - 49:13, 58:13
**FRS** [11] - 72:21, 73:3, 78:2, 79:18, 79:24, 80:10, 80:22, 81:1, 81:4, 83:22, 83:24
**FRS's** [1] - 78:3
**fruit** [1] - 14:21
**fruition** [2] - 38:21, 38:23
**full** [5] - 33:4, 33:19, 33:24, 41:18, 81:13
**full-time** [2] - 33:19, 33:24
**fully** [3] - 3:7, 10:15, 36:12
**furnished** [1] - 57:1
**fuse** [1] - 41:23
**future** [6] - 12:9, 21:6, 30:24, 31:1, 41:6, 41:7

## G

**Gables** [1] - 1:15
**gained** [1] - 53:1
**game** [1] - 81:3
**Garcia** [4] - 68:7, 68:16, 68:25, 69:1
**gears** [1] - 34:24
**general** [5] - 5:18, 6:3, 27:18, 37:12, 38:1, 43:4, 75:19, 78:5, 78:10
**generally** [4] - 7:11, 47:13, 53:6, 75:23
**generate** [1] - 21:2
**generated** [1] - 21:20
**generating** [1] - 29:22
**generational** [1] - 49:20
**Genting** [103] - 11:12, 12:8, 12:11, 12:17, 12:23, 12:25, 14:1, 14:13, 14:15, 14:25, 15:3, 15:6, 15:12, 15:17, 15:25, 16:6, 16:10, 16:12, 16:14, 16:21, 17:13, 17:24, 17:25, 24:18, 24:21, 24:24, 25:6, 25:21, 25:23, 26:11, 26:25, 27:2, 27:8, 27:14,

27:22, 30:15, 30:16, 34:15, 34:17, 42:5, 42:8, 42:13, 42:16, 42:20, 43:1, 43:22, 44:3, 44:7, 44:9, 44:10, 44:13, 46:10, 46:11, 46:23, 51:22, 60:19, 61:6, 61:16, 61:23, 69:21, 69:23, 70:19, 71:7, 71:11, 72:1, 72:2, 72:11, 72:13, 72:17, 72:21, 73:2, 73:3, 73:8, 73:16, 74:7, 74:16, 74:20, 75:11, 75:16, 75:24, 76:7, 76:16, 77:14, 77:18, 77:22, 77:25, 78:4, 78:22, 79:12, 79:15, 79:17, 79:19, 79:24, 80:16, 81:25, 82:10, 82:15, 83:5, 83:7, 83:13, 83:15
**Genting's** [4] - 16:19, 42:18, 82:7, 82:20
**gentleman** [2] - 38:9, 38:10
**gentlemen** [2] - 27:21, 74:1
**geographic** [1] - 5:3
**Gerardo** [1] - 60:3
**gerardo** [1] - 11:18
**Gibraltar** [1] - 5:19
**given** [9] - 19:22, 21:12, 26:12, 37:22, 42:11, 54:14, 67:12, 68:7, 68:16
**global** [1] - 61:16
**goal** [1] - 10:14
**Goetz** [3] - 78:2, 83:21, 83:24
**govern** [1] - 63:23
**Government** [1] - 26:24
**Government's** [1] - 26:23
**Gozo** [1] - 6:21
**great** [4] - 29:14, 43:14, 76:16, 85:19
**greatly** [2] - 29:9, 30:21
**gritty** [1] - 53:5
**grounds** [3] - 19:15, 22:19, 35:21
**Group** [4] - 11:16, 12:1, 22:16, 58:22
**group** [3] - 11:17, 11:21, 77:14
**grow** [1] - 8:3
**guarantee** [1] - 39:17

**guarantees** [1] - 15:6
**Guard** [1] - 43:15
**guess** [1] - 39:11
**guidance** [1] - 3:4

## H

**half** [1] - 8:22
**halted** [1] - 16:20
**hand** [2] - 18:21, 19:2
**handle** [1] - 84:23
**Hanlon** [1] - 1:12
**hard** [3] - 21:25, 22:14, 22:22
**hardly** [2] - 39:10, 79:14
**Havana** [1] - 25:18
**headed** [1] - 73:23
**headway** [1] - 7:17
**hear** [1] - 50:16
**heard** [1] - 3:2
**hearsay** [1] - 68:10
**HELD** [1] - 1:8
**held** [3] - 11:10, 16:24, 30:10
**helped** [3] - 7:2, 7:3
**hereby** [1] - 86:3
**Hernan** [1] - 1:6, 5:14, 16:23, 20:3, 21:1, 37:11, 38:1, 80:1, 80:22, 81:5
**herrero** [1] - 83:10
**Herrero** [19] - 42:11, 47:9, 61:7, 70:14, 70:18, 70:21, 71:5, 71:15, 71:19, 71:21, 71:25, 72:10, 73:24, 75:2, 75:22, 81:25, 82:14, 83:3, 83:8
**high** [1] - 55:22
**highest** [1] - 36:9
**himself** [8] - 24:10, 33:19, 33:23, 61:17, 70:19, 71:15, 82:15, 82:19
**hinted** [1] - 29:9
**hold** [1] - 42:1
**holder** [1] - 5:2
**home** [1] - 32:22
**honor** [2] - 11:22, 12:2
**Honor** [21] - 3:18, 4:2, 4:8, 20:11, 22:4, 22:17, 23:4, 26:14, 34:22, 35:8, 36:1, 37:6, 38:24, 39:14, 39:23, 46:16, 47:12, 54:18, 58:7, 80:17, 84:20
**HONORABLE** [1] - 1:8
**hoped** [1] - 76:14

**hopefully** [1] - 3:22
**hoping** [1] - 76:25
**hotel** [6] - 17:17, 20:4, 20:5, 20:6, 20:8, 20:18
**hotels** [1] - 12:24
**hours** [2] - 17:23, 25:19
**housekeeping** [1] - 85:2
**housing** [2] - 8:22, 33:5
**hurt** [1] - 19:18

## I

**IBM** [1] - 9:20
**idea** [1] - 3:13
**identification** [2] - 19:8, 36:16
**idle** [1] - 53:8
**image** [2] - 81:10, 81:16
**imagine** [1] - 68:13
**imaging** [1] - 22:23
**immediately** [1] - 26:18, 70:15, 81:25
**impact** [2] - 61:10, 61:20
**impeach** [1] - 39:8
**importance** [8] - 10:6, 13:4, 44:22, 45:2, 45:6, 45:19, 45:24, 64:4
**important** [13] - 3:5, 10:7, 10:9, 25:25, 26:3, 26:9, 30:4, 45:13, 45:15, 46:4, 78:8, 83:12
**impression** [1] - 14:4
**improper** [1] - 65:21
**improved** [1] - 8:17
**IN** [1] - 68:21
**inasmuch** [1] - 45:15
**inception** [1] - 4:25
**includes** [1] - 56:22
**including** [1] - 32:24
**inconceivable** [1] - 23:15
**indicated** [5] - 35:2, 52:10, 59:16, 65:19, 77:11
**indication** [1] - 47:14
**individual** [1] - 33:2
**individually** [1] - 84:18
**individuals** [1] - 46:22
**industry** [2] - 31:10, 33:7
**information** [31] - 3:6,

23:14, 23:15, 23:23, 31:18, 32:14, 32:18, 35:18, 36:4, 39:3, 41:2, 41:5, 41:11, 41:16, 46:18, 64:16, 64:21, 65:5, 65:6, 65:13, 66:21, 67:5, 67:18, 67:25, 69:7, 79:6, 79:8, 79:9, 79:10, 81:6, 84:17
**informed** [3] - 67:12, 74:2, 75:15
**initial** [1] - 6:1
**initiated** [1] - 11:25
**inspect** [2] - 15:13, 16:1
**installed** [1] - 66:7
**instead** [2] - 9:17, 54:5
**institutions** [1] - 9:3
**instruction** [1] - 83:3
**instructions** [1] - 42:11
**insurance** [4] - 56:23, 57:9, 59:20, 59:23
**intended** [1] - 51:21
**intending** [1] - 51:18
**intensive** [1] - 8:13
**intent** [1] - 23:23
**intention** [1] - 15:21
**interest** [6] - 23:18, 29:13, 30:11, 42:1, 49:23, 75:24
**interested** [5] - 12:15, 12:16, 23:11, 44:10, 60:18
**interests** [1] - 55:2
**internal** [1] - 21:11
**international** [3] - 6:12, 6:25, 14:3
**INTERPRETER** [1] - 35:2
**interview** [1] - 69:10
**introduced** [1] - 3:15
**introducing** [1] - 3:14
**investments** [1] - 11:7
**investor** [1] - 11:6
**invited** [1] - 31:10
**invoke** [1] - 4:2
**involved** [3] - 30:21, 42:23, 81:1
**involvement** [1] - 30:3
**involves** [2] - 19:16, 55:22
**irrelevant** [2] - 19:15, 35:21
**Island** [2] - 5:13, 6:22
**issue** [3] - 19:17, 49:21, 49:25
**issued** [1] - 67:20

**issues** [4] - 7:3, 9:1, 9:3, 35:22
**item** [3] - 3:1, 59:1, 59:18
**items** [2] - 59:15, 59:21, 68:16
**itself** [2] - 56:21, 64:6

## J

**January** [10] - 42:7, 72:8, 72:12, 72:13, 73:1, 73:6, 73:15, 76:3, 82:13
**job** [3] - 6:15, 7:20, 68:24
**Juan** [1] - 50:14
**JUDGE** [1] - 1:9
**July** [6] - 16:20, 25:16, 25:18, 26:1, 66:4
**June** [6] - 66:4, 72:21, 73:7, 73:15, 74:15, 74:25

## K

**Karavias** [3] - 16:15, 27:17, 78:20
**KATHLEEN** [1] - 1:8
**keen** [1] - 29:13
**keep** [3] - 14:10, 49:23, 74:1
**kept** [2] - 24:11, 61:6
**key** [2] - 80:21, 81:4
**Key** [1] - 32:22
**kiddingly** [1] - 34:11
**kind** [2] - 31:3, 41:22
**kinds** [1] - 44:25
**knowledge** [16] - 17:2, 22:20, 24:23, 32:10, 36:10, 41:18, 42:15, 42:17, 53:2, 66:20, 67:4, 67:8, 67:9, 69:6, 81:6
**knowledgeable** [1] - 56:9
**known** [8] - 26:25, 30:9, 33:6, 44:2, 44:13, 47:7, 54:2, 83:4
**knows** [2] - 40:14, 56:4

## L

**land** [1] - 60:6
**language** [1] - 67:21
**laptop** [13] - 64:11, 64:16, 64:20, 64:24, 65:6, 65:12, 66:14,

66:21, 67:5, 67:18, 67:25, 68:17, 69:2
**large** [2] - 11:7, 49:22
**largely** [1] - 15:17
**largest** [1] - 60:6
**last** [10] - 17:6, 40:1, 43:22, 45:22, 60:13, 60:16, 66:17, 70:14, 74:9, 85:6
**late** [12] - 16:15, 27:6, 44:1, 44:12, 48:13, 57:14, 76:18, 77:10, 78:25, 79:3, 79:13, 81:3
**Lauderdale** [1] - 15:13
**lawsuit** [6] - 11:20, 11:24, 11:25, 12:3, 61:10, 61:18
**lawyer** [1] - 70:23
**lay** [4] - 18:22, 18:24, 80:22, 81:4
**leading** [1] - 26:14
**learn** [7] - 16:4, 16:11, 34:14, 42:5, 50:8, 50:20, 78:2
**learned** [13] - 16:7, 16:9, 17:4, 17:12, 23:8, 24:17, 42:7, 43:25, 46:9, 50:9, 67:10, 67:11, 77:4
**least** [4] - 48:13, 48:18, 57:3
**leave** [6] - 4:5, 31:6, 31:9, 31:12, 69:14, 69:15
**leaves** [1] - 72:25
**leaving** [4] - 30:19, 32:23, 33:7, 35:3
**left** [6] - 16:8, 33:14, 66:22, 67:5, 67:17, 69:8
**legend** [1] - 84:15
**Leiboviz** [4] - 16:12, 16:13, 16:15, 78:17
**lengthy** [1] - 43:16
**letter** [1] - 33:17
**licenses** [2] - 26:1, 26:24
**likely** [1] - 31:13
**Line** [13] - 10:16, 11:14, 12:9, 12:14, 12:22, 13:5, 26:12, 26:16, 26:17, 26:19, 26:21, 34:18, 82:15
**line** [13] - 10:18, 10:19, 12:15, 17:7, 19:14, 24:19, 25:4, 26:9, 35:21, 59:1, 59:18, 59:21, 67:3
**lines** [3] - 5:18, 6:12,

51:14
**link** [2] - 26:23, 50:10
**listen** [1] - 67:15
**live** [2] - 6:6, 6:7
**logic** [1] - 54:25
**London** [1] - 30:10
**long-term** [1] - 54:4
**look** [9] - 6:11, 6:13, 36:16, 40:16, 58:16, 59:1, 82:22, 84:5, 84:8
**looked** [1] - 7:18
**looking** [3] - 14:4, 14:5, 17:20
**losing** [1] - 13:18
**loss** [4] - 58:18, 58:19, 58:23, 59:16
**losses** [1] - 29:22
**lost** [3] - 52:25, 53:7, 81:2
**Lotus** [3] - 65:1, 65:25, 66:11
**Ltd** [3] - 1:4, 5:7, 5:10
**lunch** [5] - 3:11, 3:13, 3:17, 3:19, 17:18

## M

**Mac** [1] - 64:11
**Madrid** [2] - 6:8, 28:7
**mail** [28] - 3:5, 8:10, 16:23, 19:21, 20:3, 20:8, 20:11, 20:15, 20:22, 22:24, 27:13, 27:24, 38:8, 38:16, 38:17, 40:9, 40:12, 64:25, 65:2, 65:5, 65:14, 65:17, 65:19, 65:20, 67:13, 75:10, 84:10
**mailed** [2] - 33:21, 39:2
**mails** [15] - 3:2, 18:14, 18:15, 18:16, 18:17, 28:16, 28:18, 39:25, 40:4, 65:20, 65:23, 65:24, 66:9, 66:13, 74:19
**main** [2] - 6:9, 79:18
**maintain** [3] - 37:22, 38:22, 63:12
**maintained** [2] - 21:21, 21:22
**maintenance** [4] - 56:23, 57:8, 59:18, 59:23
**majority** [1] - 5:1
**Malayan** [1] - 11:6
**Mama** [1] - 16:17
**man** [2] - 7:2, 81:13

**manage** [1] - 45:8
**management** [1] - 9:5
**manager** [4] - 6:15, 78:5, 78:10, 83:20
**manner** [1] - 75:19
**March** [9] - 13:23, 14:1, 14:14, 14:18, 14:20, 16:11, 48:14, 54:8, 66:24
**march** [1] - 70:19
**Maritimas** [4] - 4:20, 5:9, 43:4, 53:18
**Maritime** [2] - 11:8, 24:4
**marked** [3] - 19:7, 37:18, 64:8
**market** [10] - 6:12, 10:5, 10:6, 13:15, 14:16, 43:11, 44:12, 45:21, 46:5, 82:9
**marking** [1] - 64:5
**Martinez** [2] - 2:3, 4:13
**master** [1] - 22:23
**matter** [9] - 13:7, 19:18, 27:12, 30:15, 39:9, 82:20, 83:12, 83:13, 86:4
**matters** [5] - 17:7, 23:11, 35:24, 83:11, 85:13
**mature** [3] - 69:24, 70:2, 70:9
**mean** [3] - 31:24, 33:10, 80:6
**meaning** [2] - 49:9, 69:23
**means** [1] - 59:4
**meant** [2] - 7:22, 32:3
**Mediterranean** [1] - 5:4
**meet** [3] - 5:14, 5:20, 49:24
**meeting** [20] - 5:16, 16:25, 17:9, 17:19, 27:15, 28:2, 28:8, 28:9, 28:10, 29:2, 30:12, 34:10, 46:19, 47:8, 48:10, 48:22, 69:13, 69:20, 70:7, 77:25
**meetings** [22] - 14:24, 16:4, 26:10, 27:7, 27:21, 43:1, 43:3, 47:10, 48:1, 48:4, 48:13, 48:18, 49:8, 49:14, 74:6, 74:8, 74:15, 74:19, 75:9, 83:14, 83:19
**mention** [6] - 17:24,

17:25, 25:21, 27:7, 27:22
**mentioned** [5] - 11:15, 18:8, 28:3, 47:7, 56:16
**merchandise** [2] - 4:23, 24:5
**merge** [1] - 41:21
**met** [5] - 7:8, 16:11, 16:13, 28:7, 43:15
**mIAMI** [1] - 1:2
**Miami** [15] - 1:13, 1:17, 1:18, 7:25, 10:18, 11:1, 11:2, 11:9, 11:14, 12:13, 12:22, 13:16, 19:16, 28:11, 72:22
**Microsoft** [1] - 9:20
**mid** [8] - 27:5, 72:20, 73:6, 73:15, 77:4, 81:1
**might** [9] - 3:8, 19:4, 24:12, 28:13, 51:5, 58:4, 71:7, 76:20, 85:12
**million** [3] - 8:22, 57:5, 59:7
**millions** [1] - 13:18
**mind** [3] - 28:12, 30:5, 53:20
**minority** [7] - 42:1, 49:23, 60:7, 60:10, 60:20, 61:19, 61:23
**minute** [1] - 68:22
**minutes** [3] - 84:24, 85:7, 85:14
**mistake** [1] - 13:19
**mixed** [1] - 41:23
**model** [5] - 12:25, 13:1, 13:19, 13:25, 82:11
**moment** [5] - 34:21, 46:6, 46:24, 58:16, 80:13
**moments** [2] - 48:19, 81:24
**monopoly** [2] - 79:19, 80:3
**month** [8] - 42:21, 45:11, 71:10, 73:6, 73:12, 73:14, 74:5, 74:21
**monthly** [3] - 33:1, 33:9, 33:10
**months** [11] - 10:25, 16:8, 17:9, 32:6, 32:7, 32:8, 32:23, 43:16, 54:12, 73:3, 81:2
**moreover** [1] - 34:10

**morning** [6] - 3:2, 4:11, 18:12, 34:23, 39:2, 40:13
**motion** [1] - 36:21
**move** [15] - 10:4, 44:18, 51:17, 55:4, 55:17, 58:5, 58:9, 58:10, 60:1, 66:16, 68:10, 69:13, 71:1, 77:2, 80:17
**moved** [1] - 46:22
**movement** [1] - 14:17
**moves** [1] - 82:20
**moving** [3] - 24:17, 34:14, 55:19
**MR** [111] - 3:1, 3:4, 3:12, 3:18, 3:22, 3:25, 4:7, 4:10, 17:1, 17:6, 17:11, 18:4, 18:7, 18:15, 18:20, 18:24, 19:3, 19:6, 19:14, 19:23, 20:11, 20:16, 20:18, 21:23, 22:4, 22:5, 22:15, 22:17, 22:18, 22:19, 23:2, 23:5, 24:19, 25:1, 25:9, 25:11, 25:15, 26:6, 26:14, 26:20, 28:12, 28:15, 28:17, 28:24, 34:20, 35:8, 35:10, 35:20, 36:1, 36:2, 36:19, 36:25, 37:2, 37:6, 37:7, 37:17, 37:19, 38:7, 38:12, 38:24, 39:5, 39:14, 39:23, 40:1, 40:5, 40:8, 40:12, 40:17, 43:21, 44:15, 44:17, 46:6, 46:8, 46:15, 46:16, 47:4, 47:12, 47:18, 47:20, 47:22, 49:16, 54:18, 54:20, 55:7, 55:25, 56:3, 56:15, 58:7, 58:10, 58:12, 61:22, 62:1, 68:3, 68:10, 69:5, 71:4, 72:9, 76:24, 77:3, 80:17, 80:20, 81:20, 82:13, 84:2, 84:4, 84:19, 84:25, 85:2, 85:15, 85:19, 85:21
**mult** [1] - 12:23
**mult-national** [1] - 12:23
**multiple** [1] - 74:15
**multiplied** [1] - 10:12
**must** [2] - 62:14, 67:15

**N**

**name** [4] - 4:12, 4:13, 29:16, 68:6
**national** [1] - 12:23
**nature** [4] - 4:21, 5:20, 18:9, 46:13
**NDA** [3] - 36:21, 39:15, 39:18
**necessarily** [1] - 17:5
**necessary** [3] - 45:11, 45:16, 63:14
**necessity** [1] - 54:15
**need** [5] - 18:6, 37:4, 41:18, 68:6, 68:19
**needed** [2] - 20:9, 41:16
**needs** [3] - 42:18, 42:22, 45:9
**negatively** [1] - 61:20
**negotiating** [1] - 41:14
**negotiation** [2] - 21:21, 48:19
**negotiations** [30] - 20:12, 20:19, 21:5, 26:11, 35:11, 35:16, 35:25, 36:20, 36:24, 38:13, 39:4, 39:16, 40:21, 44:3, 61:5, 73:7, 73:16, 73:24, 74:3, 74:12, 74:24, 75:3, 77:12, 77:14, 77:18, 77:21, 78:23, 78:25, 79:3, 79:13
**negotiator** [1] - 38:15
**never** [19] - 9:18, 10:3, 15:7, 15:11, 15:15, 22:21, 29:9, 34:5, 34:8, 62:23, 63:1, 63:2, 63:7, 63:10, 63:14, 78:11, 78:15, 78:17, 79:14
**new** [12] - 6:11, 6:12, 16:13, 18:15, 18:16, 27:18, 32:19, 45:6, 45:14, 67:12, 82:19
**news** [7] - 14:22, 25:22, 25:23, 27:10, 27:11, 28:1, 50:16
**next** [4] - 7:15, 40:8, 45:12, 84:24
**night** [2] - 17:23, 25:20
**nitty** [1] - 53:5
**nobody** [1] - 39:12
**non** [10] - 23:14, 34:2, 34:3, 36:4, 36:7, 36:11, 37:1, 40:19, 62:3, 62:5, 62:8, 62:14, 62:16, 62:20,

62:22, 81:15
**non-compete** [6] - 34:2, 62:14, 62:16, 62:20, 62:22, 81:15
**non-competition** [4] - 34:3, 62:3, 62:5, 62:8
**non-disclosure** [5] - 36:4, 36:7, 36:11, 37:1, 40:19
**non-public** [1] - 23:14
**none** [1] - 7:17
**normally** [2] - 46:14, 49:25
**north** [2] - 11:7, 11:19
**North** [2] - 1:17, 5:4
**notebook** [2] - 58:14, 83:25
**Notes** [3] - 65:1, 65:25, 66:11
**nothing** [2] - 19:16, 72:2
**notice** [1] - 31:3
**November** [4] - 33:17, 64:11, 72:8, 72:11
**Number** [1] - 1:3
**number** [14] - 13:12, 18:18, 22:19, 22:21, 45:6, 45:12, 45:19, 45:22, 45:24, 47:2, 54:5, 59:22, 74:5, 74:18
**numbers** [4] - 44:25, 45:23, 45:25
**numerous** [2] - 13:7, 82:23

**O**

**object** [4] - 19:14, 22:19, 24:19, 37:20
**objection** [16] - 17:1, 18:4, 19:20, 22:1, 22:7, 25:14, 35:20, 35:24, 39:20, 44:15, 46:15, 47:12, 54:18, 54:20, 61:22, 81:18
**obligation** [1] - 38:2
**obliged** [1] - 32:1
**obtain** [3] - 23:23, 61:12, 81:15
**obtained** [1] - 53:1
**obvious** [1] - 55:14
**obviously** [1] - 31:12
**occasion** [4] - 5:22, 7:12, 48:11, 50:13
**occasions** [2] - 13:7, 74:15
**occur** [2] - 48:19, 65:24

**occurred** [1] - 16:5
**October** [6] - 32:18, 66:18, 70:14, 72:7, 72:11, 72:25
**OF** [1] - 1:2
**OFAC** [1] - 26:1
**offer** [9] - 33:13, 35:19, 37:16, 41:17, 41:19, 41:21, 41:22, 43:7, 74:9
**offered** [4] - 7:20, 7:25, 33:1, 33:8
**offers** [3] - 19:12, 43:8, 51:5
**office** [2] - 31:8, 38:10
**officer** [2] - 38:10, 81:12
**offices** [1] - 70:19
**often** [3] - 8:23, 13:20, 50:1
**old** [1] - 19:1
**once** [2] - 10:16, 50:14
**one** [42] - 3:1, 5:22, 7:23, 10:11, 13:15, 18:12, 18:14, 18:15, 18:16, 18:23, 21:13, 21:14, 22:19, 29:23, 30:3, 36:19, 40:8, 41:20, 42:21, 46:14, 48:2, 48:4, 48:6, 48:11, 48:13, 48:18, 48:20, 50:2, 50:13, 52:25, 53:7, 53:8, 54:12, 57:22, 60:6, 60:17, 63:2, 68:24, 79:12, 79:18, 81:5, 81:6
**one-day** [1] - 13:15
**ongoing** [3] - 14:9, 73:7, 73:16
**open** [4] - 31:2, 85:8, 85:10
**opening** [1] - 81:7
**operate** [3] - 5:3, 11:3, 55:14
**operated** [2] - 10:25, 53:24
**operating** [1] - 5:12
**operation** [4] - 10:22, 41:23, 42:19, 72:14
**operational** [1] - 58:2
**operations** [11] - 9:3, 10:20, 11:13, 13:14, 15:23, 32:11, 42:12, 57:11, 57:14, 82:8
**operator** [5] - 23:16, 24:14, 42:18, 50:11, 82:22
**opinion** [3] - 12:21, 79:21, 80:9

opportunities [2] - 6:13
opportunity [13] - 3:9, 5:12, 7:21, 29:15, 40:24, 44:2, 44:11, 46:20, 55:21, 70:3, 70:9, 70:18, 71:12
opposed [1] - 56:25
opposite [3] - 61:13, 61:14, 61:25
optimistic [2] - 76:21, 85:15
options [1] - 21:13
order [15] - 10:17, 19:13, 36:3, 41:16, 41:18, 45:10, 45:16, 46:5, 52:8, 64:4, 67:19, 68:7, 68:16, 82:11, 83:11
orders [1] - 67:12
ordinarily [1] - 58:22
ore [1] - 36:21
originally [1] - 22:16
otherwise [3] - 16:10, 46:3, 66:2
outset [2] - 12:16, 12:24
outside [4] - 7:10, 7:11, 10:2, 24:14
overrule [2] - 22:1, 39:20
overruled [4] - 19:19, 25:14, 46:17, 61:24
own [5] - 7:1, 10:1, 11:13, 12:17, 29:13
owned [4] - 53:11, 53:14, 53:22, 55:1
owner [8] - 11:18, 49:21, 53:17, 60:10, 60:20, 61:19, 61:23, 83:23
owners [2] - 41:24, 60:6
owns [1] - 11:19

**P**

P11 [3] - 18:20, 19:8, 20:14
P50 [2] - 18:20, 22:8
P81 [2] - 83:25, 84:1
P85 [1] - 36:16
package [1] - 8:19
page [13] - 19:7, 19:24, 20:13, 40:3, 54:10, 67:3, 70:7, 73:11, 73:13, 75:7, 79:23, 80:25, 84:5
paid [2] - 15:17, 33:8
pallet [2] - 45:22, 46:1

paper [1] - 19:2
parent [12] - 3:6, 5:9, 43:5, 53:14, 53:17, 53:20, 53:22, 53:25, 54:23, 54:25, 56:11, 57:6
part [15] - 18:5, 21:5, 22:22, 24:14, 26:8, 32:15, 34:23, 36:20, 36:24, 37:24, 38:4, 38:7, 38:13, 49:25, 83:7
particular [3] - 21:23, 21:24, 36:8
parties [1] - 3:21
partner [3] - 11:6, 11:15, 60:7
partnering [1] - 77:5
party [1] - 51:13
pass [1] - 14:11
passenger [1] - 45:18
passengers [3] - 4:23, 13:12, 24:4
password [3] - 65:7, 65:9, 65:15
passwords [2] - 67:20, 67:23
past [2] - 29:10, 29:19
patch [1] - 49:5
path [1] - 31:14
patriarch [1] - 11:18
PATRICIA [2] - 1:16, 86:8
patricia_sanders@ flsd.uscourts.gov [1] - 1:19
Patrick [1] - 1:12
pause [1] - 80:12
pay [5] - 32:22, 33:5, 33:9, 41:24, 57:5
payment [2] - 33:1, 49:23
peeled [1] - 14:10
penalty [2] - 55:18, 55:24
pending [1] - 61:18
people [5] - 16:25, 50:5, 68:13, 77:22, 80:12
percent [1] - 55:1
percentages [1] - 45:3
perfectly [1] - 29:6
perform [1] - 83:21
perhaps [5] - 17:22, 32:13, 35:6, 60:25, 85:17
period [12] - 9:9, 31:11, 31:20, 32:3, 54:11, 62:10, 73:6, 73:12, 73:14, 74:5,

74:21, 83:8
periods [3] - 54:5, 54:14, 55:8
perks [1] - 68:24
Permanent [1] - 74:1
permanent [2] - 60:23, 60:24
permit [1] - 12:9
person [6] - 3:8, 25:17, 27:3, 50:3, 68:5, 81:17
personal [10] - 9:7, 9:9, 9:11, 9:16, 9:23, 9:25, 33:2, 65:16, 65:20, 67:14
personally [4] - 64:15, 77:21, 78:3, 83:14
persuade [1] - 30:2
persuaded [1] - 48:9
pertains [1] - 9:5
phases [1] - 21:18
phone [2] - 74:19, 75:10
physically [1] - 37:23
piece [1] - 50:16
Pinar [17] - 10:23, 15:9, 16:17, 16:18, 18:1, 51:19, 52:7, 52:15, 52:17, 53:11, 53:17, 53:22, 53:24, 57:11, 57:16, 57:19, 59:7
pitch [2] - 78:3, 78:6
place [12] - 11:4, 11:5, 14:20, 24:21, 24:24, 28:13, 66:14, 74:8, 74:25, 75:1, 75:4, 75:5
PLAINTIFF [1] - 1:11
plaintiff [2] - 5:7, 40:2
Plaintiff's [4] - 19:8, 22:2, 37:18, 40:3
plaintiffs [1] - 3:25
plan [2] - 18:3, 46:2
planning [1] - 49:4
plans [1] - 71:6
Plastic [6] - 29:16, 30:7, 30:22, 31:1, 33:19, 33:24
plate [1] - 24:5
platform [1] - 9:21
point [6] - 39:5, 49:3, 57:15, 65:12, 77:17, 82:21
points [2] - 49:7, 59:20
policy [2] - 64:5, 66:8
poor [1] - 53:19
port [1] - 10:20
Port [2] - 12:20, 52:17

portion [1] - 82:9
position [5] - 6:1, 6:2, 7:15, 7:18, 26:12
positioned [1] - 43:13
possesses [1] - 81:6
possession [1] - 69:8
possibility [3] - 7:25, 29:10, 72:17
possible [14] - 3:6, 15:6, 48:5, 48:7, 48:8, 48:17, 48:23, 49:7, 49:8, 49:9, 54:7, 57:13, 59:13, 79:14
possibly [6] - 3:16, 55:10, 56:6, 57:7, 62:18, 66:1
Post [10] - 1:14, 25:3, 47:19, 55:23, 68:2, 76:21, 80:11, 81:19, 81:24, 85:20
POST [36] - 17:1, 18:4, 19:14, 22:17, 22:19, 24:19, 26:14, 28:17, 35:20, 36:1, 37:19, 39:5, 44:15, 46:15, 47:12, 47:20, 47:22, 49:16, 55:7, 55:25, 56:3, 56:15, 58:10, 58:12, 62:1, 68:3, 68:10, 69:5, 71:4, 72:9, 76:24, 77:3, 80:17, 80:20, 81:20, 85:21
potential [4] - 37:24, 44:20, 71:16, 75:24
powers [1] - 81:13
practically [1] - 13:23
predicate [3] - 18:22, 18:25, 19:21
preferred [2] - 8:3, 9:21
preliminary [2] - 36:14, 36:17
prepare [2] - 27:17, 27:19
prepared [4] - 11:7, 52:2, 71:6, 71:16
preparing [1] - 67:11
presence [1] - 43:14
present [1] - 24:20
presenting [1] - 80:15
president [9] - 4:17, 4:24, 4:25, 5:7, 16:12, 16:14, 78:12, 78:17
presume [1] - 70:17
price [3] - 45:18, 45:23, 46:1
principal [1] - 11:17

printed [3] - 20:10, 20:12, 20:19
private [3] - 7:1, 7:3, 24:14
problem [2] - 62:23, 80:14
problems [2] - 7:1, 31:1
procedural [2] - 28:8, 28:9
procedure [1] - 8:11
proceedings [5] - 16:8, 79:1, 79:7, 79:11, 86:4
process [2] - 13:9, 43:16
procured [1] - 69:25
produced [2] - 34:23, 58:25
profession [1] - 4:16
professional [1] - 12:21
profit [4] - 58:18, 58:19, 58:23, 59:15
profitability [2] - 10:12, 12:19
profits [2] - 52:25, 53:7
project [12] - 8:2, 8:14, 25:24, 25:25, 26:8, 29:13, 29:14, 29:15, 29:16, 30:3, 30:21, 61:20
projection [1] - 52:25
projections [6] - 41:6, 44:19, 44:22, 44:23, 45:1, 45:13
projects [2] - 7:17, 13:18
promising [1] - 8:1
pronunciation [1] - 53:19
proposal [7] - 8:3, 15:3, 34:17, 41:19, 42:20, 43:23, 78:3
proposals [6] - 42:22, 42:23, 43:25, 75:16, 75:23, 76:15
proposed [1] - 7:17
propriety [1] - 64:20
protocol [1] - 8:9
provide [9] - 12:12, 12:18, 35:17, 42:18, 44:8, 66:12, 72:22, 73:3, 76:7
provided [4] - 28:17, 36:20, 36:23, 46:23
provider [1] - 76:2
provides [2] - 4:22, 41:8

**providing** [1] - 24:11
**public** [2] - 23:14, 72:13
**Puerto** [17] - 17:16, 17:19, 20:4, 20:5, 20:6, 20:9, 20:12, 35:24, 48:24, 48:25, 49:3, 49:6, 49:12, 49:15, 50:10, 50:12, 50:14
**pulled** [2] - 11:13, 74:10
**purchased** [1] - 64:11
**pure** [1] - 24:24
**purpose** [5] - 27:15, 28:6, 45:20, 46:4, 48:25
**purposes** [1] - 15:20
**pursuant** [2] - 40:15, 53:25
**pursue** [2] - 44:24, 47:9
**put** [6] - 16:22, 18:10, 47:15, 58:14, 65:19, 66:3
**putting** [1] - 26:13

**Q**

**qualified** [1] - 53:3
**quality** [1] - 76:8
**questioning** [3] - 19:14, 24:19, 25:4
**QUESTIONING** [1] - 20:20
**questions** [13] - 10:5, 34:20, 35:21, 36:14, 36:15, 36:17, 42:2, 47:18, 60:2, 65:18, 75:6, 81:20, 84:20
**quickly** [1] - 42:11
**quite** [5] - 13:12, 13:15, 60:5, 61:13, 61:25

**R**

**raise** [1] - 8:15
**Raquel** [1] - 7:8
**rates** [2] - 45:12, 45:13
**rather** [1] - 8:4
**reach** [1] - 46:14
**reached** [2] - 12:7, 49:18
**react** [2] - 29:7, 42:10
**read** [7] - 3:7, 3:9, 3:11, 79:4, 80:7, 84:15, 84:16
**ready** [1] - 46:12
**realized** [1] - 82:10

**really** [1] - 31:22
**reason** [13] - 23:9, 29:11, 29:18, 30:18, 31:9, 39:14, 43:25, 49:20, 52:17, 52:19, 69:17, 81:14
**reasonable** [5] - 55:15, 57:7, 59:9, 59:13, 66:1
**reasons** [4] - 29:11, 37:19, 49:12, 79:18
**receive** [5] - 8:15, 36:3, 37:10, 38:16, 82:12
**received** [7] - 8:21, 26:1, 27:13, 27:25, 38:7, 38:17, 40:19
**receiving** [2] - 79:6, 79:10
**recent** [1] - 29:19
**RECESS** [2] - 28:21, 58:11
**recipient** [1] - 84:10
**recognize** [6] - 19:9, 19:25, 22:10, 22:11, 22:12, 58:17
**recollection** [4] - 58:5, 59:6, 59:12, 70:11
**recommence** [1] - 74:12
**recommended** [1] - 77:18
**reconfigure** [2] - 64:12, 64:16
**record** [3] - 39:20, 39:23, 59:21
**REDIRECT** [2] - 2:2, 81:22
**redirect** [2] - 70:24, 81:21
**reference** [1] - 21:7
**referring** [2] - 41:3, 55:23
**reflected** [2] - 20:13, 41:10
**refresh** [3] - 58:4, 59:6, 70:11
**refreshed** [1] - 59:11
**regard** [4] - 35:24, 45:9, 71:17, 82:18
**regarding** [1] - 3:1
**region** [2] - 62:11, 79:20
**regions** [1] - 5:3
**regular** [2] - 74:19, 75:10
**regularly** [3] - 74:2, 75:2, 75:15
**regulations** [1] - 63:23
**rejected** [1] - 33:18

**relate** [1] - 84:12
**related** [4] - 9:3, 18:17, 32:21, 37:15
**relating** [1] - 59:22
**relation** [1] - 37:13
**relations** [1] - 74:22
**relationship** [19] - 5:6, 5:21, 6:19, 6:20, 6:22, 6:23, 7:5, 7:6, 29:24, 31:25, 33:3, 33:11, 34:7, 39:10, 50:5, 50:15, 63:20
**relationships** [1] - 49:15
**relative** [2] - 45:1, 45:18
**relevance** [6] - 22:2, 39:1, 39:6, 39:21, 45:6, 45:24
**relevant** [1] - 51:17
**rely** [1] - 44:19
**remained** [1] - 13:23
**remains** [1] - 14:23
**remember** [14] - 8:18, 28:4, 49:2, 49:9, 55:4, 58:21, 60:4, 66:6, 74:17, 75:21, 81:8, 82:2, 84:7
**remind** [1] - 83:23
**remotely** [2] - 68:13, 68:17
**renewable** [1] - 54:6, 54:14
**renewed** [2] - 55:12, 55:15
**renting** [2] - 56:25
**rep** [1] - 58:7
**repair** [1] - 56:22
**repairs** [2] - 59:18, 59:23
**repeat** [1] - 50:23
**replace** [1] - 14:5
**replacement** [3] - 32:9, 32:12, 32:16
**replacing** [2] - 44:13, 57:21
**report** [5] - 6:4, 6:5, 8:7, 8:8, 52:2
**REPORTED** [1] - 1:16
**Reporter** [1] - 1:17
**representations** [1] - 25:6
**representative** [2] - 16:21, 21:10
**representatives** [3] - 74:6, 74:20, 75:11
**representing** [1] - 29:15
**Republic** [1] - 50:11
**request** [4] - 9:11,

9:14, 16:19, 28:7
**requested** [2] - 64:12, 69:18
**required** [2] - 41:14, 51:22
**requirements** [1] - 43:15
**requires** [1] - 55:20
**rescheduled** [1] - 85:11
**reservations** [1] - 32:25
**reside** [1] - 4:14
**resignation** [7] - 27:6, 28:10, 29:4, 29:8, 30:24, 32:20, 32:21
**resigned** [3] - 30:1, 30:13, 34:1
**resigning** [2] - 29:12, 31:9
**resistance** [1] - 26:23
**Resorts** [8] - 15:9, 15:17, 60:7, 60:10, 60:21, 61:19, 78:12, 78:18
**resources** [2] - 26:12, 46:22
**respects** [1] - 17:4
**respond** [2] - 31:21, 42:10
**response** [3] - 30:1, 33:20, 65:18
**responsibilities** [1] - 6:9
**responsibility** [2] - 6:2, 6:11
**responsible** [3] - 42:12, 57:8, 59:18
**responsive** [1] - 77:1
**result** [2] - 10:13, 12:1
**resume** [2] - 12:9, 16:24, 28:23
**resumed** [1] - 74:10
**retained** [2] - 21:6, 21:24
**return** [1] - 69:7
**revenue** [2] - 45:20, 46:2
**review** [5] - 28:16, 38:14, 38:18, 44:19, 71:5
**reviewed** [2] - 20:25, 53:2
**Rican** [1] - 17:19
**Ricardo** [1] - 37:11
**Rico** [16] - 17:16, 20:4, 20:5, 20:6, 20:9, 20:12, 35:24, 48:24, 48:25, 49:3, 49:6, 49:12, 49:15, 50:10,

50:12, 50:14
**rights** [2] - 11:10, 11:11
**Rio** [17] - 10:23, 15:9, 16:17, 16:18, 18:1, 51:19, 52:7, 52:15, 52:17, 53:11, 53:17, 53:22, 53:24, 57:11, 57:16, 57:19, 59:7
**ripe** [3] - 70:13, 70:17, 71:12
**ripen** [4] - 14:21, 70:13, 72:3, 82:21
**river** [1] - 24:5
**Road** [1] - 1:15
**robert** [1] - 1:14
**role** [4] - 6:4, 6:6, 8:7, 83:21
**rolling** [1] - 4:23
**route** [16] - 10:6, 10:11, 19:16, 34:15, 51:19, 53:1, 57:16, 73:2, 73:8, 75:25, 76:2, 76:13, 77:6, 77:19, 77:22, 78:23
**RPR** [2] - 1:16, 86:8
**rule** [1] - 4:2
**rumors** [1] - 14:2
**run** [2] - 10:18, 16:17
**rush** [1] - 76:22

**S**

**salary** [1] - 8:21
**sample** [1] - 52:8
**San** [1] - 50:14
**SANDERS** [3] - 1:16, 86:6, 86:8
**Santo** [1] - 50:14
**saw** [1] - 12:24
**schedule** [2] - 3:21, 85:5
**scheduled** [1] - 16:17
**school** [1] - 19:1
**scope** [1] - 17:1
**Sea** [1] - 8:2
**seal** [2] - 36:22, 37:5
**season** [1] - 45:11
**seasonability** [1] - 45:3
**seat** [1] - 15:6
**seated** [1] - 28:22
**second** [3] - 19:7, 20:13, 80:2
**secret** [1] - 16:25
**secretary** [2] - 37:12, 38:1
**secrets** [1] - 23:20
**secure** [2] - 72:18, 77:5

**security** [1] - 7:24
**see** [19] - 5:22, 13:8, 13:25, 14:1, 14:20, 15:23, 15:24, 16:1, 28:19, 49:5, 56:1, 58:8, 58:23, 59:11, 71:1, 71:11, 71:12, 83:18, 85:22
**seeing** [1] - 13:17
**seek** [2] - 14:4, 41:6
**seem** [3] - 15:19, 48:8, 74:8
**segment** [1] - 14:16
**sell** [1] - 14:5
**sensitive** [4] - 41:11, 64:6, 64:20, 65:4
**sensitivity** [1] - 64:5
**sent** [11] - 16:23, 20:3, 20:12, 20:15, 20:17, 22:21, 33:17, 37:25, 38:13, 65:4, 65:14
**sentencing** [1] - 85:7
**separate** [1] - 9:24
**separated** [1] - 40:10
**September** [5] - 16:24, 46:9, 46:19, 47:8, 72:7
**serious** [1] - 44:13
**service** [12] - 4:22, 12:12, 12:18, 34:18, 42:6, 42:9, 43:11, 60:20, 72:22, 73:4, 76:2, 76:8
**serviced** [2] - 57:16, 57:20
**servicing** [1] - 12:16
**serving** [1] - 7:14
**set** [2] - 8:9, 38:6
**several** [6] - 8:24, 48:3, 49:6, 49:12, 59:15
**share** [2] - 23:13, 32:14
**shared** [4] - 10:14, 13:3, 23:16, 55:2
**shareholder** [1] - 29:14
**shares** [1] - 41:25
**ship** [21] - 10:12, 10:23, 10:25, 11:13, 14:6, 16:2, 29:21, 42:19, 51:18, 51:22, 52:6, 52:8, 52:15, 53:8, 55:12, 55:14, 55:19, 55:20, 55:21, 57:9, 58:1
**shipping** [2] - 4:17, 6:12
**ships** [11] - 15:13, 16:16, 43:14, 43:15,

46:22, 51:23, 52:11, 52:14, 57:21, 76:12, 76:17
**short** [5] - 54:5, 54:14, 55:3, 55:8, 55:11
**short-term** [1] - 55:11
**shorter** [1] - 85:16
**shortly** [2] - 13:5, 13:7
**show** [3] - 14:2, 34:23, 36:13
**showing** [2] - 19:7, 36:16
**side** [1] - 24:9
**sign** [6] - 34:3, 36:4, 62:19, 63:7, 63:10, 82:10
**signal** [1] - 82:12
**signed** [3] - 36:7, 36:9, 36:11
**significant** [3] - 49:23, 55:19, 55:20
**signs** [2] - 14:2, 14:8
**simple** [1] - 51:8
**simply** [2] - 18:10, 76:7
**single** [4] - 10:11, 10:12, 52:15, 77:25
**sitting** [2] - 51:8, 72:20
**situation** [9] - 8:17, 14:11, 29:23, 30:15, 31:18, 42:17, 69:21, 72:3, 83:7
**six** [4] - 6:16, 6:18, 7:16, 54:12
**small** [2] - 7:22, 30:10
**smaller** [2] - 10:25, 14:6
**socially** [1] - 7:12
**sold** [1] - 42:5
**solicit** [2] - 63:5, 63:9
**solution** [2] - 42:13, 44:9
**someone** [6] - 21:22, 47:9, 56:2, 65:4, 68:12, 76:7
**sometimes** [3] - 7:9, 8:24, 62:10
**son** [1] - 49:22
**sooner** [1] - 13:1
**sorry** [7] - 14:5, 34:19, 74:11, 74:17, 76:1, 77:20, 81:9
**sort** [4] - 32:1, 48:5, 52:8, 83:19
**sources** [1] - 79:10
**South** [5] - 1:15, 57:11, 76:9, 78:3, 81:11
**Southern** [1] - 6:7

**sOUTHERN** [1] - 1:2
**Spain** [14] - 4:15, 5:4, 5:18, 5:19, 5:24, 6:7, 6:24, 12:4, 27:16, 28:3, 60:13, 62:6, 63:21, 69:14
**Spanish** [2] - 63:22, 63:24
**SPANISH** [1] - 68:21
**SPEAK** [1] - 68:21
**speaking** [1] - 68:24
**specializing** [1] - 12:23
**specific** [2] - 44:25, 54:11
**specifically** [5] - 13:10, 14:12, 41:2, 65:1, 69:17
**specified** [2] - 54:4, 62:10, 62:11
**speculation** [4] - 18:5, 24:25, 44:15, 46:15
**sped** [1] - 44:7
**spend** [4] - 7:9, 7:12, 25:16, 27:3
**spent** [2] - 17:15, 17:22
**spoken** [6] - 30:7, 78:11, 78:15, 78:17, 78:20, 78:22
**spy** [3] - 15:21, 15:22, 15:23
**staff** [1] - 57:1
**stand** [1] - 75:22
**standby** [1] - 13:24
**standby-by** [1] - 13:24
**standing** [2] - 35:23, 50:15
**start** [9] - 6:12, 10:20, 12:8, 71:1, 80:12, 84:25, 85:5, 85:17, 85:18
**starting** [2] - 12:15, 73:13
**state** [1] - 4:12
**State** [1] - 62:13
**statement** [2] - 58:18, 59:16
**statements** [1] - 58:23
**STATES** [2] - 1:1, 1:9
**States** [3] - 1:17, 8:3, 10:17
**status** [1] - 74:3
**stay** [4] - 31:6, 31:10, 31:20, 69:18
**stayed** [3] - 17:17, 20:5, 69:17
**staying** [2] - 20:6, 20:19
**steer** [1] - 18:6

**step** [1] - 84:21
**steps** [1] - 31:17
**still** [4] - 3:20, 42:15, 68:11, 85:15
**stock** [2] - 5:1, 41:25
**stop** [1] - 26:2
**stopped** [2] - 34:18, 74:8
**stopping** [2] - 28:13, 42:9
**Straits** [1] - 5:19
**strategies** [1] - 72:1
**strategy** [12] - 9:4, 13:2, 13:8, 13:10, 13:11, 82:5, 82:23, 83:1, 83:2, 83:4
**street** [1] - 70:19
**stress** [1] - 76:16
**strike** [3] - 34:2, 57:15, 68:10
**structure** [2] - 13:13, 41:13
**subject** [4] - 14:23, 22:7, 37:1, 60:1
**submit** [5] - 6:14, 41:16, 41:19, 42:20, 43:6
**submitted** [6] - 27:5, 28:10, 42:21, 43:7, 52:13, 52:22
**submitting** [1] - 15:2
**subsequent** [1] - 67:10
**subsequently** [1] - 22:12
**subsidiaries** [1] - 58:23
**subsidiary** [1] - 55:1
**substantially** [1] - 8:17
**substantive** [1] - 36:14
**successful** [4] - 39:16, 43:6, 43:8, 46:11
**successfully** [1] - 61:11
**sued** [1] - 12:1
**suggesting** [1] - 20:23
**suitable** [1] - 16:2
**Suite** [1] - 1:17
**suited** [1] - 42:18
**summer** [1] - 46:10
**SuperFast** [13] - 12:8, 12:18, 12:21, 14:5, 34:18, 42:6, 42:9, 42:19, 44:14, 46:11, 46:12, 72:14, 82:1
**suppose** [1] - 39:22
**supposed** [1] - 57:5

**surprised** [2] - 29:9, 33:20
**suspect** [5] - 33:21, 51:1, 51:3, 51:5, 77:7
**suspicions** [1] - 33:22
**suspicious** [1] - 30:18
**sustain** [1] - 81:18
**Sustained** [2] - 44:16, 47:13
**sustained** [2] - 18:5, 52:3
**switch** [1] - 34:24
**switched** [1] - 9:9
**SWORN** [1] - 4:9
**system** [5] - 9:25, 10:2, 65:2, 65:8, 67:13
**systems** [3] - 9:22, 65:16, 68:5

## T

**tailor** [1] - 42:22
**TAKEN** [2] - 28:21, 58:11
**talks** [1] - 26:10
**technical** [2] - 16:16, 64:12
**ten** [2] - 12:4, 61:17
**tense** [1] - 62:23
**tension** [2] - 29:23, 48:19
**tentative** [1] - 85:4
**tenus** [1] - 36:21
**term** [3] - 54:4, 54:13, 55:11
**terms** [18] - 15:5, 19:21, 20:22, 20:25, 21:1, 21:10, 30:25, 32:21, 39:18, 40:18, 54:22, 55:4, 55:5, 56:5, 56:10, 56:18, 57:3
**Terricabras** [3] - 73:24, 75:2, 83:20
**test** [3] - 15:8, 16:17, 26:22
**testified** [3] - 64:10, 81:24, 82:14
**testifies** [1] - 56:13
**testify** [3] - 23:1, 24:20, 40:10
**testifying** [2] - 4:5, 24:24
**testimony** [5] - 35:11, 35:14, 61:21, 67:11, 74:25
**THE** [119] - 1:8, 1:11, 1:14, 2:25, 3:3, 3:11,

3:14, 3:20, 3:24, 4:4,
17:3, 17:8, 17:9,
18:5, 18:14, 18:18,
18:21, 19:1, 19:5,
19:19, 20:14, 20:17,
20:20, 21:19, 22:1,
22:13, 22:16, 25:2,
25:10, 25:13, 26:2,
26:4, 26:5, 26:15,
26:16, 28:14, 28:16,
28:19, 28:22, 34:25,
35:2, 35:4, 35:5,
35:6, 35:23, 36:23,
37:1, 37:3, 37:21,
37:25, 38:4, 38:9,
38:19, 39:10, 39:19,
39:24, 40:3, 40:7,
40:11, 40:14, 43:17,
43:19, 43:20, 44:16,
46:7, 46:17, 46:18,
47:1, 47:13, 47:19,
49:9, 49:11, 54:19,
54:21, 54:24, 55:3,
55:5, 55:23, 56:1,
56:14, 58:3, 61:24,
61:25, 67:15, 67:19,
67:21, 68:1, 68:2,
68:6, 68:7, 68:11,
68:18, 68:19, 68:22,
69:3, 69:4, 70:22,
71:3, 71:20, 71:23,
71:24, 71:25, 72:4,
72:7, 76:20, 77:2,
80:11, 80:19, 81:18,
81:21, 84:1, 84:3,
84:21, 84:23, 85:1,
85:4, 85:18, 85:20,
85:22
**theme** [1] - 68:23
**thereabouts** [1] -
17:17
**thereafter** [1] - 13:7
**therefore** [3] - 22:25,
24:24, 46:11
**thinking** [3] - 19:1,
34:11, 42:4
**thinks** [1] - 47:15
**third** [2] - 21:14, 51:13
**three** [10] - 17:22,
19:12, 21:13, 32:6,
32:7, 32:8, 32:23,
49:11, 76:22, 77:24
**three-witness** [1] -
76:22
**Thursday** [4] - 3:22,
85:10, 85:14, 85:16
**timeframe** [1] - 72:24
**TO** [1] - 68:21
**today** [10] - 35:1, 38:7,
50:16, 51:8, 57:25,

67:8, 67:9, 67:11,
72:20, 81:14
**together** [11] - 6:20,
17:16, 17:18, 17:22,
25:19, 41:23, 46:1,
47:15, 58:14, 83:9
**tomorrow** [6] - 35:3,
35:7, 85:5, 85:16,
85:18, 85:23
**took** [10] - 11:4, 11:5,
14:20, 24:21, 24:23,
54:8, 74:24, 75:1,
75:21, 82:1
**top** [2] - 8:1, 76:8
**topic** [3] - 10:4, 13:21,
69:23
**topics** [1] - 9:1
**total** [4] - 8:18, 8:19,
8:20, 33:4
**totaled** [1] - 8:19
**touch** [1] - 50:20
**tourists** [1] - 76:9
**traffic** [2] - 11:8, 51:22
**transcription** [1] -
86:4
**transfer** [2] - 32:9,
32:18
**transition** [9] - 27:17,
27:19, 31:7, 31:11,
31:20, 32:3, 32:9,
32:15, 83:8
**transmitting** [1] - 82:7
**transportation** [2] -
4:22, 24:4
**travel** [2] - 11:14,
50:13
**traveled** [4] - 6:20,
6:21, 49:6, 49:12
**traveling** [2] - 65:25,
66:4
**trial** [5] - 17:25, 37:4,
38:25, 60:13, 60:16
**TRIAL** [1] - 1:8
**triangle** [2] - 10:9,
12:20
**tried** [2] - 72:19, 76:16
**trip** [12] - 10:11, 14:16,
15:16, 15:20, 15:25,
17:16, 17:21, 17:24,
25:21, 25:24, 26:3,
82:9
**tripper** [1] - 13:15
**trips** [1] - 7:11
**true** [3] - 17:5, 50:7,
73:19
**trust** [8] - 6:23, 7:6,
29:24, 30:20, 33:4,
34:7, 79:20, 80:2
**trusted** [2] - 81:13,
81:17

**try** [8] - 23:3, 35:8,
41:20, 42:13, 46:10,
58:10, 61:15, 77:5
**trying** [2] - 19:20,
42:22
**turn** [2] - 22:6, 22:7,
83:25
**turned** [1] - 29:3
**two** [17] - 5:21, 7:22,
10:14, 15:13, 16:18,
22:21, 32:6, 32:7,
40:10, 46:24, 48:1,
52:23, 53:6, 56:20,
74:1, 79:18, 79:20
**type** [1] - 21:2
**types** [1] - 63:13
**typical** [1] - 9:16
**typically** [1] - 9:1

# U

**U.S** [2] - 26:24, 63:23
**unaware** [1] - 16:10
**unclear** [1] - 49:10
**uncontested** [1] - 40:1
**under** [12] - 11:10,
23:18, 24:8, 36:20,
36:22, 37:5, 38:2,
39:15, 40:18, 57:4,
59:1, 63:21
**understood** [3] -
38:12, 64:19, 82:16
**undertake** [2] - 45:10,
45:17
**undertaking** [2] - 46:3
**undertook** [1] - 45:14
**unfurnished** [1] -
56:25
**unhappy** [1] - 29:19
**unilaterally** [1] - 16:20
**unit** [1] - 45:23
**UNITED** [1] - 1:1
**uNITED** [1] - 1:9
**United** [3] - 1:17, 8:3,
10:17
**unnecessary** [1] -
66:8
**unsuccessful** [1] -
43:7
**unsustainable** [1] -
13:19
**unwilling** [1] - 49:24
**up** [15] - 3:1, 11:11,
12:14, 12:15, 13:21,
14:15, 23:2, 34:5,
36:23, 44:7, 49:5,
83:11, 85:9, 85:10,
85:13
**up-to-date** [1] - 83:11
**updates** [1] - 75:3

**uploaded** [1] - 9:22
**Utor** [31] - 2:3, 3:8,
3:19, 4:1, 4:7, 4:11,
4:13, 18:6, 18:21,
20:21, 23:6, 25:5,
28:25, 34:25, 37:21,
39:22, 40:18, 47:1,
47:23, 56:1, 58:13,
67:15, 67:22, 68:6,
68:12, 70:22, 80:15,
80:21, 81:20, 81:24,
84:21
**utor** [4] - 40:14, 43:17,
68:15, 72:4
**Utor's** [2] - 3:6, 58:5

# V

**vacation** [1] - 15:20
**valuation** [2] - 37:15,
41:10
**value** [2] - 41:7, 41:14
**various** [5] - 52:14,
71:5, 75:16
**vehicles** [2] - 8:22,
24:5
**Venezuela** [1] - 6:21
**verbally** [1] - 8:10
**vessel** [5] - 12:22,
51:21, 55:17, 56:21,
65:8
**via** [1] - 65:5
**viability** [1] - 6:13
**Vicente** [1] - 61:7
**Victor** [2] - 27:17,
78:20
**villa** [2] - 56:25, 57:1
**vis** [2] - 31:19
**vis-a-vis** [1] - 31:19
**visit** [3] - 15:12, 28:6,
81:25
**visited** [2] - 16:16,
17:14
**visits** [1] - 16:4
**voyages** [1] - 13:16
**vs** [1] - 1:5

# W

**wait** [4] - 55:21, 68:22,
68:23, 82:10
**waiting** [4] - 3:16,
13:25, 46:24, 72:2
**waived** [1] - 33:18
**walked** [3] - 48:4,
48:6, 48:22
**watching** [1] - 14:17
**ways** [1] - 50:10
**weakness** [1] - 14:2
**Wednesday** [3] - 3:23,

85:8
**week** [5] - 3:21, 8:24,
32:13, 34:25, 60:13
**weeks** [1] - 47:6
**welfare** [1] - 7:24
**whatsoever** [1] - 39:1
**whereby** [6] - 62:9,
63:5, 63:9, 63:12,
63:18, 64:1
**wherewithal** [1] -
45:10
**whole** [2] - 11:19,
29:15
**wife** [1] - 7:8
**WILLIAMS** [1] - 1:8
**wish** [1] - 83:23
**withdraw** [3] - 24:2,
54:20, 67:20
**withdrawal** [1] - 67:23
**withdrew** [1] - 42:19
**WITNESS** [23] - 4:9,
17:9, 26:4, 26:16,
35:5, 37:25, 43:19,
46:18, 49:11, 54:24,
55:5, 61:25, 67:19,
68:1, 68:7, 68:18,
68:21, 69:3, 71:3,
71:23, 71:25, 72:7,
84:22
**witness** [11] - 2:25,
4:6, 22:20, 22:25,
24:20, 24:23, 34:24,
35:2, 76:22, 76:25,
84:25
**words** [1] - 18:17
**World** [8] - 15:9,
15:17, 60:7, 60:11,
60:21, 61:19, 78:13,
78:18
**world** [1] - 66:9
**worthy** [1] - 7:2
**writing** [1] - 62:14
**written** [1] - 63:12

# Y

**year** [8] - 13:20, 29:21,
48:15, 54:12, 57:5,
57:19, 58:2, 58:18
**years** [11] - 6:16, 6:18,
6:24, 7:16, 30:9,
32:1, 46:12, 46:25,
49:11, 54:5, 75:5